PAGES:   86
EXHIBITS:  2
VOLUME:   I

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

C.A. No. 03-12477JLA

***************************×**********

RUSSELL F. SHEEHAN as he is
ADMINISTRATOR, ELECTRICAL WORKERS'
HEALTH and WELFARE FUND, LOCAL 103
IBEW, et al
        Plaintiffs

vs.

RICHARDSON ELECTRIC, INC.
        Defendant/Plaintiffs-in-Counterclaim

and
BANK OF NEW HAMPSHIRE
        Defendant

***************************×**********

        DEPOSITION OF VAUGHAN RICHARDSON, a witness
called on behalf of the Plaintiffs, pursuant to the
Massachusetts Rules of Civil Procedure, before Gail A.
Carignan, Professional Shorthand Reporter and Notary
Public, within and for the Commonwealth of Massachusetts,
at the Law Offices of Segal, Roitman & Coleman,
11 Beacon Street, Boston, Massachusetts, commencing at
11:51 a.m. on Wednesday, June 29, 2005.

1

                  I N D E X

DEPONENT                                    PAGE

Vaughan Richardson

DIRECT EXAMINATION BY MR. SILLS


                  E X H I B I T S

NUMBER                                    MARKED

1  Document entitled "Agreement"          23

2  Document entitled "Agreement"          25

         (Exhibits enclosed with transcript.)

3

                  A P P E A R A N C E S

LYNCH BREWER HOFFMAN & FINK
by Alan R. Hoffman, Esq.
100 Federal Street
Boston, Massachusetts 02110
617.951.0800
        On behalf of Richardson Electric

SEGAL ROITMAN & COLEMAN
by Anne R. Sills, Esq.
   Ira Sills, Esq.
11 Beacon Street, Suite 500
Boston, Massachusetts 02109
617.742.0208
        On behalf of IBEW, Local 103

Also present:
Gregory A. Geiman, Esq.

Richard Gambino

2

                  P R O C E E D I N G S

        MR. SILLS:  I assume this is subject to
the normal stipulations we've had with other
witnesses?
        MR. HOFFMAN:  Yes.

        VAUGHAN RICHARDSON,
having been satisfactorily identified by the
production of his driver's license, and duly sworn
by the Notary Public, was examined and testified as
follows:

                  DIRECT EXAMINATION
BY MR. SILLS:
Q.  Vaughan, can you first state your full name for the
    record.
A.  Vaughan Alfred Richardson II.
Q.  Okay.  At some point, did you become a licensed
    electrician?
A.  Yes, sir.
Q.  And when was that?
A.  Oh, my God.
Q.  You don't have to give us the exact year and date,

4

1    but as best as you can recall.

2  A.  Let me see.  It was somewhere around '85.

3  Q.  Okay.  And were you licensed in what state?

4  A.  Massachusetts.

5  Q.  And have you ever worked for any other electrical

6      contractors, besides Richardson Electric?

7  A.  No.

8  Q.  And when did you begin working with Richardson

9      Electric?

10 A.  1980.

11 Q.  And in 1980, was the company located in Waltham,

12     Massachusetts?

13 A.  Yes, it was.

14 Q.  And was it a family business, owned by your family?

15 A.  Yes, sir.

16 Q.  Okay.  And --

17 A.  Well, actually, it was owned by two different

18     families, but it was a family business.

19 Q.  Okay.  And the two different families were?

20 A.  My uncle and my father.

21 Q.  And your uncle's name was what?

22 A.  David Davidson.

23 Q.  And your father is?

24 A.  Gerald Richardson.

5

1  Q.  Okay.  And in 1980, in what capacity or what job did

2      you join the company in when you first started

3      there?

4  A.  Well, I did many general things.  I did some

5      estimating.  I did some project management work, a

6      lot of different aspects of the business.

7  Q.  Did you start out in a management or a supervisory

8      position right away in 1980, or did you start as a

9      journeyman electrician?

10 A.  No.  I wasn't in a supervisory position, and I

11     wasn't a journeyman.

12 Q.  Okay.  What were you?

13 A.  I was just a worker.  I just worked at the company.

14     I reported to a number of different people.

15 Q.  And did your duties change from 1980 at some point,

16     or did they remain the same?

17 A.  Oh, yes.  They've changed a great deal over the

18     years.

19 Q.  Okay.  When did you take on a different role than

20     the one you started with?

21 A.  It was constantly involving what they had me do.

22 Q.  Okay.  How old were you in 1980 when you started

23     working with the company?

24 A.  22 years old -- 22, 23 years old.  I had to think

6

1  Q.  back and do the math.

2  Q.  Okay.  And during your early years with the company

3      in the 1980s, was the company a Local 103 signatory

4      contractor?

5  A.  Yes, it was.

6  Q.  And did it have a long history of working under

7      Local 103 contracts, going back to as early as the

8      turn of the century?

9  A.  I don't know.  By the "turn of the century," do you

10     mean, like, 1900?

11 Q.  Yeah.

12 A.  No, I don't think so.  I think they became a union

13     contractor sometime in the '50s or '60s.  I don't

14     recall.

15 Q.  Okay.  And when you first started with the company,

16     who was running it, who was in charge?  Was it your

17     dad?

18 A.  My father and Dave Davidson.

19 Q.  Okay.  Your dad's name is?

20 A.  Gerald Richardson.

21 Q.  And at some point, did you become president of the

22     company?

23 A.  Yes.

24 Q.  When was that?

7

1  A.  I don't recall.

2  Q.  Can you make your best estimate, approximately what

3      year.

4  A.  Sometime in the -- probably the early '90s, I'm

5      going to say.  Maybe late '80s.  I'm not sure.

6  Q.  And did you take over as president when your dad

7      stepped down as president?

8  A.  My dad was never president of the company.

9  Q.  What was his position?

10 A.  He was treasurer of the company.

11 Q.  Was he, in the late '80s, the main person running

12     the company?

13 A.  No.  Dave Davidson and Gerald Richardson ran the

14     company together.  They also had Bruce Atkinson who

15     functioned as an outside superintendent.

16 Q.  Okay.  When did your dad retire?

17 A.  My father has not retired.  Well, my father tried

18     retirement for about three months.  And then he

19     comes in, and he does consulting work when we ask

20     him to, or he just travels around to jobs and sees

21     what's happening and gives his opinion, whether it's

22     wanted or not.

23 Q.  Okay.  And did Mr. Davidson retire at some point?

24 A.  Dave left the company sometime in the early '90s.

8

1 Q.  Okay.  And when you took over as president, what
2     were your duties?
3 A.  Day-to-day management of the company.
4 Q.  Were you the chief executive officer of the company?
5 A.  Yes.
6 Q.  Okay.
7 A.  I'm sorry.  No.  I was chief operating officer.
8 Q.  And did the company maintain, in the early '80s and
9     through the '90s, it's relationship with Local 103?
10 A.  I believe so.
11 Q.  And the company remained signatory to Local 103
12     agreements during that period of time?
13 A.  I believe so.
14 Q.  Okay.  And did you have a role in dealing with Local
15     103 when union issues came up when you were
16     president?
17 A.  Yes.
18 Q.  Okay.  And deal with various different business
19     agents and business managers during the course of
20     your responsibilities as president of the company?
21 A.  Yes.
22 Q.  And when was the last date you served as president
23     of the company?  Approximately, if you don't
24     remember the exact date.

9

1 A.  I would say four years ago.
2 Q.  We're at 2005, so that would be 2001?
3 A.  Yeah.  2001, sometime, yeah.
4 Q.  And prior to 2001, did the company relocate its
5     facilities at some point?
6 A.  Yes.
7 Q.  You were originally in Waltham, Massachusetts?
8 A.  Yes.
9 Q.  And you moved to Seabrook, New Hampshire?
10 A.  Yes.
11 Q.  And when was that, if you recall?
12 A.  Sometime in the '90s.  I don't recall exactly.
13 Q.  And why did the company do that, if you recall?
14 A.  We were hemmed in with — our location in Waltham
15     was pinned in on four sides, and there was really
16     not much room for us to expand.  Taxes were
17     outrageous where we were located.  It was difficult
18     to get in and out of Boston from where we were
19     located.  Our work was all over New England, and
20     Seabrook was just a nice fit.  We were looking along
21     the northern edge of Massachusetts or the southern
22     edge of New Hampshire, and Seabrook seemed to fill
23     the bill.
24 Q.  And does Richardson Electric — is it known

10

1     professionally in the electrical contracting field
2     for any particular area of specialization and the
3     work you do?
4 A.  Water and wastewater.
5 Q.  Water and wastewater treatment facilities?
6 A.  Yup.  Pumping stations, treatment facilities.
7 Q.  And is it fair to state that during the '80s and
8     '90s, a lot of municipalities and regional
9     facilities had to upgrade and modernize or build new
10     facilities because of stricter requirements of the
11     federal and state environmental laws?
12 A.  I don't know the answer to that question.  I know
13     they build them.  They're building them all the
14     time, but I don't know why they'd be motivated to
15     build them, other than maybe they wore out or —
16 Q.  Okay.  But that's your company's specialty?
17 A.  Yes, sir.  It's one of the specialties.
18 Q.  Okay.  And after 2001, how did your responsibilities
19     change for the company when you stopped being
20     president?
21 A.  I started doing work in the field, started doing
22     more direct project management.  I do some
23     estimating now.  I'll do a lot of layout for work,
24     take a set plans, mark out exactly what I want to

11

1     have done, and give it to a journeyman to install.
2 Q.  And do you have a — I take it you still have an
3     ownership and interest in the company, even though
4     you're not president?
5 A.  No, sir.
6 Q.  Who owns the company?
7 A.  My wife owns one-third of the — owns two-thirds of
8     the company.
9 Q.  Your wife owns one-third of the —
10 A.  No.  She owns two-thirds of the company.
11 Q.  And who owns the rest of it?
12 A.  The other third of the company is owned by my
13     mother.
14 Q.  Why does your wife own two-thirds and not yourself?
15 A.  She owns the stock.  It's not in my name.
16 Q.  I understand that.  My question is:  Why did you as
17     a family decide to have her own the stock and not
18     have it in your name, since it was your father's
19     business and other people's business, and it came
20     down through your family for many decades?  Is there
21     a business reason why you allow her to own the
22     stock, instead of yourself?
23 A.  She took over the position as president of the
24     company, and she has control and ownership and

