# Commonwealth of Massachusetts

PAGES:  86

EXHIBITS:  2

VOLUME:  I

## UNITED STATES DISTRICT COURT

RUSSELL F. SHEEHAN as he is
ADMINISTRATOR, ELECTRICAL
WORKERS' HEALTH and WELFARE
FUND, LOCAL 103
IBEW, et al
                    Plaintiffs

VS.

RICHARDSON ELECTRIC, INC.
                    Defendant/Plaintiffs-
in-Counterclaim and

BANK OF NEW HAMPSHIRE,
                    Defendant

CIVIL ACTION NO.

03-12477JLA

DEPOSITION OF VAUGHAN RICHARDSON, a witness called on behalf of the Plaintiffs, pursuant to the Massachusetts Rules of Civil Procedure, before Gail A. Carignan, Professional Shorthand Reporter and Notary Public, within and for the Commonwealth of Massachusetts, at the Law Offices of Segal, Roitman & Coleman, 11 Beacon Street, Boston, Massachusetts, commencing at 11:15 a.m. on Wednesday, June 29, 2005.

*Accurate Reporting Services*
*36 West Street*
*Whitman, MA  02382*
*(781) 447-9520*

1              P R O C E E D I N G S

2

3              MR. SILLS:  I assume this is subject to

4       the normal stipulations we've had with other

5       witnesses?

6              MR. HOFFMAN:  Yes.

7

8              VAUGHAN RICHARDSON,

9       having been satisfactorily identified by the

10      production of his driver's license, and duly sworn

11      by the Notary Public, was examined and testified as

12      follows:

13

14              DIRECT EXAMINATION

15      BY MR. SILLS:

16   Q.  Vaughan, can you first state your full name for the

17      record.

18   A.  Vaughan Alfred Richardson II.

19   Q.  Okay.  At some point, did you become a licensed

20      electrician?

21   A.  Yes, sir.

22   Q.  And when was that?

23   A.  Oh, my God.

24   Q.  You don't have to give us the exact year and date,

1    A.    Okay.

2    Q.    -- for a moment.  During this -- there was a number

3          of jobs that the company had between 2000 and 2003

4          in the City of Lawrence; is that right?  Or was

5          there just one, if you recall?

6    A.    I don't recall the dates at which these jobs

7          happened, but I know we were doing a job at the

8          water treatment plant and a job at the sewerage

9          treatment plant.

10   Q.    Okay.  And the sewer treatment and the water

11         treatment are two separate facilities?

12   A.    Two separate sites.

13   Q.    Are they geographically separated?

14   A.    Oh, yeah.

15   Q.    Okay.  And the sewer treatment plant takes raw

16         sewerage and processes it.  And a water treatment

17         plant does what?

18   A.    Makes -- makes fresh water.

19   Q.    Okay.  Or it makes sure the fresh water is properly

20         cleaned and potable?

21   A.    Well, it treats it as well.  They put, you know, all

22         kinds of chemicals in to stop corrosion and --

23   Q.    Okay.

24   A.    -- and fluoride and --

```
 1   Q.   And was the City of Lawrence involved in the

 2        construction of one of these facilities or both?

 3        New construction is my question.

 4   A.   Their -- both sites had a bit of both.  There was

 5        some new construction, some rehab of existing

 6        building at both sites.

 7   Q.   Okay.  And did the -- did Richardson Electric apply

 8        for market recovery money for one of these jobs or

 9        both of these jobs?

10   A.   Just one.  Just the water treatment plant.

11   Q.   Okay.  And the other job at the sewer treatment

12        plant, is that called "the pelletizer job"?

13   A.   That was called the pelletizer, yeah.  That's what

14        we called it.  I don't know the official name of the

15        project.

16   Q.   And "pelletizer" refers to pelletizing waste into

17        pellets so they can be recycled or sold or used for

18        some other function; right?

19   A.   They put them in fertilizer.  They purify them, and

20        it's a biodegradable material that goes in

21        fertilizer.

22   Q.   And the company applied for market recovery funds on

23        the water treatment job?

24   A.   Yes.
```

1      listening around the office -- I haven't sat down

2      and specifically gone through the stuff -- is that I

3      think the problem right now is the pelletizer and

4      the apprentice hours on that job.  And I think it's

5      only some of the apprentices.  I'm not sure if it's

6      all or what the story is.