12

1  direction of the company. I think most of it was
2  determined because I wasn't doing an adequate job to
3  manage the company.
4  Q.  Okay. Is that why you left the position of
5      president? You didn't feel that that was your best
6      assignment, if you will, within the company?
7  A.  Yup. That's correct.
8  Q.  And did Linda Richardson, who's your wife, take over
9      as president as soon as you left that position, or
10     did somebody else step in?
11  A.  She was doing the duties of president before --
12      before the -- she was doing some of the duties of
13      president before I officially gave up the title.
14      She has a management and marketing degree from the
15      University of Maine.
16  Q.  Okay. And do all the profits from this company come
17      to your family, either to you or your wife, your
18      immediate family?
19  A.  It's a corporation. The profits are the company's.
20      I'm not sure I understand.
21  Q.  Well, do the profits get distributed at the end of
22      the year?
23  A.  That's a good question. I do not know.
24  Q.  Other than your wife and your mother, there's no

13

1  other owners who are entitled to the profits of this
2  company; is that right?
3  A.  I -- I assume so. Well, I don't know. There may be
4      agreements that someone gets a bonus based on
5      profits of the company. I'm not privy to that.
6  Q.  Okay. I take it you and your wife discuss the
7      company and how to make it better, as husband and
8      wife?
9  A.  I get a lot of direction.
10  Q.  Okay. But you have some input, too, I take it;
11      right?
12  A.  With regard to, like, estimate -- or how to get
13      something done. You mean, if we're talking about
14      how to physically build something, I have an
15      engineering degree.
16  Q.  Right.
17  A.  I have input to those sort of things.
18  Q.  And where did you get your engineering degree from?
19  A.  University of Maine.
20  Q.  And what degree is that?
21  A.  Electrical engineering.
22  Q.  I mean, is it a Bachelor of Science or --
23  A.  It's a Bachelor of Science, electrical engineering.
24  Q.  So you would characterize your strength as kind of

14

1  hands-on oversight, simply laying out the jobs,
2  estimating, bidding, and making sure the jobs
3  operate as effectively as possible. Is that fair?
4  A.  My strengths lie in laying out the work, figuring
5      out what needs to be physically done to make
6      something happen.
7  Q.  Okay. And within the company, what is your job
8      title, if you have one?
9  A.  Probably, right now, my title would be project
10      manager, estimator project manager.
11  Q.  You say "probably." You're not sure?
12  A.  We really don't -- I mean, I really don't have a
13      title at the company.
14  Q.  Okay. And how are you paid? Are you paid a salary?
15  A.  I'm paid hourly. I have hourly with benefits. I
16      have vacations and holidays and stuff like that.
17  Q.  Do you get paid overtime if your work over 40 hours?
18  A.  No, I don't.
19  Q.  Let's talk about your current role. Do you -- in
20      helping to lay out jobs and the other aspects of the
21      jobs that you're involved with on a -- sort of on
22      the one-site basis, do you have an opportunity to
23      work with the journeymen electricians who work for
24      Richardson Electric and apprentices?

15

1  A.  On occasion.
2  Q.  Okay. And what's your role with regard to those
3      folks? Do you advise them, assist them, direct
4      them -- things like that?
5  A.  It depends on the job. Sometimes I'll just come in
6      and give -- give -- if we're fixing some variable
7      frequency drives, I may come in and do some
8      troubleshooting and tweaking to make it work. If
9      they're just putting pipe in the ground, you know,
10      I'll come in and lay things out, as far as, you
11      know, what size pipes have got to go where, what
12      size wires and that stuff and give someone a sketch
13      and then walk off. I mean, if we're pulling wire
14      one day, and there's an extra body needed, I'll hop
15      in and pull wire.
16  Q.  Okay. And do you have authority to determine how
17      many men are needed on a particular job and when to
18      reassign somebody to another job as the work slows
19      down or --
20  A.  Not normally.
21  Q.  Who does that?
22  A.  That's usually done by the foreman on the job or
23      Craig Cole -- I shouldn't say -- it's usually done
24      by Craig Cole. If someone thinks they need more

16

1   people, they'll go to Craig, and Craig will make a
2   determination on that.
3   Q.   And what's his title?
4   A.   His title is Operations Manager.
5   Q.   And do you have a regular foreman who works most of
6        your jobs?
7   A.   We have a number of foremen.
8   Q.   Who are they?
9   A.   Oh, God.  Troy Perault, Mike Merrill, Peter Eastman,
10       Josh Knight, George -- I believe his last name is
11       Smith.  He's up in Auburn, Maine.  Phil Plante.
12       That's all the ones I can think of off the top of my
13       head.
14  Q.   Are these gentlemen, when they work for Richardson
15       Electric, always foremen when they are assigned to a
16       job?
17  A.   I don't know.
18  Q.   But they are sometimes, obviously?
19  A.   They run projects.  I'm assuming they're foremen.
20  Q.   Okay.
21  A.   But I don't know -- I really don't know their rates
22       of pay, but I guess that with most of them, it's
23       foremen pay.
24  Q.   And are all the individuals that you just described

17

1   affiliated with an IBEW local, if you know?
2   A.   I believe so, yeah.
3   Q.   And are they all affiliated with a New Hampshire
4        local, except for Mr. Smith?  Maybe Mr. Smith is, as
5        well, I'm not sure.  It's Local 490, I believe.
6   A.   I'm not positive.  I think so.
7   Q.   Okay.  And none of them are Local 103 members, are
8        they?
9   A.   Not to my knowledge.
10  Q.   And who are -- there are a few names.  See if you
11       can help me.  Who's Neil Werfel?  W-E-R-F-E-L.
12  A.   He was a mechanic who worked for the company.
13  Q.   Was he a Local 490 mechanic?  That's a New Hampshire
14       local.
15  A.   I think so.  I'm not positive.  I think so.
16  Q.   And Troy Perault, you mentioned?
17  A.   Mm-hmm.
18  Q.   And Peter Eastman, you mentioned?
19  A.   Mm-hmm.
20  Q.   Who is Rebecca O'Neil?
21  A.   I have no idea.
22  Q.   Who's Kenneth Gowen, if you know?  G-O-W-E-N.
23  A.   Ken Gowen was a journeyman at Local 490.  He's
24       retired now.  Did do you mean Junior or Senior?  I

18

1   know there's two of them.  I don't know what Junior
2   is doing.
3   Q.   I think it's Senior.
4   A.   Senior.  He was -- he was a Local 490 electrician.
5        He retired a year or so ago.
6   Q.   Okay.  And I think you mentioned Phillip Plante --
7   A.   Yup.
8   Q.   -- as one of the people who served as a foreman.
9        And Mike Merrill, you mentioned --
10  A.   Mm-hmm.
11  Q.   -- also, as somebody who served as a foreman?
12  A.   Mm-hmm.
13  Q.   Do you know who Jerry Dufour, D-U-F-O-U-R, I
14       believe, is the spelling --
15  A.   He's my brother-in-law.
16  Q.   Other than your brother-in-law, does he work on the
17       job as an electrician?
18  A.   He does on occasion.  He's in the office right now.
19  Q.   And when he's not in the office, has he ever worked
20       as an electrician?
21  A.   Yes.
22  Q.   Is he a journeyman or an apprentice, if you know?
23  A.   Journeyman.
24  Q.   And what local is he affiliated with?

19

1   A.   Local 490.
2   Q.   You say he's your brother-in-law?
3   A.   Mm-hmm.
4   Q.   He's married to whom in your family?
5   A.   My sister.
6   Q.   And is she affiliated with the company?
7   A.   Nope.
8   Q.   And do you know who Alan Cole is?
9   A.   He was a mechanic that worked for the company for a
10       number of years.  He's retired now.  He lives in
11       Florida.
12  Q.   Was he a member of Local 490?
13  A.   Yup.
14  Q.   Is he related to Craig Cole?
15  A.   Nope.  Well, he may be, but I don't -- not -- if it
16       is, it's a distant relationship.
17  Q.   Okay.  And to your knowledge, does Richardson
18       Electric -- is it currently signatory to a
19       collective bargaining agreement with Local 103,
20       IBEW?
21  A.   I believe so, yup.
22  Q.   And were you involved in the dealing with the issues
23       of clarifying the company's contract status with
24       Local 103 when Mr. Gambino was -- Rich Gambino was

20

1      business manager of Local 103?

2  A.  Yes.

3  Q.  Okay. And I take it, a question was raised at some

4      point about whether Richardson Electric had a

5      contract with Local 103, and you became involved in

6      trying to negotiate a contract with Joseph Sheehan

7      on behalf of Local 103; is that correct?

8  A.  I don't remember whether it was with Joe or not, but

9      yeah. I was involved in negotiating the last --

10     negotiating an agreement in -- I think it was either

11     2000 or 2001. I don't recall which year.

12 Q.  Okay. Well, there are really -- there's two

13     documents we've -- I've looked at, and see if this

14     refreshes your recollection without looking at the

15     documents first.

16         It appears that after some discussions

17     back and forth between Local 103 and yourself on

18     behalf of Richardson Electric in about the year 2000

19     that the company entered into an agreement in 2000

20     for the 1997 to 2000 collective bargaining agreement

21     and that you signed that agreement. Does that

22     refresh your memory.

23 A.  I don't recall. If I could see the document, I may

24     be some help, but I don't recall.