7   Q.  And let's talk about that.  It's fair to state that

8      on the pelletizer job, what happened -- and you

9      correct me if I get it wrong because I'm not an

10     electrician and I'm not -- I don't run a company, so

11     I'm in foreign territory here a little bit, but --

12     and on the pelletizer job, what happened was that

13     the company employed a number of Local 490

14     apprentices; is that correct?

15  A.  Yes.

16  Q.  And the company's contention, I take it, is that

17     there weren't Local 103 apprentices available during

18     the course of this job?

19  A.  No.  The business agent told me that.  He said, "I

20     don't have apprentices for you."  He said, "Bring

21     your own down."  He told me the same thing with

22     journeymen.  He said, "Look it.  If I give you guys

23     out of the hall, they're just going to be travelers,

24     so bring your own travelers."

Q.   Okay.  So -- and one of the things, as you
     understand it, that Local 103 cares about is having
     all of its union contractors, whomever they are,
     including yourself and others, bid on an equal
     basis?

A.   Yup.

Q.   And you understand that if the union awards, for
     example, labor management cooperation trust money on
     a particular job, it goes to any union contractor
     who gets that job, not just Richardson?

A.   That's right.

Q.   So that everybody completes -- competes on a level
     playing field?

A.   Yup.  I believe it only goes to the contractors if
     they apply for it.  If you had two contractors who
     were both bidding a job and one applied for market
     recovery and the other didn't, I think the only one
     that gets -- that applies for it gets it, even if
     that other contractor gets the job, but I don't know
     that to be the -- to be a fact.

Q.   Okay.  And in this particular situation, we know --
     I don't think there's any dispute, as you testified
     earlier -- that Richardson, in fact, paid the Local
     490 apprentices on the pelletizer job the 490 fringe

```
 1        benefit package, if you will?

 2   A.   That's correct.

 3   Q.   And that was less expensive than the 103 package?

 4   A.   That's correct.

 5   Q.   Okay.  Now, you testified, or you made a comment

 6        earlier in your testimony, that the cost advantage

 7        deriving from that practice, vis-a-vis a Local 103

 8        contractor, would not obtain, so to speak, if it was

 9        a prevailing rate job?

10   A.   That's correct.

11   Q.   If it was a prevailing-rate job, what would happen,

12        in your view?

13   A.   You'd end up having to pay the men additional money

14        in their paycheck to offset the lower benefits paid

15        in their home local.

16   Q.   Okay.  And was the Lawrence pelletizer job for a

17        public authority?

18   A.   Yes.

19   Q.   Was it a prevailing-rate job?

20   A.   Yes, it was.

21   Q.   And in that respect, did you do what you just

22        suggested and have to pay the Local 490 folks some

23        amount of extra compensation because of the lower

24        fringe benefit package that you just described that
```

1   it obtained for 490 members?

2 A. Yes, we did.

3 Q. And do you know how much you paid each one of the

4   those fellows?

5 A. If memory serves me, I believe we bumped the guys

6   two grades in pay.  So if there was a second half of

7   second year apprentice, he would get second half of

8   fourth year pay.  I think that's the way it worked.

9      What we found out is that if you raised

10   them by a certain number of steps, it got them to --

11   and I think in some cases, we also paid guys -- it

12   was an odd-ball dollar figure.  For some of the real

13   earlier apprentices, the would get like an extra $15

14   or $12 or something like that in their pay.

15 Q. And then as a result of whatever happened and

16   however it happened, the funds commenced litigation

17   against your company; is that correct?

18 A. That's correct.

19 Q. Okay.  Now, at some point, as I understand it, your

20   contention is that you were authorized by Local 103

21   to do what you did in this case with regard to how

22   the apprentice's fringes were paid?