                                                    21

1  Q.  Okay. Do you recall that the company, in

2      discussions with Joseph Sheehan and, actually, one

3      of the attorneys from this office, Donald Segal,

4      that you, on behalf of Richardson Electric back in

5      2000 raised an issue about not wanting to be subject

6      to the NECA dispute resolution procedure known as

7      the "Joint Conference," in that there were some

8      concerns the company had about being subject to that

9      part of the process and that you expressed that to

10     103; is that --

11 A.  Our -- our main concern at the time, and I think

12     still is today, is we don't want to be bound by what

13     NECA does. We would like to be -- we would like to

14     have -- be able to make our own decisions. We don't

15     want NECA unilaterally making decisions for us

16     because we don't feel that they reasonably represent

17     us.

18 Q.  Right. And one of the issues that came up in that

19     negotiation in the 2000 agreement was that you

20     didn't want NECA to be able to resolve differences

21     between you and the union through their joint

22     conference process, you went through your own

23     process; is that right?

24 A.  That's what happened. That was the resolution that,

                                                    22

1      I believe, the attorney offered. He said that's

2      something they could do. I think they had done it

3      with other -- other contractors had had

4      that -- had had that provision in their agreements.

5      I don't remember who it was at the time.

6  Q.  Okay. And your dad had been a long active member of

7      NECA prior to 2000? He had been the head of NECA at

8      some point?

9  A.  Yeah. Way, way back.

10 Q.  Way back. Okay.

11 A.  Yeah.

12 Q.  And so I want to show you, and maybe this will help.

13         MR. SILLS: Can I have this marked as

14     Exhibit 1.

15         (Exhibit No. 1 marked for identification.)

16 Q.  I want you to review this document. It's two pages

17     and it's entitled "Agreement."

18         (Brief pause)

19 A.  Yes, sir.

20 Q.  And looking at the second page, is that your

21     signature under "Richardson Electric" where it says

22     "Vaughan Richardson," right above the name "Vaughan

23     Richardson"?

24 A.  Yes. It looks like my signature.

                                                    23

1  Q.  Okay. And your signature, right under your

2      signature, it's dated 5/18/2000 and says -- your

3      name written out with the word "Title" as

4      "Director."

5  A.  Yes, sir.

6  Q.  Is that your handwriting?

7  A.  Yes. It looks like it.

8  Q.  Okay. Did you sign this document?

9  A.  Yes.

10 Q.  Okay. And when you signed this document, is there a

11     reason that you listed yourself as "Director" and

12     not president of the company?

13 A.  I don't recall why.

14 Q.  Okay. And on the top part of the page, Page 2,

15     there's a reference to substitution of that for

16     another section of the IBEW contract, substituting

17     the -- I think the American Arbitration Association

18     to resolve disputes. Is this the provision that we

19     discussed earlier that substituted a different

20     dispute resolution mechanism for joint conference?

21 A.  Yup.

22 Q.  Okay. And that was something that the company asked

23     for and even agreed to?

24 A.  If I recall correctly, I think it was something the

                                                    24

1    attorney suggested because we told him that that was
2    one of our problems, was the -- was the joint
3    conference.
4 Q. So it was proposed by the union's attorney as a
5    resolution to your objection to the joint
6    conference?
7 A. I think so, but I'm not positive.
8 Q. Okay. And this agreement when into effect; did it
9    not?
10 A. Yup.
11 Q. I'm drawing your attention to the third paragraph of
12    the first page. The agreement became effective on
13    the 1st day of September, 1997; is that right?
14 A. Yes.
15 Q. Okay.
16 A. Am I done with this?
17 Q. Yeah. You can give it back to the reporter. Thank
18    you very much.
19      I want to show you -- well, first I'm
20    going to have it marked, if you'll be patient with
21    me.
22      MR. SILLS: Another document that I'd like
23    to have marked as Exhibit 2, if the reporter can
24    please mark it for me.

25

1      (Exhibit No. 2 marked for identification.)
2 Q. I want you to review this document, which is marked
3    "Agreement," and it's very similar to the document
4    you've looked at. One of the differences is, as
5    I'll point out to you as you review it, is the third
6    paragraph of the first page, which has a different
7    start date for the agreement.
8      And then the other apparent difference, at
9    least to me, is the signature dates for both your
10    signature and Mr. Gambino's. But you can review it
11    yourself and see if that's --
12 A. It appears to be the same document, except for those
13    dates you're saying.
14 Q. Okay. And with regard to Exhibit 2, on the bottom
15    left-hand section or middle-left section of the
16    second page --
17 A. Mm-hmm.
18 Q. -- is that your signature, Vaughan?
19 A. It looks like my signature. I mean, I assume it's
20    my signature. I don't have any reason to think it's
21    not.
22 Q. Okay. And this is dated May 7, 2001. Did you sign
23    this document?
24 A. It appears so, yup.

26

1 Q. I know it appears so, but --
2 A. I don't recall. I mean, I would -- I would accept
3    that this is a document I signed. I don't recall
4    signing it.
5 Q. Okay. So this document on its face subjects the
6    Local 103 and Richardson Electric to become
7    signatory together to the 103 agreement from
8    September 2000 going forward, subject to the changes
9    in the arbitration provision.
10      Did your company agree to that, this
11    agreement?
12 A. I'm sorry?
13 Q. Did your company agree to this agreement by your
14    signature?
15 A. Yup. Well, no. It goes back to the directors. I
16    mean, I signed on behalf of the company, but it goes
17    back to the board of directors, and the board of
18    directors approves it.
19 Q. And they did approve this; did they not?
20 A. Yeah. There was a letter, I believe, with one of
21    these that the attorney wrote up that just said that
22    if within seven days, the board has not said that
23    they don't accept it, then it goes into effect. And
24    then we agreed to that.

27

1 Q. That was the 2000 agreement, I believe?
2 A. It was the 2000.
3 Q. Okay. So your company became signatory to the 103
4    agreement from 2000 to 2003 on May 7, '01; is that
5    correct?
6 A. To 2000 -- I'm sorry. Say that again, please.
7 Q. From September 1, 2000 until the end of August 2003,
8    your company became signature --
9 A. Is that when this -- when the 2000 agreement ended?
10 Q. Yeah.
11 A. Okay. Yeah.
12 Q. And after becoming signatory to the agreement, the
13    company, at various times, for work in the
14    jurisdiction of Local 103, employed journeymen
15    electricians and paid them under the Local 103
16    agreement?
17 A. Yup.
18 Q. And at various times between 2000 and 2003, the
19    company not only hired journeymen and paid them
20    under the Local 103 agreement, but also hired
21    apprentices and paid them under the Local 103
22    agreement at various times?
23 A. I assume so. They were working 103 at that time. I
24    don't -- I don't know of any, in particular, but I

28

1    assumed we did.

2  Q. And based on your experience of dealing with Local

3    103 in your various capacities with the company over

4    the years, during the period between 2000 and 2003,

5    approximately — the normal rules under the 103

6    contract required, as I understand it, that when the

7    journeymen worked under 103's jurisdiction, he got

8    paid the 103 wage rates; is that right?

9  A. That is correct.

10 Q. And that rule applied for the journeymen, whether

11   that they were members of Local 103 or whether came

12   from a local somewhere else?

13 A. That's correct.

14 Q. Okay. And between 2000 and 2003, was it your

15   understanding that if the normal rules under the

16   Local 103 agreement required that if you had a

17   apprentice who worked under Local 103's

18   jurisdiction, they would get paid the Local 103 wage

19   rates; is that correct?

20 A. The apprentices usually come to us from Local 103.

21 Q. Okay. And they're under the 103 agreement required

22   to get the 103 wage rates?

23 A. Yup.

24 Q. And the requirement in the collective bargaining

29

1    agreement with Local 103 sets forth specific wage

2    rates for apprentices based on how long they've been

3    in the apprenticeship program?

4  A. Yes.

5  Q. And the less time they've been in the program, the

6    less they make; the more time, the more they make?

7  A. Yes. Just — usually just in their wage package,

8    not in their fringe package. In their fringe

9    package, many of the items are just a fixed rate.

10   So whether you've been in, you know, two years or

11   five years, you get the same, you know, like —

12   like, same payment for like an annuity or something

13   like that.

14 Q. Right. So for the annuity and for the pension and

15   health, those are fixed rates, whether you're an

16   apprentice or a journeyman under Local 103's

17   agreement?

18 A. Yeah. There's several things that are fixed.

19 Q. Okay. And to the extent — to your knowledge, is

20   there anything in the Local 103 agreement that

21   allows you to pay apprentices a different benefit

22   rate if the apprentices come from a local, other

23   than Local 103, but are working in, let's say,

24   eastern Massachusetts in 103's jurisdiction?

30

1    Anything in their contract that allows —

2  A. Could you say that again?

3  Q. Is there anything in the Local 103 agreement that

4    you're familiar with that allows you to pay a

5    different benefit rate for apprentices if the

6    apprentices happen to come from a different local,

7    assuming they are working in Local 103's

8    jurisdiction, let's say, eastern Massachusetts?

9  A. Well, not so much just for apprentices that are from

10   out of town, but they can get a different package.

11   The union gives out a different package for a job,

12   yeah.

13 Q. My question isn't what the union can do. My

14   questions is: Is there anything in the Local 103

15   agreement, in their working agreement, their

16   contract —

17 A. Yes.

18 Q. — that allows for a different fringe benefit

19   contribution rate for apprentices who work in 103's

20   jurisdiction, but are members of a different local?

21 A. Yes.

22 Q. And what part of the agreement allows that?

23 A. I believe it's the targeting part of the agreement.

24   And I'm not sure if that's the agreement or if

31

1    that's a memorandum of understanding, and there's

2    also the market recovery that would allow you to do

3    it differently.

4  Q. So if there's a — you mean, if the market recovery

5    approves funding, the rate doesn't change. The

6    union just helps fund the fringe benefit cost, but

7    the fringe benefit costs are exactly the same, it's

8    just that the union subsidizes a contractor?