23 A. We were directed to do it.

24 Q. You were directed -- I mean, you were told to do it?

```
 1          think it was -- it was late summer, early fall.  I
 2          think it was something in that time frame, either
 3          summer or fall, something like that.
 4     Q.   But you don't remember the year?
 5     A.   No, I don't, no.
 6     Q.   Okay.
 7     A.   I mean, like I said, if I could look at the job
 8          number, I'd also know when the job would have
 9          started so I could say, "Okay.  It would be in this
10          time frame."
11     Q.   Okay.  And in the late summer or fall, did you meet
12          with a business agent?
13     A.   Yes.
14     Q.   And how did that meeting come about?  Was it
15          arranged in advance?
16     A.   No.  The business agent was coming to the job --
17          coming to that site on a regular basis because there
18          was another contractor working at another project on
19          the Lawrence site.  I don't recall what that job
20          was, but the contractor, I think, was Freedom
21          Electric.
22     Q.   Okay.  And how did this meeting between you and him
23          come about?
24     A.   He saw the building going up and came over to look
```

```
 1        at it.  He'd met our foreman on the site a couple of

 2        times before that.

 3   Q.   So it wasn't planned between you and him?

 4   A.   No.

 5   Q.   And who was the business agent?

 6   A.   Mr. Lally.

 7   Q.   And had you ever met him before?

 8   A.   Not to my knowledge.  I may have met him at the hall

 9        at some time, but I don't recall.

10   Q.   And did you know he was going to be on the job the

11        day you talked to him?

12   A.   Nope.

13   Q.   So it was just by happenstance that --

14   A.   Chance coincidence, yeah.

15   Q.   Okay.  And who introduced who to somebody else?  I

16        mean, how did you come to meet each other?

17   A.   I believe Pete had told me he'd seen him on the site

18        that day, and I went looking for him.

19   Q.   And why were looking for him?

20   A.   To ask him about bodies.

21   Q.   About what kind of bodies?

22   A.   Journeymen, at that time.

23   Q.   You mean, you needed bodies?

24   A.   Yes.
```

1    Q.    Okay.  And why would you talk to him about that?

2    A.    To see what was available because at that point in

3          time, the Boston local was very, very busy.  They

4          had a lot guys in town.  They had a lot of guys --

5          they had a lot of travelers on the list.  Just to

6          find out who was out there because sometimes the

7          guys that live out in that area, that live out in

8          the Lowell/Lawrence area would say, you know, I'd

9          rather not drive into town.  I'd rather -- you know,

10         even if it -- even if I may not get as much money,

11         I'd rather work out there than work in here.

12   Q.    And had you expressed this need for bodies to Local

13         103 or anybody in Local 103 prior to your chance

14         meeting with Mr. Lally?

15   A.    I didn't myself, no.

16   Q.    Did anybody else in the company?

17   A.    I don't know.

18   Q.    Would you be the person who would be doing that?

19   A.    Not necessarily, no.

20   Q.    Well, who would be?

21   A.    It could have been -- Pete could have made a call

22         down there.  Glen Richardson could have made a call

23         down there.

24   Q.    Do you have any knowledge that any people made such

1          calls?

2     A.   I do not know.

3     Q.   So prior to your meeting with Mr. Lally, you had

4          made no prior contacts, to your knowledge, either

5          that you made or anybody else made, to your own

6          personal knowledge, with regard to the need for

7          extra bodies?

8     A.   That's correct.

9     Q.   And when you saw Mr. Lally, where did you see him on

10         the site?

11    A.   I don't recall.  I mean, it would have been

12         somewhere in the area of the pelletizer because I

13         didn't travel very far elsewhere on that site.  It's

14         a big site, and I pretty much stayed to that side of

15         it.

16    Q.   And who else was present when you had your meeting

17         with Mr. Lally?

18    A.   It was just Brian and I.

19    Q.   And what time of day was it?

20    A.   I don't recall.  Probably morning.  That's when I

21         went down there most of the time.

22    Q.   And did somebody introduce the two of you, or how

23         did you come about to talk to him?

24    A.   I don't recall now how I -- I don't recall now how I

```
 1      found him.  I think -- well, I don't recall.  I

 2      think Pete described him to me, and he had parked by

 3      our side of the site.  I think.  I'm not -- I'm

 4      really not positive.

 5  Q.  And tell me what transpired in your conversation

 6      with him?  That's what --

 7  A.  We just mentioned --

 8  Q.  What he said and what you said.

 9  A.  We just -- I had said to him that at some time --

10      that in the near future, we'd be looking to add a

11      few people.

12  Q.  Before you got to that, did you introduce yourself,

13      identify who you were?

14  A.  Well, I assume so.  I don't recall.

15  Q.  Okay.  Did he introduce himself to you and say, "My

16      name is Brian Lally.  I'm the business agent for

17      Local 103"?

18  A.  I don't recall.

19  Q.  Okay.  Was Peter part of the conversation at any

20      time?

21  A.  No, not with me.

22  Q.  If Peter wasn't there, how would you know who Brian

23      was if he didn't say --

24  A.  I don't recall now.  I mean, I do not recall how
```

1      Brian and I first met at the site.

2  Q.  Okay.  But Peter did not introduce you?

3  A.  I don't recall.

4  Q.  He may have?

5  A.  He may have.  He may have.  He may have pointed him

6      out to me.  He may have been walking back, and Peter

7      may have said, Hey, that's the guy over there.