9  A. For market recovery, it could be that. They could

10   also come in and say, we want this job. We're going

11   to give you some market recovery, but we're also

12   going to — you know, the annuity's not going to be

13   a dollar, it's going to be seventy-five cents.

14 Q. Okay. And that was something the union did before

15   the market recovery fund was set up; isn't that

16   correct?

17 A. I think it's still in the agreement. I'm not

18   positive. I think it's still in the agreement;

19   isn't it? Targeting?

20 Q. And who has the approval or the right to approve job

21   targeting concession, if that's what you're calling

22   it?

23 A. It usually comes under the business manager's

24   office.

32

1  Q.  When it applied for market recovery funds, at some
2      point when the company was awarded that job, it
3      sought to access those funds?
4  A.  Yup.
5  Q.  Because the company believed it had been approved
6      for those funds?
7  A.  Yup.
8  Q.  I believe it was in 1999 or thereabouts?
9  A.  Somewhere around there, yeah.
10 Q.  And then a -- and you knew when you sought to access
11     those funds in 2001 or thereabouts -- I believe is
12     when the job became active, when you were awarded
13     it -- and you sought to access those funds that in
14     order to be entitled to those funds, you had to be a
15     signatory to 103's agreement to get the market
16     recovery funds?
17 A.  I assume so.  I don't know.
18 Q.  Okay.  And you were not claiming in 2001 or 2002
19     that the company wasn't signatory to a 103
20     agreement.  That was not an issue, was it?
21 A.  Nope.
22 Q.  Okay.  There was an issue, though, and dispute where
23     the administrator of the Local 103 funds challenged
24     or questioned, I guess, for lack of a better term,
                                                        37

1      the company's entitlement to market recovery funds
2      on the water treatment job?
3  A.  Yeah.  What happened was, we started --
4  Q.  We're going to get there.
5  A.  Okay.
6  Q.  And there was -- putting aside the specific merits
7      of --
8  A.  I don't think he challenged it.  I don't think he
9      challenged -- he told us six months after we'd --
10     we'd been filing reports for six or seven months on
11     the job, and they'd been getting market recovery.
12     Then he told us, "Wait a second.  The job you're
13     getting market recovery on was never approved."
14 Q.  Right.
15 A.  So we sent forms into him to say, "Well, here's the
16     letter we got that was approving it."  And he said,
17     "Yeah, but it was never activated."  And we said,
18     "Well, wait a second.  We've been sending forms in,
19     and you've been giving us market recovery for, you
20     know, seven months on it.  How is it all of a sudden
21     now that it's not market recovery?"  That's what
22     essentially happened.
23 Q.  Okay.  I don't want to get too involved in that
24     dispute because it's not really necessarily relevant
                                                        38

1      to this case.
2          But at the end of day, after money was
3      awarded, the fund administrator took the position --
4      I'm not going to say who's right or wrong.  We'll
5      leave that for another day -- in this particular
6      dialogue, but he said, "We made a mistake.  You
7      shouldn't have gotten that money."  He claimed that
8      the -- I believe that the letter he sent you expired
9      in 60 days; and therefore, the accessing of the job
10     was inappropriate because you were supposed to tell
11     the funds in 60 days, and the job wasn't awarded
12     until, I think, later than 60 days; right?
13 A.  I don't recall.
14 Q.  Okay.  You don't recall.  And at some point, is it
15     fair to state that because you were having problems
16     resolving the market recovery money issue with
17     Mr. Sheehan, the fund administrator, you sought the
18     assistance of Richard Gambino to see if he could
19     intercede and help straighten this situation out?
20 A.  Yeah.  I believe we spoke to Richard on it.
21 Q.  And did Richie, at one point, take you and Barbara
22     Wade up to the fund offices to meet with the fund
23     staff to try to iron out the differences?
24 A.  Yeah.  I don't recall it was there, but I remember
                                                        39

1      going -- I remember going to a funds meeting and --
2      and trying to get that corrected.
3  Q.  And after Rich Gambino got involved, did you
4      successfully obtain that market recovery for that
5      water treatment job with the funds, the market
6      recovery funds for that water treatment job?
7  A.  Yes and no.
8  Q.  Yes and no.  Tell me the "yes" part first.
9  A.  The yes part was the part that they'd already paid
10     out for that period of time, they said you could
11     keep.  The part that hadn't been paid out on, they
12     said you have to pay us benefits on that.
13         And I believe I brought that back to the
14     office, and we talked about it there, and just said,
15     "Look.  At the amount of money we're talking about
16     it's not worth having an argument, so let's just pay
17     it and move on."
18 Q.  And do you recall, Vaughan, what portion of that job
19     was completed at that point, what percentage of the
20     job approximately was done --
21 A.  No, I don't.
22 Q.  -- when you had gotten market recovery and what part
23     wasn't?
24 A.  No.  I don't recall.
                                                        40

1  Q.  And this Lawrence Water Treatment job is the
2      underlying work site where this dispute about
3      delinquent funds came from?  It's the basis for this
4      lawsuit; isn't it?
5  A.  No.
6  Q.  It's the other site?
7  A.  No, no, no.  That all started -- this all started
8      way back before the Lawrence Water Treatment plant.
9      It started back with the Veteran's Administration.
10     One of the business agents gave us a special rate
11     for the project because they wanted to take it away
12     from a nonunion company.  And we started that
13     project, but the -- we had a total dollars that we
14     knew the package had to beat, but we didn't know how
15     it was going to be broken up.  We knew what the wage
16     rate was going to be and that there was a certain
17     number of dollars left over for --
18 Q.  But the audit that took place that resulted in this
19     lawsuit was against your company from the Local 103
20     funds is not based on the Veteran's job, is it?
21 A.  I don't know.  There were slews of things the
22     auditor found.  I mean, he found hundreds upon
23     hundreds upon hundreds of thousands of dollars, he
24     said, I believe.  At least, that's what I heard

41

1      around the office.
2  Q.  Okay.  So you don't really know what the basis for
3      the lawsuit is, whether it involves the Veteran's
4      job or some other job.  Is that what you're saying?
5  A.  I think the Veteran's job is closed, but that's
6      where the problem started with the administrator.
7  Q.  Okay.  Let's focus on the Lawrence job for the
8      moment.  I'm not asking where it started --
9  A.  Okay.
10 Q.  -- sort of where the current outstanding dispute is.
11     Some things, you successfully worked out with the
12     intercession of Mr. Gambino or Barbara Wade or
13     others have resolved as much as they could.
14 A.  Okay.
15 Q.  And I'm trying to focus on not what's been
16     successfully resolved, which is fabulous, but we're
17     trying to work on the things that aren't resolved.
18     Otherwise, we wouldn't have all these lawyers in the
19     room, costing everybody a lot of money.  So let's
20     try to focus on what your understanding is of the
21     current dispute with the company since you were
22     involved in this dispute back when it took place.
23         Is it the Lawrence pelletizer job?
24 A.  The only thing I -- and I only know, just from

42

1      listening around the office -- I haven't sat down
2      and specifically gone through the stuff -- is that I
3      think the problem right now is the pelletizer and
4      the apprentice hours on that job.  And I think it's
5      only some of the apprentices.  I'm not sure if it's
6      all or what the story is.
7  Q.  And let's talk about that.  It's fair to state that
8      on the pelletizer job, what happened -- and you
9      correct me if I get it wrong because I'm not an
10     electrician and I'm not -- I don't run a company, so
11     I'm in foreign territory here a little bit, but --
12     and on the pelletizer job, what happened was that
13     the company employed a number of Local 490
14     apprentices; is that correct?
15 A.  Yes.
16 Q.  And the company's contention, I take it, is that
17     there weren't Local 103 apprentices available during
18     the course of this job?
19 A.  No.  The business agent told me that.  He said, "I
20     don't have apprentices for you."  He said, "Bring
21     your own down."  He told me the same thing with
22     journeymen.  He said, "Look it.  If I give you guys
23     out of the hall, they're just going to be travelers,
24     so bring your own travelers."

43

1  Q.  Right.  And so ultimately, what happened on this job
2      was that you ended up employing Local 490
3      apprentices?
4  A.  Mm-hmm.
5  Q.  Was there apprentices from any other locals, besides
6      490?
7  A.  I don't know if we had any 103 guys or not.
8  Q.  Okay.
9  A.  I don't know if -- I'd be guessing if I told you.
10 Q.  Okay.  And your understanding of the Local 103
11     contract, as you previously expressed it to me in
12     this deposition, was that if an outside apprentice
13     from outside of 103 worked, which would include 490
14     apprentices, absent market recovery money or job
15     targeting money, they would have to get paid the
16     Local 103 fringe benefit rate; isn't that right?
17     That's what you testified to earlier.
18 A.  Well then, what you understood me to say was not
19     correct.  If your benefits were paid to Local 103,
20     you would pay them what was in the package.
21         If the benefits weren't paid to Local 103,
22     another benefit fund could mix up additional money.
23     If Local 103's benefit for pension is $5 and I send
24     them $7 for a man's pension, they send $2 back

44

1  because they can't take in an extra two bucks for a
2  particular guy and say that's okay.
3  Q. Does the Local 103 contract require that those
4  apprentices receive their fringe benefit
5  contributions when they work in Massachusetts that
6  those benefits get paid to the Local 103 funds?
7  A. Exclusive -- and not -- not --
8  Q. Yes.
9  A. -- subject to a direction by the business agent --
10  the business manager. If the business manager
11  decides on a project he's not doing something with a
12  particular fund because he wants a job or has some
13  other reason for it, then he can do anything he
14  wants with the -- with the package.
15  Q. Well, the contract doesn't say that, does it?
16  That's your understanding?
17  A. That's my understanding.
18  Q. Okay. And the business manager at the time of this
19  job was Rich Gambino, was it not?
20  A. I don't know when Richie started, if he started --
21  if he was --
22  Q. Approximately '99?
23  A. -- if it started with Richie or if it started with
24  his predecessor. I don't -- I don't know. I don't
                                                    45