8  Q.  But you don't recall that?

9  A.  I don't recall, no.

10  Q.  Okay.  So tell me what you recall the conversation

11      again.

12  A.  I told him we were going to be ramping up on the

13      job.  We'd probably, in the near future, be looking

14      for a couple of guys.  And at that time, he told me,

15      "You're going to get all travelers out of Boston."

16      He said, "All the guys in Boston are all out, and

17      you'd be better off if you're going to get

18      travelers,  just to bring your travelers down.  Just

19      have them go in and sign the book and send them back

20      out," which is what we did.

21           Now, I don't know if the guys went

22      directly to the hall or if the girls in the office

23      called in because sometimes when we travel out of

24      town, the girls will call that business manager's

1   A.   No, no.   What I'm saying is that I know -- I know

2        before I met him down there, he had come to the job

3        site at least once and had talked to the guys -- our

4        guys who were there and looked at union cards to see

5        who was there already.

6   Q.   Oh.   And how did you know that?

7   A.   Peter told me.

8   Q.   Peter Eastman?

9   A.   In fact, Peter told me, and he gave me a copy of his

10       business card.

11  Q.   So you knew who he was?

12  A.   At least, I knew a name and a business card.

13  Q.   So you had a second meeting sometime after the first

14       meeting?

15  A.   Yup.

16  Q.   You can't remember how distant in time it was, but

17       not too long after --

18  A.   I wouldn't think it would have been terribly long

19       afterwards.   Maybe -- maybe a month or two.

20  Q.   A month or two.   Okay.   How long did this job last?

21  A.   It was more than a year.

22  Q.   Okay.

23  A.   I think more than a year, less than two.

24  Q.   And on the second meeting, was it also a planned

```
 1         meeting, or was it a random running into Brian at
 2         the site like the first one?
 3    A.   I just happened to see him at the site again.
 4    Q.   It wasn't planned at all?
 5    A.   No.
 6    Q.   Do you remember what time of day it was?
 7    A.   No.
 8    Q.   Do you remember where it was?
 9    A.   It was at the job site.
10    Q.   I mean, where on the job site?
11    A.   I don't recall exactly.
12    Q.   And was this like the first meeting -- no one else
13         was present?
14    A.   Yup.
15    Q.   Okay.  And at the second meeting, how did you come
16         to talk to him?  How did you -- what made you talk
17         to him?  What caused you two to come together?
18    A.   I don't recall.  I don't -- well, I don't recall how
19         we ran into each other, but at the time, we just --
20         we -- we ran into each other, and I said, "Look.
21         I'm looking to add a couple more, and I want to put
22         some apprentices on."
23    Q.   Okay.  And why did you need to tell him that?
24    A.   Because I was going to need some more bodies.  The
```

1    business manager's office is who you call to get

2    bodies.

3  Q.  Okay.  Before you had the second conversation with

4    him, had you decided to add journeymen, as Mr. Lally

5    allegedly suggested to your from your own local --

6    from Local 490, rather?

7  A.  Yeah.  I think we brought down one or two other

8    journeymen down there.

9  Q.  Okay.  Did they go through the hiring hall at

10    Local 103?

11  A.  I do not recall.

12  Q.  Okay.  So the second meeting, you told Mr. Lally

13    what again?

14  A.  I wanted to add some apprentices now because I

15    wanted to try and get the cost down per hour on job.

16  Q.  Okay.  And you wanted to get the cost down?

17  A.  Yeah.

18  Q.  So it wasn't just new bodies, but you wanted to

19    reduce the cost?

20  A.  Yeah.

21  Q.  And why did you want to reduce the cost at that

22    time?

23  A.  Well, because you always figure your job with a

24    mixture of journeymen and apprentices.  And if you

1      just put all journeymen on a job, it ends up costing

2      you a lot more per hour than you would normally

3      figure.  And you don't need a journeyman to lug

4      trash out to a dumpster.  You don't need a

5      journeyman to move pipe, you know.  You use

6      apprentices for that.