1  recall when Richie started.
2  Q. Okay.
3  A. I mean, if you say it was Rick, that's when Richie
4  started, then I'll accept that. I don't have any
5  reason to -- to doubt you.
6  Q. And with regard to the Local 490 apprentices who
7  worked on the Lawrence pelletizer job, they worked
8  for -- there were 490 apprentices who worked on that
9  job; right?
10  A. Yeah.
11  Q. And then -- this was in what year, approximately,
12  when the job started?
13  A. I don't recall.
14  Q. 2001?
15  A. I'd be guessing. I assume somewhere in that time
16  frame. I don't even recall the job number, to be
17  honest with you.
18  Q. Okay. But do --
19  A. Do you know the job number on that job? Our job
20  number on that job? Do you have any records?
21  Q. I can get it for you in a second.
22  A. Okay. Because that would tell me -- that would tell
23  me what year the job started.
24        MR. SILLS: Why don't you see if we can
                                                    46

1  get that -- for me while I'll ask you some other
2  questions.
3  Q. But with regard to your own memory -- okay -- of
4  the -- I want to work with that for a second. On
5  the Lawrence pelletizer job, you knew at the time
6  that that job took place that Gambino was the
7  business manager because you had gone through that
8  negotiation of the agreement with him to get the 103
9  issue straightened out; right?
10  A. Yup.
11  Q. And with regard to the Local 490 apprentices who
12  worked on the pelletizer project at Lawrence, it's
13  fair to state that Rich Gambino did not authorize
14  you to make a fringe benefit contribution through
15  those apprentices into the 490 funds?
16  A. Directly? Are you asking me if Rich --
17  Q. Did Rich Gambino --
18  A. Did Rich Gambino tell me --
19  Q. -- authorize you to do that, to make contributions
20  into the 490 funds?
21  A. Well, I'd have to say through his business agent,
22  yeah.
23  Q. Did he do it?
24  A. Did Rick?
                                                    47

1  Q. Exactly, yes.
2  A. I guess I'm trying to ask for clarification for your
3  question. Are you asking if specifically, did Rich
4  Gambino say to us, "You tried to do this?"
5  Q. Yes.
6  A. The answer to that question is no.
7  Q. Okay. And no -- no business manager of Local 103
8  authorized you to make contributions for the 490
9  apprentices on that pelletizer job into the 490
10  funds?
11  A. There's only --
12  Q. No business manager.
13  A. There's only one business manager, right?
14  Q. Yeah.
15  A. Okay. Richie Gambino did not specifically direct us
16  to do that.
17  Q. And did -- did any other business manager who might
18  have been in place, if you don't think it was Rich,
19  authorize you to do that?
20  A. My understanding is there's one business manager and
21  many business agents. Are you asking about business
22  agents, or are you asking about Rich?
23  Q. I'm asking about any business manager, someone with
24  that title.
                                                    48

1  A.  The only business manager at Local 103 that I'm
2      aware of was Richie, and he did not tell us directly
3      to do that.
4  Q.  Okay. And is it fair to state that the Local 490
5      contract -- are you familiar with the Local 490
6      contract?
7  A.  Somewhat, yeah.
8  Q.  It's fair to state that that 490 contract has a
9      lower-cost fringe benefit contribution for
10     journeymen and apprentices, the same, than the 103
11     contract?
12 A.  Yes. That's correct.
13 Q.  Approximately how much less is it, ballpark?
14 A.  I don't -- now or then?
15 Q.  Why don't you start with "then," if you know.
16 A.  I don't know. I don't recall.
17 Q.  Now?
18 A.  Now? Let me see. I believe there's about 10 or $12
19     in benefits in New Hampshire, and the rate there is
20     about $25 an hour for a journeyman. And in Boston,
21     I have no idea what the rate is. The benefits are
22     probably something on the order of $20, and the
23     rate, I think, is something in the $30 -- 30-plus
24     dollars. I don't recall exactly.
                                              49

1  Q.  So there's always been a gap there, a differential,
2      with the Local 103 rates being substantially higher?
3  A.  In recent times. I don't know going back very far.
4  Q.  But it's known -- I think you're --
5  A.  I understand your question. But for the time I've
6      known it, there's been a difference. To say
7      "significant" is -- is -- now, I think it's a
8      significant number.
9  Q.  Well, it's -- I think one of your other company
10     representatives in this case testified that the
11     Local 103 fringe benefits rates are among the
12     highest in the United States.
13 A.  I don't know that.
14 Q.  I think it was your dad who testified to that.
15     There was only one other local higher.
16 A.  I don't know that.
17 Q.  You don't know that. Okay. But they're higher than
18     490's rates, whatever they are?
19 A.  Yes, they are.
20 Q.  So would it be fair to state that if you were
21     competing against a 103 contractor for bidding on a
22     job, and you can pay 490 fringe benefit rates, and a
23     103 contractor was using 103 apprentices, he'd have
24     higher costs than you; isn't that right?
                                              50

1  A.  If you just -- if you just look at that. If you're
2      looking at the prevailing wage on the job, no,
3      because they'd be same. In fact, it would be more
4      expensive to use 490 guys than it would be to use
5      Local 103.
6  Q.  Well, we'll put aside the prevailing wage for the
7      moment. Okay?
8  A.  Okay. Heads up, yes. It would be cheaper to bring
9      people from New Hampshire to Massachusetts.
10 Q.  Because they have a lower fringe benefit cost?
11 A.  They have a lower wage rate.
12 Q.  Right. And they have a lower wage rate, but you're
13     not allowed to pay the lower wage rate under Local
14     103's agreements, are you? -- when you bring them to
15     Massachusetts.
16 A.  No.
17 Q.  And you're not allowed to pay a lower fringe benefit
18     rate under the Local 103 agreement when you bring
19     them to Massachusetts?
20 A.  Exclusive of those other things we talked about.
21 Q.  Job targeting and labor management cooperation --
22 A.  Yup.
23 Q.  -- trust?
24 A.  Yup.
                                              51

1  Q.  Okay. So -- and one of the things, as you
2      understand it, that Local 103 cares about is having
3      all of its union contractors, whomever they are,
4      including yourself and others, bid on an equal
5      basis?
6  A.  Yup.
7  Q.  And you understand that if the union awards, for
8      example, labor management cooperation trust money on
9      a particular job, it goes to any union contractor
10     who gets that job, not just Richardson?
11 A.  That's right.
12 Q.  So that everybody completes -- competes on a level
13     playing field?
14 A.  Yup. I believe it only goes to the contractors if
15     they apply for it. If you had two contractors who
16     were both bidding a job and one applied for market
17     recovery and the other didn't, I think the only one
18     that gets -- that applies for it gets it, even if
19     that other contractor gets the job, but I don't know
20     that to be the -- to be a fact.
21 Q.  Okay. And in this particular situation, we know --
22     I don't think there's any dispute, as you testified
23     earlier -- that Richardson, in fact, paid the Local
24     490 apprentices on the pelletizer job the 490 fringe
                                              52

**Page 53**

1  benefit package, if you will?
2  A.  That's correct.
3  Q.  And that was less expensive than the 103 package?
4  A.  That's correct.
5  Q.  Okay.  Now, you testified, or you made a comment
6     earlier in your testimony, that the cost advantage
7     deriving from that practice, vis-a-vis a Local 103
8     contractor, would not obtain, so to speak, if it was
9     a prevailing rate job?
10 A.  That's correct.
11 Q.  If it was a prevailing-rate job, what would happen,
12    in your view?
13 A.  You'd end up having to pay the men additional money
14    in their paycheck to offset the lower benefits paid
15    in their home local.
16 Q.  Okay.  And was the Lawrence pelletizer job for a
17    public authority?
18 A.  Yes.
19 Q.  Was it a prevailing-rate job?
20 A.  Yes, it was.
21 Q.  And in that respect, did you do what you just
22    suggested and have to pay the Local 490 folks some
23    amount of extra compensation because of the lower
24    fringe benefit package that you just described that

**Page 54**

1     it obtained for 490 members?
2  A.  Yes, we did.
3  Q.  And do you know how much you paid each one of the
4     those fellows?
5  A.  If memory serves me, I believe we bumped the guys
6     two grades in pay.  So if there was a second half of
7     second year apprentice, he would get second half of
8     fourth year pay.  I think that's the way it worked.
9          What we found out is that if you raised
10    them by a certain number of steps, it got them to --
11    and I think in some cases, we also paid guys -- it
12    was an odd-ball dollar figure.  For some of the real
13    earlier apprentices, the would get like an extra $15
14    or $12 or something like that in their pay.
15 Q.  And then as a result of whatever happened and
16    however it happened, the funds commenced litigation
17    against your company; is that correct?
18 A.  That's correct.
19 Q.  Okay.  Now, at some point, as I understand it, your
20    contention is that you did what you did in this case with regard to how
21    the apprentice's fringes were paid?
22    to do what you did in this case with regard to how
23 A.  We were directed to do it.
24 Q.  You were directed -- I mean, you were told to do it?