7  Q.  So is it your testimony that now into the job a few

8      months that up until that point, you hadn't had any

9      journeymen on the job?

10         MR. HOFFMAN:  Journeymen or apprentices?

11  Q.  I am sorry.  Any apprentices on the job.

12  A.  Yeah.  I don't believe there had been any

13      apprentices, but I don't know.  I don't know that

14      for a fact.  There may have -- there may have been

15      at some point in time.  I do not know.

16  Q.  Well, it's kind of important because you said you

17      wanted to reduce the cost of the job with

18      apprentices.  And if you already had apprentices on

19      the job, then that whole argument wouldn't make any

20      sense, would it?

21         MR. HOFFMAN:  Objection to the form.  You

22      may answer it.  Go ahead.

23         THE WITNESS:  I'm sorry.

24  A.  What you're doing is, if you look in the book,

```
 1          there's a ratio that you usually do with
 2          apprentices.  If you've got one journeyman, you have
 3          one apprentice.  If you've got two journeymen, you
 4          still only have one apprentice.  If you've got three
 5          journeymen, you still need one apprentice, but I
 6          believe the next person you can put on the site's
 7          another apprentice.  So the fact that you may have
 8          had one apprentice already, you have to add some
 9          number of journeymen before you can put another
10          apprentice on the job.
11     Q.   The contract says it's a three-to-one ratio; right?
12     A.   Well, it depends.  It depends.  I think the book
13          says something about a varying number and a certain
14          number of first years for every so many men on the
15          job site.  But it's not three to one.  It's not --
16          it's not three to one.  You get three -- one, you
17          have one apprentice.  You get six, you have one
18          apprentice.  You get nine, you have one apprentice.
19          I don't think that's correct.
20     Q.   No.  I said three to one means one apprentice for
21          every three journeymen.
22     A.   No.  I don't believe that's correct.
23     Q.   Okay.
24     A.   Yeah.
```

```
 1    Q.   So in any event, because of cost reasons, you

 2         indicated to Mr. Lally that you needed apprentices?

 3    A.   Yeah.

 4    Q.   And what did he say?

 5    A.   That they didn't have any apprentices, either.

 6    Q.   Did he ask you to check first with the Local 103

 7         apprenticeship office?

 8    A.   No.

 9    Q.   He told you he knew that?

10    A.   Yup.  They didn't have any apprentices, and they

11         didn't have any journeymen.

12    Q.   So he told you to get apprentices from wherever you

13         could get them?

14    A.   He said, "Why don't you bring your own down," and

15         that's what I did.

16    Q.   Okay.  Was that the end of the conversation

17         basically?

18    A.   No, no, because one of the questions was -- is,

19         bring them down, pay their -- pay their home local

20         their benefits and pay them the Boston wages.

21    Q.   And Mr. Lally told you to pay the -- pay the

22         benefits to the home local?

23    A.   Yup.

24    Q.   And had any Local 103 business agent or business
```

| | | |
|---|---|---|
| 1 | | manager ever told you to do such a thing in all the |
| 2 | | history of your working with Local 103? |
| 3 | A. | Yes. |
| 4 | Q. | To pay the benefits to the home local? |
| 5 | A. | Yup.  Pay everything to the home local.  We, on |
| 6 | | occasion, have service calls into Local 103 where a |
| 7 | | guy will come down to do a job in Amesbury, and the |
| 8 | | business agent -- and our understanding has always |
| 9 | | been that if a guy comes in for a short duration of |
| 10 | | time -- if the guy comes in for an hour-long service |
| 11 | | call, don't make out a whole form and go through the |
| 12 | | whole process of sending his benefits to Boston so |
| 13 | | they can send one hour's worth of benefits back to |
| 14 | | his home local. |
| 15 | Q. | Okay.  But this was a two-year job? |
| 16 | A. | Yeah. |
| 17 | Q. | So for a normal construction job that wasn't a |
| 18 | | service call, this was the first time that a |
| 19 | | business agent had ever told you to pay benefits to |
| 20 | | the home local for an apprentice or a journeyman; |
| 21 | | isn't that true? |
| 22 | A. | No.  Because like I said, it happens.  And I'm not |
| 23 | | saying it's a one-hour service call.  If a guy comes |
| 24 | | down for, you know, for a day on the job, if it's a |

1      -- if it -- it had always been that if it was a

2      short duration thing, just to bring him in and bring

3      him home.