**Page 55**

1  A.  Yup.
2  Q.  Okay.  I want you to listen to my questions
3     carefully and see if we can work through this, just
4     so we can establish for the record what you think
5     happened as you best recall it.
6          Putting into context for a moment that you
7     applied for market recovery money on the water
8     treatment job -- okay -- and received some of it and
9     maybe not all of it, in your view; right?
10 A.  Mm-hmm.  Yes.  I'm sorry.
11 Q.  And part of the -- part of that award was to
12    subsidize your higher fringe benefits costs under
13    Local 103 that you'd have to pay if you did a job in
14    Massachusetts; is that right?  That's why you
15    applied for market recovery to subsidize those
16    costs?
17 A.  The reason for it, my understanding of the reason
18    for it is it's market recovery.  Because the
19    nonunion rates are less expensive than the union
20    rates, the union is helping union contractors to
21    tackle jobs that are going more and more often to
22    nonunion contractors.
23 Q.  Right.  But you understand that the way that market
24    recovery funds helps you compete against that

**Page 56**

1  nonunion company is by paying for the fringe
2  benefits of your electricians and apprentices who
3  work on that job?
4  A.  I think it's just three items it pays.  I don't know
5     about --
6  Q.  Some of the fringe benefits?
7  A.  Yes.
8  Q.  The most expensive ones?
9  A.  I think so, yes.
10 Q.  Which ones -- health, pension?
11 A.  I think it's health, pension.  And is it a deferred
12    income or an annuity or something like that?
13 Q.  Those are the big-money dollars in --
14 A.  Yeah.  The biggest dollars are --
15 Q.  Big money items?
16 A.  Yeah.
17 Q.  Okay.  So what they do is they take over the cost of
18    those items for your company so you can compete more
19    effectively with a nonunion contractor?  Yes?
20 A.  Yes.  That's the plan.
21 Q.  And one of the reasons you applied for the Lawrence
22    funds was you knew how big the cost of that Local
23    103 fringe benefit cost was, it was significant?  When you
24 A.  Yeah.  Especially in the outlying areas.  When you

1    get out into the -- the outside of 128 areas, the
2    difference in pay is significant between the union
3    and nonunion.

4 Q.  And since you knew that the Lawrence -- in the
5    Lawrence Water Treatment job, the way to alleviate
6    that high fringe benefit cost was to apply to market
7    recovery, the same would obtain for the pelletizer
8    job; did you know?

9 A.  No.

10 Q.  Why not?

11 A.  Because the pelletizer job was a designed build
12    privatization project that was allowed by bill for
13    the State. The passed a bill in the State House
14    that gave Lawrence -- gave the greater Lawrence
15    sanitary district permission to privatize a building
16    on their site. And one of the conditions in the
17    bill was that all the work would be done union.

18 Q.  Would be done union?

19 A.  Would be done union.  So there was -- there was no
20    nonunion competition on that job.

21 Q.  So you didn't need market recovery?

22 A.  You wouldn't even ask for it because the only people
23    that were going to do it were union contractors, and
24    it was a design build. We had the job.

57

1 Q.  So you didn't need any relief on the fringe benefit
2    cost because you weren't competing against the
3    nonunion contractor?

4 A.  We weren't competing against anyone. It was a
5    design build project.

6 Q.  Okay. So when you bid the contract, I take it that
7    when you did the numbers for the bid on that
8    contract, you assumed that you'd be paying all Local
9    103 fringe benefit costs?

10 A.  Yup. There wasn't a bid.

11 Q.  You didn't bid?

12 A.  No. It was a design build. They came up with an
13    overall project budget, what would work, and we sat
14    down and said, "Okay. Let's work within this budget
15    to give them the best job we can."

16 Q.  And when you cost it out, did you cost it out what
17    the project would cost you?

18 A.  Yes.

19 Q.  And when you did the costing out of that job, didn't
20    you assume that you would pay 103 fringe benefit
21    costs for everybody?

22 A.  Yes, I did.

23 Q.  Including apprentices?

24 A.  Yes, I did.

58

1 Q.  So at some point, did you have a conversation with
2    somebody from Local 103 who was not the business
3    manager, but a business agent?

4 A.  Yes, I did.

5 Q.  And can you tell us when in time that conversation
6    took place?

7 A.  I don't -- I don't recall exactly. It was fairly
8    early in the project. We had -- we had one mechanic
9    working on the site, maybe two, on and off.

10 Q.  When the job had started already?

11 A.  When the job had started, yeah. We brought down one
12    of our foremen. Peter Eastman came down and did
13    that job. And most of the under-slab work -- there
14    wasn't a lot of pipe they'd let us put under the
15    slab, so that sort of stuff, he could do on his own.
16    If he had a -- if he needed a hand for a day, he'd
17    call one of the other jobs and just ask them to send
18    a guy over from that job site for the day or for a
19    couple of hours.
20        I mean, if he had to unload a truck, he'd,
21    you know, call over to the Lawrence job or whatever
22    and say, "Hey, can you send a guy for a couple of
23    hours, help me unload this truck."

24 Q.  Okay.

59

1 A.  After the job started going, after, I believe, the
2    deck got hard, that's when we said, "Okay. We're
3    going to have to ramp up and get some more bodies in
4    here because we've got more work than a man can do."

5 Q.  Okay.

6 A.  And that's when -- that's when I first met with the
7    business agent out there and said, "Look, we're
8    looking for some bodies," and he told me that -- I'm
9    sorry.

10 Q.  Before you get to the meeting with the business
11    agent, can you tell me what year this was taking
12    place in approximately, if you know?

13 A.  I don't recall.

14 Q.  Can you tell me -- to the extent you had a meeting
15    with the business agent, do you remember the time of
16    year, the month or the fall, the spring, the winter,
17    or the summer? If you don't recall, that's fine.

18 A.  I'm -- I'm trying to remember. I -- I remember they
19    had to shovel snow off the deck, but I also remember
20    the deck sat for a long time because the steel for
21    the structure was a little bit late. They had some
22    big vessels that had to get into the building, and
23    they couldn't put the roof on until after they
24    dropped the vessels in from above. I think it -- I

60

1  think it was -- it was late summer, early fall.  I
2  think it was something in that time frame, either
3  summer or fall, something like that.
4  Q.  But you don't remember the year?
5  A.  No, I don't, no.
6  Q.  Okay.
7  A.  I mean, like I said, if I could look at the job
8  number, I'd also know when the job would have
9  started so I could say, "Okay.  It would be in this
10  time frame."
11  Q.  Okay.  And in the late summer or fall, did you meet
12  with a business agent?
13  A.  Yes.
14  Q.  And how did that meeting come about?  Was it
15  arranged in advance?
16  A.  No.  The business agent was coming to the job --
17  coming to that site on a regular basis because there
18  was another contractor working at another project on
19  the Lawrence site.  I don't recall what that job
20  was, but the contractor, I think, was Freedom
21  Electric.
22  Q.  Okay.  And how did this meeting between you and him
23  come about?
24  A.  He saw the building going up and came over to look

61

1  at it.  He'd met our foreman on the site a couple of
2  times before that.
3  Q.  So it wasn't planned between you and him?
4  A.  No.
5  Q.  And who was the business agent?
6  A.  Mr. Lally.
7  Q.  And had you ever met him before?
8  A.  Not to my knowledge.  I may have met him at the hall
9  at some time, but I don't recall.
10  Q.  And did you know he was going to be on the job the
11  day you talked to him?
12  A.  Nope.
13  Q.  So it was just by happenstance that --
14  A.  Chance coincidence, yeah.
15  Q.  Okay.  And who introduced who to somebody else?  I
16  mean, how did you come to meet each other?
17  A.  I believe Pete had told me he'd seen him on the site
18  that day, and I went looking for him.
19  Q.  And why were looking for him?
20  A.  To ask him about bodies.
21  Q.  About what kind of bodies?
22  A.  Journeymen, at that time.
23  Q.  You mean, you needed bodies?
24  A.  Yes.

62

1  Q.  Okay.  And why would you talk to him about that?
2  A.  To see what was available because at that point in
3  time, the Boston local was very, very busy.  They
4  had a lot guys in town.  They had a lot of guys --
5  they had a lot of travelers on the list.  Just to
6  find out who was out there because sometimes the
7  guys that live out in that area, that live out in
8  the Lowell/Lawrence area would say, you know, I'd
9  rather not drive into town.  I'd rather -- you know,
10  even if it -- even if I may not get as much money,
11  I'd rather work out there than work in here.
12  Q.  And had you expressed this need for bodies to Local
13  103 or anybody in Local 103 prior to your chance
14  meeting with Mr. Lally?
15  A.  I didn't myself, no.
16  Q.  Did anybody else in the company?
17  A.  I don't know.
18  Q.  Would you be the person who would be doing that?
19  A.  Not necessarily, no.
20  Q.  Well, who would be?
21  A.  It could have been -- Pete could have made a call
22  down there.  Glen Richardson could have made a call
23  down there.
24  Q.  Do you have any knowledge that any people made such

63

1  calls?
2  A.  I do not know.
3  Q.  So prior to your meeting with Mr. Lally, you had
4  made no prior contacts, to your knowledge, either
5  that you made or anybody else made, to your own
6  personal knowledge, with regard to the need for
7  extra bodies?
8  A.  That's correct.
9  Q.  And when you saw Mr. Lally, where did you see him on
10  the site?
11  A.  I don't recall.  I mean, it would have been
12  somewhere in the area of the pelletizer because I
13  didn't travel very far elsewhere on that site.  It's
14  a big site, and I pretty much stayed to that side of
15  it.
16  Q.  And who else was present when you had your meeting
17  with Mr. Lally?
18  A.  It was just Brian and I.
19  Q.  And what time of day was it?
20  A.  I don't recall.  Probably morning.  That's when I
21  went down there most of the time.
22  Q.  And did somebody introduce the two of you, or how
23  did you come about to talk to him?
24  A.  I don't recall now how I -- I don't recall now how I

64

1    found him. I think -- well, I don't recall. I
2    think Pete described him to me, and he had parked by
3    our side of the site. I think. I'm not -- I'm
4    really not positive.
5 Q.  And tell me what transpired in your conversation
6    with him? That's what --
7 A.  We just mentioned --
8 Q.  What he said and what you said.
9 A.  We just -- I had said to him that at some time --
10    that in the near future, we'd be looking to add a
11    few people.
12 Q.  Before you got to that, did you introduce yourself,
13    identify who you were?
14 A.  Well, I assume so. I don't recall.
15 Q.  Okay. Did he introduce himself to you and say, "My
16    name is Brian Lally. I'm the business agent for
17    Local 103"?
18 A.  I don't recall.
19 Q.  Okay. Was Peter part of the conversation at any
20    time?
21 A.  No, not with me.
22 Q.  If Peter wasn't there, how would you know who Brian
23    was if he didn't say --
24 A.  I don't recall now. I mean, I do not recall how