4   Q.  Was this a short-duration request?

5   A.  I didn't know how long I was going to have

6      apprentices on the site, but that's the point.  I

7      thought your question was -- if your question was,

8      is on any long-duration project, did the union ever

9      say to us, bring apprentices from your own local,

10      pay everything to their home local.  The answer to

11      your question is no.

12  Q.  Okay.  And this was not a short-term job.  This was

13      two-year job; right?

14  A.  Yes.  But the men wouldn't all be there for that

15      whole period of time.

16  Q.  Well, in fact, they turned out to be there for quite

17      a while on this job?

18  A.  I don't -- I don't specifically know that.  I

19      don't -- I couldn't tell you.  They may have -- they

20      may have had guys there for quite a while, but I

21      think the number of people went up and down.  I

22      don't believe it was --

23  Q.  But this case involves a $30,000 swing in the

24      different cost of the benefits for just apprentices,

|    |    |                                                          |
|----|----|----------------------------------------------------------|
| 1  |    | so it indicates they were there for a while; doesn't     |
| 2  |    | it?                                                      |
| 3  | A. | Yeah.  It sounds like a good-size figure, yeah.         |
| 4  | Q. | So you were assuming that Mr. Lally was authorized       |
| 5  |    | by the business manager to make this statement; is       |
| 6  |    | that true?                                               |
| 7  | A. | Yup.                                                     |
| 8  | Q. | He didn't tell you that he was authorized by the         |
| 9  |    | business manager, did he?                                |
| 10 | A. | No, no.                                                  |
| 11 | Q. | Okay.  You didn't take any action to confirm with        |
| 12 |    | the business manager of Local 103, Mr. Gambino, who      |
| 13 |    | you knew that this arrangement was okay with him,        |
| 14 |    | did you?                                                 |
| 15 | A. | I never have in the past on any other job where a        |
| 16 |    | business agent had done that.  I never had in the        |
| 17 |    | past.                                                    |
| 18 | Q. | You just told me that for a long-term job, no            |
| 19 |    | business agent had ever authorized this before,          |
| 20 |    | ever.                                                    |
| 21 | A. | Well -- well, you're saying for lower wages.             |
| 22 |    | You're -- I -- I -- you said for lower wages.  My        |
| 23 |    | understanding of your last question was that did a       |
| 24 |    | business agent ever authorize me to do something,        |

1      other than the agreement for which I didn't check

2      with Richie or didn't check with the business

3      manager at the given time.

4              And the answer to that question is:  Yes.

5      Business agents have told us to do different things

6      with rates and benefits that I did not get an

7      authorization from the business manager for.  The

8      authorization came from the business agent, and the

9      union took it just the way it was and -- and -- I

10     mean, that -- that has happened.

11  Q.  But this was an authorization to pay fringe benefits

12      for a long-term job to a different local; right?

13  A.  That's correct.

14  Q.  And for a long-term job, that had never happened

15      before, as far as you know, with Local 103?

16  A.  As far as I know.  That's correct.

17  Q.  Okay.  And Mr. Lally didn't tell you at what rate to

18      pay the people to their home local, did he?

19  A.  No.

20  Q.  Okay.  And your testimony is you relied on what he

21      told you?

22  A.  Yes.

23  Q.  Did you make any attempt to memorialize this

24      understanding in writing, just in case there was to

```
 1        cooperation trust monies to put into writing your
 2        understanding with Mr. Lally, in the event you might
 3        have a future dispute with somebody at the funds,
 4        like you are right now, or somebody at the union.
 5        That didn't occur to you?
 6   A.   No.
 7   Q.   Okay.
 8   A.   As I said, I had never had a problem with a business
 9        agent or business manager telling me something and
10        going back on it.
11   Q.   And that didn't happen in the Veterans
12        Administration?
13   A.   No.  No, it didn't.  The business agent sat down
14        with the funds and said this is what we agreed to do
15        to get that job, and he worked it out for us.  So
16        no.  I had never had a problem.  I had always --
17        I've always found the people in that office to be
18        pretty up straight.
19   Q.   Did you have a problem with the funds going back on
20        a commitment you thought they made to you about the
21        Lawrence Water Treatment plant?
22   A.   Yeah.  That bothered me.
23   Q.   They did exactly what you suggested never happened.
24        They went back on a commitment they made to you,
```