65

1    Brian and I first met at the site.
2 Q.  Okay. But Peter did not introduce you?
3 A.  I don't recall.
4 Q.  He may have?
5 A.  He may have. He may have. He may have pointed him
6    out to me. He may have been walking back, and Peter
7    may have said, Hey, that's the guy over there.
8 Q.  But you don't recall that?
9 A.  I don't recall, no.
10 Q.  Okay. So tell me what you recall the conversation
11    again.
12 A.  I told him we were going to be ramping up on the
13    job. We'd probably, in the near future, be looking
14    for a couple of guys. And at that time, he told me,
15    "You're going to get all travelers out of Boston."
16    He said, "All the guys in Boston are all out, and
17    you'd be better off if you're going to get
18    travelers, just to bring your travelers down. Just
19    have them go in and sign the book and send them back
20    out," which is what we did.
21         Now, I don't know if the guys went
22    directly to the hall or if the girls in the office
23    called in because sometimes when we travel out of
24    town, the girls will call that business manager's

66

1    office, give the card numbers and local affiliations
2    and all that stuff, and somehow that's how they do
3    it.
4         The first time I met him, we just talked
5    about adding a couple of bodies.
6 Q.  That was it?
7 A.  And that was it. Then later on, when we were
8    starting to get more and more work, I met him
9    another time and said, "Look it. We're going to be
10    adding more people, at which point" --
11 Q.  Stop. Slow down. I can't keep up with you.
12         The other time that you met him, where was
13    that?
14 A.  At the site. Every time I met him was at the site.
15 Q.  And when was the next meeting you had with Brian
16    Lally?
17 A.  I don't recall. It would have been sometime not too
18    far after the first one. And I may have met him on
19    the site before we even talked about bodies. I
20    believe he came by at least once or twice to check
21    union cards with the guys who were on the job.
22 Q.  I thought you said earlier that the first time you
23    met him, Mr. Eastman told you this guy had been
24    around before, and he's the business agent.

67

1 A.  No, no. What I'm saying is that I know -- I know
2    before I met him down there, he had come to the job
3    site at least once and had talked to the guys -- our
4    guys who were there and looked at union cards to see
5    who was there already.
6 Q.  Oh. And how did you know that?
7 A.  Peter told me.
8 Q.  Peter Eastman?
9 A.  In fact, Peter told me, and he gave me a copy of his
10    business card.
11 Q.  So you knew who he was?
12 A.  At least, I knew a name and a business card.
13 Q.  So you had a second meeting sometime after the first
14    meeting?
15 A.  Yup.
16 Q.  You can't remember how distant in time it was, but
17    not too long after --
18 A.  I wouldn't think it would have been terribly long
19    afterwards. Maybe -- maybe a month or two.
20 Q.  A month or two. Okay. How long did this job last?
21 A.  It was more than a year.
22 Q.  Okay.
23 A.  I think more than a year, less than two.
24 Q.  And on the second meeting, was it also a planned

68

1  meeting, or was it a random running into Brian at
2  the site like the first one?
3  A.  I just happened to see him at the site again.
4  Q.  It wasn't planned at all?
5  A.  No.
6  Q.  Do you remember what time of day it was?
7  A.  No.
8  Q.  Do you remember where it was?
9  A.  It was at the job site.
10  Q.  I mean, where on the job site?
11  A.  I don't recall exactly.
12  Q.  And was this like the first meeting — no one else
13  was present?
14  A.  Yup.
15  Q.  Okay.  And at the second meeting, how did you come
16  to talk to him?  How did you — what made you talk
17  to him?  What caused you two to come together?
18  A.  I don't recall.  I don't — well, I don't recall how
19  we ran into each other, but at the time, we just —
20  we — we ran into each other, and I said, "Look.
21  I'm looking to add a couple more, and I want to put
22  some apprentices on."
23  Q.  Okay.  And why did you need to tell him that?
24  A.  Because I was going to need some more bodies.  The

69

1  business manager's office is who you call to get
2  bodies.
3  Q.  Okay.  Before you had the second conversation with
4  him, had you decided to add journeymen, as Mr. Lally
5  allegedly suggested to your from your own local —
6  from Local 490, rather?
7  A.  Yeah.  I think we brought down one or two other
8  journeymen down there.
9  Q.  Okay.  Did they go through the hiring hall at
10  Local 103?
11  A.  I do not recall.
12  Q.  Okay.  So the second meeting, you told Mr. Lally
13  what again?
14  A.  I wanted to add some apprentices now because I
15  wanted to try and get the cost down per hour on job.
16  Q.  Okay.  And you wanted to get the cost down?
17  A.  Yeah.
18  Q.  So it wasn't just new bodies, but you wanted to
19  reduce the cost?
20  A.  Yeah.
21  Q.  And why did you want to reduce the cost at that
22  time?
23  A.  Well, because you always figure your job with a
24  mixture of journeymen and apprentices.  And if you

70

1  just put all journeymen on a job, it ends up costing
2  you a lot more per hour than you would normally
3  figure.  And you don't need a journeyman to lug
4  trash out to a dumpster.  You don't need a
5  journeyman to move pipe, you know.  You use
6  apprentices for that.
7  Q.  So is it your testimony that now into the job a few
8  months that up until that point, you hadn't had any
9  journeymen on the job?
10  MR. HOFFMAN:  Journeymen or apprentices?
11  Q.  I am sorry.  Any apprentices on the job.
12  A.  Yeah.  I don't believe there had been any
13  apprentices, but I don't know.  I don't know that
14  for a fact.  There may have — there may have been
15  at some point in time.  I do not know.
16  Q.  Well, it's kind of important because you said you
17  wanted to reduce the cost of the job with
18  apprentices.  And if you already had apprentices on
19  the job, then that whole argument wouldn't make any
20  sense, would it?
21  MR. HOFFMAN:  Objection to the form.  You
22  may answer it.  Go ahead.
23  THE WITNESS:  I'm sorry.
24  A.  What you're doing is, if you look in the book,

71

1  there's a ratio that you usually do with
2  apprentices.  If you've got one journeyman, you have
3  one apprentice.  If you've got two journeymen, you
4  still only have one apprentice.  If you've got three
5  journeymen, you still need one apprentice, but I
6  believe the next person you can put on the site's
7  another apprentice.  So the fact that you may have
8  had one apprentice already, you have to add some
9  number of journeymen before you can put another
10  apprentice on the job.
11  Q.  The contract says it's a three-to-one ratio; right?
12  A.  Well, it depends.  It depends.  I think the book
13  says something about a varying number and a certain
14  number of first years for every so many men on the
15  job site.  But it's not three to one.  It's not —
16  it's not three to one.  You get three — one, you
17  have one apprentice.  You get six, you have one
18  apprentice.  You get nine, you have one apprentice.
19  I don't think that's correct.
20  Q.  No.  I said three to one means one apprentice for
21  every three journeymen.
22  A.  No.  I don't believe that's correct.
23  Q.  Okay.
24  A.  Yeah.

72

1  Q.  So in any event, because of cost reasons, you
2      indicated to Mr. Lally that you needed apprentices?
3  A.  Yeah.
4  Q.  And what did he say?
5  A.  That they didn't have any apprentices, either.
6  Q.  Did he ask you to check first with the Local 103
7      apprenticeship office?
8  A.  No.
9  Q.  He told you he knew that?
10 A.  Yup.  They didn't have any apprentices, and they
11     didn't have any journeymen.
12 Q.  So he told you to get apprentices from wherever you
13     could get them?
14 A.  He said, "Why don't you bring your own down," and
15     that's what I did.
16 Q.  Okay.  Was that the end of the conversation
17     basically?
18 A.  No, no, because one of the questions was — is,
19     bring them down, pay their — pay their home local
20     their benefits and pay them the Boston wages.
21 Q.  And Mr. Lally told you to pay the — pay the
22     benefits to the home local?
23 A.  Yup.
24 Q.  And had any Local 103 business agent or business

73

1      manager ever told you to do such a thing in all the
2      history of your working with Local 103?
3  A.  Yes.
4  Q.  To pay the benefits to the home local?
5  A.  Yup.  Pay everything to the home local.  We, on
6      occasion, have service calls into Local 103 where a
7      guy will come down to do a job in Amesbury, and the
8      business agent — and our understanding has always
9      been that if a guy comes in for a short duration of
10     time — if the guy comes in for an hour-long service
11     call, don't make out a whole form and go through the
12     whole process of sending his benefits to Boston so
13     they can send one hour's worth of benefits back to
14     his home local.
15 Q.  Okay.  But this was a two-year job?
16 A.  Yeah.
17 Q.  So for a normal construction job that wasn't a
18     service call, this was the first time that a
19     business agent had ever told you to pay benefits to
20     the home local for an apprentice or a journeyman;
21     isn't that true?
22 A.  No.  Because like I said, it happens.  And I'm not
23     saying it's a one-hour service call.  If a guy comes
24     down for, you know, for a day on the job, if it's a

74

1      — if it — it had always been that if it was a
2      short duration thing, just to bring him in and bring
3      him home.
4  Q.  Was this a short-duration request?
5  A.  I didn't know how long I was going to have
6      apprentices on the site, but that's the point.  I
7      thought your question was — if your question was,
8      is on any long-duration project, did the union ever
9      say to us, bring apprentices from your own local,
10     pay everything to their home local.  The answer to
11     your question is no.
12 Q.  Okay.  And this was not a short-term job.  This was
13     two-year job; right?
14 A.  Yes.  But the men wouldn't all be there for that
15     whole period of time.
16 Q.  Well, in fact, they turned out to be there for quite
17     a while on this job?
18 A.  I don't — I don't specifically know that.  I
19     don't — I couldn't tell you.  They may have — they
20     may have had guys there for quite a while, but I
21     think the number of people went up and down.  I
22     don't believe it was —
23 Q.  But this case involves a $30,000 swing in the
24     different cost of the benefits for just apprentices,

75

1      so it indicates they were there for a while; doesn't
2      it?
3  A.  Yeah.  It sounds like a good-size figure, yeah.
4  Q.  So you were assuming that Mr. Lally was authorized
5      by the business manager to make this statement; is
6      that true?
7  A.  Yup.
8  Q.  He didn't tell you that he was authorized by the
9      business manager, did he?
10 A.  No, no.
11 Q.  Okay.  You didn't take any action to confirm with
12     the business manager of Local 103, Mr. Gambino, who
13     you knew that this arrangement was okay with him,
14     did you?
15 A.  I never have in the past on any other job where a
16     business agent had done that.  I never had in the
17     past.
18 Q.  You just told me that for a long-term job, no
19     business agent had ever authorized this before,
20     ever.
21 A.  Well — well, you're saying for lower wages.
22     You're — I — I — you said for lower wages.  My
23     understanding of your last question was that did a
24     business agent ever authorize me to do something,

76

1 other than the agreement for which I didn't check
2 with Richie or didn't check with the business
3 manager at the given time.
4       And the answer to that question is: Yes.
5 Business agents have told us to do different things
6 with rates and benefits that I did not get an
7 authorization from the business manager for. The
8 authorization came from the business agent, and the
9 union took it just the way it was and — and — I
10 mean, that — that has happened.
11 Q. But this was an authorization to pay fringe benefits
12    for a long-term job to a different local; right?
13 A. That's correct.
14 Q. And for a long-term job, that had never happened
15    before, as far as you know, with Local 103?
16 A. As far as I know. That's correct.
17 Q. Okay. And Mr. Lally didn't tell you at what rate to
18    pay the people to their home local, did he?
19 A. No.
20 Q. Okay. And your testimony is you relied on what he
21    told you?
22 A. Yes.
23 Q. Did you make any attempt to memorialize this
24    understanding in writing, just in case there was to

77

1 be a dispute later down the road?
2 A. I had never had a problem with a business agent or a
3    business manager telling me something and going back
4    on his word up to that point.
5 Q. Well, up to that point, you had an enormous number
6    of problems with Local 103 with their fringe benefit
7    funds over disputes about delinquencies, whether you
8    had a contract, whether you didn't have a contract.
9    There were all kind of disputes you had with Local
10    103; didn't you?
11    MR. HOFFMAN: Objection.
12 A. I'm — I'm not — I'm — which — there's a whole
13    bunch there.
14 Q. I'm sorry. Let me break it down.
15       You were having an ongoing dispute at this
16    time with the Local 103 funds, were you not, about
17    market recovery?
18 A. Yes.
19 Q. You were having an ongoing dispute with Local 103
20    funds about delinquencies, going back to 2000?
21 A. That's the VA job we were talking about.
22 Q. Right.
23 A. Yes. That's the job we —
24 Q. And you had — you have had correspondence from Rich

78

1 Gambino, in fact, leading up to the signing of the
2    contract where he said, "You can't be delinquent,
3    and you got to sign the contract. We got to clean
4    this up."
5 A. Mm-hmm.
6 Q. Right?
7 A. That's correct.
8 Q. So there have been problems and misunderstandings,
9    disputes with Local 103 before this issue with Brian
10    Lally; isn't that true? — or am I getting it wrong?
11 A. The disputes or the differences we've had before
12    have not necessarily been between us and Local 103
13    or the funds. The dispute that — the thing that
14    started this whole process was the Veterans
15    Administration where a business agent gave us a
16    specific rate for the project. And for — we ran
17    the project for two or three months before they
18    decided how they'd break that rate down. When they
19    broke that rate down and said, "This is how you'll
20    pay the benefits for all those guys," we went back
21    and said, "Okay. Here's all the people. Here's
22    their forms, what should have been for the previous
23    few months. You're — the payment this month should
24    be "X" many dollars. We've previously overpaid you

79

1 by so many dollars. Here's the rate." That started
2    the whole problem with disputes about benefits. And
3    the — the funds manager said, "Oh, you can't go
4    back retroactively on a project." Even if the
5    business manager tells — business agent tells you
6    you can, you can't go back retroactively and pay a
7    different rate that's already been paid. Those men
8    have already had the money distributed and a whole
9    bunch of other things. What eventually happened was
10    that problem went away. They said, "Okay. What you
11    did was all right. We now understand what it was,"
12    and I don't how the business manager's office worked
13    it out, but the — with the funds office.
14 Q. But during the very time you were having discussions
15    with Mr. Lally, you were having an ongoing dispute
16    about the appropriate compensation for your company
17    by the Local 103 funds at the Lawrence Water
18    Treatment plant —
19 A. Yes.
20 Q. — specifically over —
21 A. Yes.
22 Q. — the market recovery money?
23 A. That's correct. And the confusion there was that
24    they had been paying market recovery for seven

80

1      months on the job, and all of a sudden after seven
2      months, they said, "Oh. It's not approved." And
3      that's where we were saying, "Well, what do you
4      mean, it's not approved? You've already paid it for
5      all this period of time." And like I said, the end
6      result to that one was that we said, "Look it. The
7      amount of argument is not worth -- it's not worth
8      having a big argument over."
9 Q.   Okay. So I guess my question to you is: I take it,
10      it's fair to state that not withstanding the fact
11      that you were having an ongoing dispute with Local
12      103 benefit funds at this time regarding a site in
13      the very same town, Lawrence, Massachusetts, at the
14      water treatment plant --
15 A.   Different town. The Lawrence pelletizer plant is
16      actually in North Andover.
17 Q.   The same area?
18 A.   Yes, sir.
19 Q.   Not too far from each other in Massachusetts?
20 A.   Yes, sir.
21 Q.   Both under the name of "Lawrence"?
22 A.   Yup.
23 Q.   It didn't occur to you since you were having an
24      ongoing dispute with the funds over labor management

81

1      cooperation trust monies to put into writing your
2      understanding with Mr. Lally, in the event you might
3      have a future dispute with somebody at the funds,
4      like you are right now, or somebody at the union.
5      That didn't occur to you?
6 A.   No.
7 Q.   Okay.
8 A.   As I said, I had never had a problem with a business
9      agent or business manager telling me something and
10      going back on it.
11 Q.   And that didn't happen in the Veterans
12      Administration?
13 A.   No. No, it didn't. The business agent sat down
14      with the funds and said this is what we agreed to do
15      to get that job, and he worked it out for us. So
16      no. I had never had a problem. I had always --
17      I've always found the people in that office to be
18      pretty up straight.
19 Q.   Did you have a problem with the funds going back on
20      a commitment you thought they made to you about the
21      Lawrence Water Treatment plant?
22 A.   Yeah. That bothered me.
23 Q.   They did exactly what you suggested never happened.
24      They went back on a commitment they made to you,

82

1      according to your view. The labor management
2      cooperation trust, through Mr. Russell Sheehan, went
3      back on a commitment they made to you according to
4      your view of what happened.
5 A.   Mr. Sheehan's never made a commitment to me. The
6      letter came to us from the business manager's
7      office, and I really believe that Richie and his
8      group did everything they could to work that item
9      out, but they were unable to get that done.
10 Q.   But my point is, irrespective of who did what,
11      somebody went back on something that was committed
12      to you, according to your view of what happened.
13      Yes?
14 A.   No.
15 Q.   Okay. Thank you.
16      MR. HOFFMAN: Ira, can you just give me an
17      idea of how long --
18      MR. SILLS: Why don't we take a
19      five-minute break.
20      (Brief recess)
21      MR. SILLS: We're all set.
22      (Deposition concluded at 1:42 p.m.)
23
24

83

1           C E R T I F I C A T E
2
3 COMMONWEALTH OF MASSACHUSETTS
4 BRISTOL, SS.
5
6      I, Gail A. Carignan, a Professional Shorthand
7 Reporter and Notary Public in and for the Commonwealth of
8 Massachusetts, do hereby certify that Vaughan Richardson,
9 the witness whose deposition is hereinbefore set forth,
10 was duly sworn by me and that such deposition is a true
11 and accurate record, to the best of my knowledge, skills
12 and ability, of the testimony given by such witness.
13      IN WITNESS WHEREOF, I have hereunto set my hand
14 and seal this 8th day of July, 2005.
15
16
17
18
19                  _____
20                  Gail A. Carignan
                    Notary Public
21                  My commission expires:
22                  March 16, 2012
23
24

84

1  ERRATA SHEET DISTRIBUTION INFORMATION
2  DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS
3
4  ERRATA SHEET DISTRIBUTION INFORMATION
5      The original of the Errata Sheet has been
6  delivered to Alan Hoffman, Esq.
7      When the Errata Sheet has been completed
8  by the deponent and signed, a copy thereof should
9  be delivered to each party of record and the
10  ORIGINAL forwarded to Ira Sills, Esq., to whom the
11  original transcript was delivered.
12
13  INSTRUCTIONS TO DEPONENT
14      After reading this volume of your
15  deposition, please indicate any corrections or
16  changes to your testimony and the reasons
17  therefor on the Errata Sheet supplied to you and
18  sign it.
19  DO NOT make marks or notations on the transcript
20  volume itself.  Add additional sheets if
21  necessary.  Please refer to the above instructions
22  for errata sheet distribution information.
23
24

85

1  PLEASE ATTACH TO THE DEPOSITION OF VAUGHAN RICHARDSON
2  CASE:  RUSSELL F. SHEEHAN ET AL V. RICHARDSON ELECTRIC
3  DATE TAKEN:  June 29, 2005
4          ERRATA SHEET
5  Please refer to page 85 for errata sheet instructions and
6  distribution information.
7  PAGE      LINE      CHANGE                    REASON
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16      I have read the foregoing transcript of my
17 deposition and except for any corrections or changes
18 noted above, I hereby subscribe to the transcript as an
19 accurate record of the statements made by me.
20      Executed this _____ day of _____, 2005.
21
22      _____
23          Vaughan Richardson
24

86