```
 1                            Volume: I
 2                            Pages:   1-26
 3
 4         UNITED STATES DISTRICT COURT
 5            DISTRICT OF MASSACHUSETTS
 6                            C.A. No. 03-12477 JLA
 7  ------------------------------------
 8  RUSSELL F. SHEEHAN, as he is Administrator,
 9  ELECTRICAL WORKERS' HEALTH AND WELFARE FUND,
10  LOCAL 103, I.B.E.W., ET AL.,
11         Plaintiff/Defendants-in-Counterclaim,
12     v.
13  RICHARDSON ELECTRIC COMPANY, INC.,
14         Defendant/Plaintiffs-in-Counterclaim,
15     and
16  BANK OF NEW HAMPSHIRE
17         Trustee.
18  ------------------------------------
19         DEPOSITION of BRIAN LALLY
20       Monday, May 23, 2005, 1:45 p.m.
21      LYNCH, BREWER, HOFFMAN & FINK, LLP
22             101 Federal Street
23             Boston, Massachusetts
24    Court Reporter: Paulette Cook, RPR/RMR
```

Page 2

```
 1   APPEARANCES:
 2
 3   SEGAL, ROITMAN & COLEMAN
 4   By Ira Sills, Esq.
 5   Anne R. Sills, Esq.
 6   11 Beacon Street, Suite 500
 7   Boston, Massachusetts 02108
 8   617-742-0208
 9   Counsel for Local 103, I.B.E.W./
10      Counsel for Local 103 Trust Funds
11
12   LYNCH, BREWER, HOFFMAN & FINK, LLP
13   By Alan Hoffman, Esq.
14   101 Federal Street
15   Boston, Massachusetts 02110
16   617-951-0800
17   Counsel for Richardson Electric Co.
18
19   ALSO PRESENT: Barbara Wade
```

Page 3

```
          I N D E X
EXAMINATION OF:                    PAGE

BRIAN LALLY
   By Mr. Hoffman                    4



         E X H I B I T S
NO.                                PAGE

   ^
```

Page 4

```
        PROCEEDINGS

   MR. HOFFMAN: Same stipulations?
   MS. A. SILLS: Yes.
   BRIAN LALLY,
a witness called for examination by counsel for the
Defendant, being first duly sworn, was examined and
testified as follows:

   DIRECT EXAMINATION
BY MR. HOFFMAN:
   Q. Would you state your name and address,
please.
   A. Brian Lally, 122 Minot Street, Dorchester,
Massachusetts.
   Q. Are you currently employed?
   A. Yes.
   Q. And who is your employer?
   A. I.B.E.W. Local 103.
   Q. And how long have you been employed by the
local?
   A. Five years.
   Q. Prior to that, what employment did you have?
```

Page 5

```
   A. Electrician.
   Q. Are you a licensed electrician?
   A. Yes.
   Q. Why don't you tell us your educational
background? How far did you get in school, and then
what did you do for work immediately after school?
   A. Twelve years of school. Worked at Hartford
Insurance for a year and then became an electrical
apprentice, worked for several different contractors
throughout my 20 years with Local 103.
   Q. Okay. So when did you first work as an
apprentice? What year roughly?
   A. July of 1981.
   Q. And five years ago you became employed by
the union?
   A. Yes.
   Q. So you were an electrician up until that
point?
   A. Yes.
   Q. What was the first position you had with the
union? What was your first job with the union as a
union employee?
   A. Examining board.
   Q. Can you tell us what that is?
```

Page 6

1  A. The examining board tests prospective
2  members for the local union.
3  Q. When did you first get that job?
4  A. Five, six -- eleven years ago.
5  Q. Oh, okay. Were you still working as an
6  electrician at that time, or were you full time --
7  A. It's a part-time electrical position. *elected*
8  Q. I see. For how long were you on the
9  examining board?
10 A. Three years.
11 Q. And what was your next union position?
12 A. Executive board. Also an elected part-time
13 position.
14 Q. And what year did you go on the executive
15 board?
16 A. Three years after the examining board.
17 Q. So what would that be? About --
18 A. -- eight years ago.
19 Q. Eight years ago? And what was your next
20 position with the union?
21 A. Business agent.
22 Q. When did you first become a business agent?
23 A. I believe it was October of 2000.
24 Q. October 2000. Okay. And are you currently

Page 7

1  a business agent? Well, strike that.
2      How long were you a business agent?
3  A. This is my fifth year.
4  Q. So you are currently a business agent?
5  A. Yes.
6  Q. Okay. When you -- well, before you were
7  hired as a business agent -- by the way, was that
8  the first full-time position that you had with the
9  union, business agent?
10 A. Yes.
11 Q. And you stopped being an electrician or
12 doing work in the field as an electrician at that
13 time?
14 A. Yes.
15 Q. Did you have any training before you became
16 a business agent with respect to that position? In
17 other words, did someone train you as to what you
18 were supposed to do as business agent?
19 A. I think as part of my job in the year on the
20 examining and executive board member has some
21 training qualifications.
22 Q. But there's no formal program of training
23 when you become a business agent?
24 A. Nothing formal. I've gone to the meeting

Page 8

1  center. Nothing formal.
2  Q. How do you understand your duties as
3  business agent?
4  A. I --
5  Q. Well, what does your job entail? In other
6  words, what do you do on a day-to-day basis as a
7  business agent for Local 103?
8  A. Service the memberhood, look for other jobs
9  coming up, try to get them to be done by union
10 contractors.
11 Q. Hm Hm. Now do you have a territory as
12 business agent?
13 A. I have a geographical area that I cover.
14 Q. What is that?
15 A. Currently it's the metro west area.
16 Q. Did you have another territory at some
17 point?
18 A. I've had several.
19 Q. Were you ever assigned to Merrimack Valley?
20 A. Yes.
21 Q. Do you remember approximately when?
22 A. From October of 2000 through -- I'd be
23 guessing. Probably 2003 maybe.
24 Q. For several years in any event?

Page 9

1  A. A couple of years, yeah.
2  Q. What did that area comprise?
3  A. I don't remember the specific towns, but it
4  was -- at that time and it has since changed --
5  Lawrence, Lowell, Andover, all the way up to
6  Dunstable and then north through I believe Amesbury
7  and Gloucester and south to Wakefield, Stoneham.
8  Q. Okay.
9  A. Not exact.
10 Q. Did you have any dealings while you were
11 assigned to the Merrimack Valley area with anyone
12 connected with Richardson Electrical Company?
13 A. Yes.
14 Q. Who do you recall ever talking to or meeting
15 with?
16 A. Peter Eastman.
17 Q. And what did you understand his position to
18 be?
19 A. I understood him to be the foreman on a
20 project that I stopped and visited.
21 Q. Do you remember which project that was?
22 A. Greater Lawrence Sanitary Treatment
23 Facility.
24 Q. Do you remember who the general contractor

Page 10

1  was?
2  A. I don't remember who the general contractor
3  was for the job that Richardson Electric was doing,
4  although Methuen Construction was a general
5  contractor on site.
6  Q. Okay. And do you remember why you -- well,
7  what stage was -- was the job in progress when you
8  visited?
9  A. It had just started.
10 Q. I see. And do you remember what your
11 purpose was in visiting at that time?
12 A. I went there to speak with Matt Caruso from
13 Freedom Electric.
14 Q. They had part of the job?
15 A. I believe it was a separate and distinct
16 contract.
17 Q. Okay. All right. Do you remember talking
18 to -- Did you talk to Peter Eastman?
19 A. I did.
20 Q. Do you remember what the conversation
21 concerned?
22 A. Hi, how are you doing, introductions; what
23 was the phase of the job, when was it going to get
24 started.

Page 11

1  Q. Do you remember any other jobs in which you
2  had some interaction with a Richardson employee?
3  Any other jobs?
4  A. I don't remember any, no.
5  Q. Was this kind of early on in your career as
6  a business agent when you went on that particular
7  job site? In other words, was it within the first
8  year of your appointment as a business agent?
9  A. I would say, yeah, within the first year. I
10 would say that's probably.
11 Q. Now do you recall -- did you ever learn that
12 there were -- strike that.
13    Do you recall having any conversation
14 with anyone connected with Moynihan -- Moynihan?
15 That's another client of mine -- with Richardson
16 regarding apprentices and the availability of
17 apprentices from the Boston local?
18 A. I can remember a conversation with Vaughn
19 regarding -- vaguely regarding apprentices.
20 Q. Okay. Do you recall that it related to this
21 particular job?
22 A. Not -- I don't directly recall that, no.
23 Q. What's your best memory of what was said in
24 that particular conversation?

Page 12

1  A. I think he expressed a need for apprentices.
2  Q. Okay. And when a contractor expressed a
3  need for apprentices, what would you customarily do?
4  A. Refer them to Frank Nigro from the JATC.
5  Q. That's the school?
6  A. Yes.
7  Q. Do you recall what you did in this instance?
8  A. Not specifically, but I -- like I say, I
9  probably referred him to Frank Nigro.
10 Q. Were there times when -- because they were
11 all employed apprentices were not available out of
12 that school for contractors?
13 A. Were there times?
14 Q. Yes.
15 A. Sure, there've been times that that's been
16 the case.
17 Q. How frequent has that been?
18 A. I mean I guess there's a time when there are
19 and there aren't. Possibly in my tenure I'd guess a
20 period of only one time.
21 Q. In other words, you remember one period of
22 time when this occurred when they were unavailable?
23 A. Yes.
24 Q. Okay. Do you recall whether it was the time

Page 13

1  that Vaughn Richardson was calling you about
2  apprenticeships?
3  A. It may have been. I don't specifically
4  recall, but, yeah, there may have been a shortage of
5  apprentices.
6  Q. All right. Do you recall having any
7  conversation with Mr. Vaughn Richardson -- by the
8  way, do you only recall one conversation with Vaughn
9  Richardson in your career, or do you recall others?
10 A. In my career as a business agent?
11 Q. Yes.
12 A. Not very many. There may have been a couple
13 of back and forges regarding the same --
14 Q. The same issue?
15 A. Yeah, attempt to contact. Yes.
16 Q. Do you recall telling him that he should --
17 he should get his apprentices from Local 490 or from
18 another local?
19    (Pause.)
20 A. I may have said that we had a shortage and
21 he needed to contact Frank to get some or that there
22 were not many available at that time.
23 Q. Okay. But do you recall directing him to --
24 or suggesting that he contact one of the other

Page 14

1  locals besides Local 103?
2      A.  I would send him to Frank Nigro.  That's the
3  normal procedure.
4      Q.  And is it your understanding that Frank
5  Nigro if he had -- if there was no availability in
6  Boston would customarily say, well, you'll have to
7  go to one of the other locals, or would Frank Nigro
8  set it up?  Do you have an understanding as to how
9  that works?
10         MR. I. SILLS:  Objection to the form.
11  If you know.
12     Q.  If you know.  Do you know what happens
13  once --
14     A.  Can you repeat that?
15     Q.  Let me make it a little more general.
16         Do you have any knowledge as to what
17  Mr. Nigro's custom and practice is when a contractor
18  calls him and he, Mr. Nigro, does not have any Local
19  103 apprentices available, do you have an
20  understanding of what his practice is?
21     A.  I mean, yeah, he has to fill the position.
22  And I knew that we had used apprentices from two
23  Maine locals in the past.  So yeah.
24     Q.  Okay.  But you're not familiar with what

Page 15

1  Mr. Nigro does on a day-to-day basis under those
2  circumstances?  You're just speculating, are you?
3         I mean has Mr. Nigro ever told you if a
4  guy -- if a contractor needs an apprentice and we
5  don't have any available we'll arrange for
6  apprentices from other locals?  Has he ever had that
7  conversation?
8      A.  Has Mr. Nigro ever told me that?  No.
9      Q.  All right.  Did you ever -- do you have a
10  recollection of ever telling Mr. Vaughn Richardson
11  in connection with his obtaining apprentices that he
12  should go -- he should work through another local
13  union and just pay the benefits directly to the
14  other local union?
15     A.  Could you say that again?
16         MR. HOFFMAN:  Can you read that back?
17         (Reporter read back.)
18     A.  I wouldn't make that statement.
19     Q.  Okay.  Why wouldn't you make that statement?
20     A.  Because if -- if one of our contractors was
21  to need manpower, be it apprentices or journeymen,
22  and they were working within our jurisdiction, they
23  would be obligated to follow our collective
24  bargaining agreement which includes benefits.

Page 16

1      If we were to make that deal with
2  anybody, then it would sort of deteriorate what the
3  collective bargaining agreement and what we stand
4  for.  Why would any contractor be signatory to Local
5  103's agreement?  They would be better economically
6  to be signatory to a periphery agreement.
7      Q.  You know what a market recovery adjustment
8  is, don't you?  Do you know what a market recovery
9  adjustment is?
10     A.  I'm familiar with our funding market
11  recovery program, the cooperative trust.
12     Q.  Okay.  Isn't it true that in a market
13  recovery program that contractors request business
14  agents for concessions or benefits so that the
15  contractor can bid a job competitively?  Isn't that
16  what happens?
17     A.  Can you repeat that?
18     Q.  Why don't you tell me what you believe the
19  market recovery program is?  What do you understand
20  it to be?
21     A.  What I believe it to be?
22     Q.  Yes.
23     A.  I mean it's a program set up between our
24  contractors and our trust funds and the local

Page 17

1  union --
2      Q.  Right.
3      A.  -- to subsidize the benefit package to be
4  more competitive within our jurisdiction.
5      Q.  And when you say subsidize the benefit
6  package, you mean that -- correct me if I'm wrong --
7  that a contractor is permitted if he's approved to
8  pay lesser benefits in connection with specific
9  employees and the trust that runs the market
10  recovery program will subsidize those benefits for
11  the employee?  Is that your understanding?
12     A.  The contractor pays the member the same
13  which is subsidized -- in other words, the way you
14  put it, he pays the guy less and then we subsidize.
15     Q.  Yes.
16     A.  But the way I understand it to work is I pay
17  you the worker the same, and then I'm subsidized by
18  the fund.
19     Q.  You think the fund actually returns money to
20  the contractor?  Is that your understanding?
21     A.  No.  The contractor fills out his monthly
22  report.
23     Q.  Right.
24     A.  Well, I guess to step back -- and I don't

Page 18

1  know how much of this I really --
2      Q. Go ahead. Why don't you try to explain it
3  because I'm trying to understand how it works.
4          MR. I. SILLS: To the extent you can,
5  you can tell him.
6      A. To the extent I understand it. Well, I
7  understand that if XYZ Electric is applying for a
8  subsidy on a particular job, he submits the number
9  of hours for that job for electrical work. If that
10 is approved, the monies for that number of hours are
11 pulled out of the pool, set aside in an account for
12 that particular job. As XYZ Electric submits his
13 monthly reports with however many hours, however
14 many workers, then at that point in time up in the
15 trust funds the funds are subsidized to that
16 employee's benefits.
17     Q. Right. I believe you used the phrase the
18 monies are set aside. Is that within the trust
19 that's responsible for economic -- I'm sorry --
20 market recovery?
21     A. I don't know, you know, the workings of the
22 fund.
23     Q. Okay.
24     A. I know each job is assigned a number, the

Page 19

1  monies are put to that number.
2      Q. Okay.
3      A. As it's paid down, it's come out of that
4  account for that job for those employees.
5      Q. Regardless of where the money comes from,
6  would you agree that if a contractor is approved
7  under the market recovery program, his total
8  payments whether they be benefits, wages that comes
9  out of his pocket with respect to a particular
10 employee are less than what would come out if he
11 just followed the collective bargaining agreement --
12         MR. I. SILLS: Are you saying benefits
13 and wages?
14     Q. The package. The package that he has to pay
15 inclusive of benefits and wages is less than the
16 package that is called for for that particular level
17 of employee under the collective bargaining
18 agreement. In other words, I'm interested in what
19 comes out of the contractor's pockets.
20     A. Why would you ask me that?
21     Q. Well, because you said you had some
22 understanding of the market recovery.
23     A. Hm Hm.
24     Q. Isn't the purpose of the market recovery so

Page 20

1  that the contractor can be more competitive in
2  bidding a job?
3      A. (Nods head.)
4          MR. I. SILLS: You have to answer yes or
5  no.
6      A. Yeah.
7      Q. So, therefore, he's looking for some
8  adjustment so he doesn't have to pay directly out of
9  his pocket an employee the full collective
10 bargaining rates inclusive of benefits, correct?
11     A. Yes.
12     Q. So, therefore, would you also agree that if
13 he's accepted into that program, he out of his
14 pocket -- the contractor's pocket -- doesn't pay the
15 full rates? And when I say that, I'm including the
16 total package of wages and benefits. He doesn't pay
17 the full package as he would if he just went by the
18 collective bargaining agreement? Is that a true
19 statement?
20     A. I believe that the program is part of the
21 collective bargaining agreement.
22     Q. No, okay. Well, maybe we're -- I'm not
23 explaining it. Hypothetical, okay? Under the
24 market recovery program, instead of paying $5 for

Page 21

1  health and welfare out of the contractor's pocket,
2  he's only paying $3. Hypothetical, okay?
3  Hypothetically, okay? Do you understand what I mean
4  by hypothetically?
5      A. (Shakes head.)
6      Q. I'm giving you an example of what may or may
7  not happen.
8      A. I understand what hypothetical means.
9      Q. Is that an example of something like that?
10 Have you ever seen that before under the market
11 recovery program instead of paying into the --
12 Mr. Sheehan $5 for health and welfare they only pay
13 $3 for health and welfare per hour? Is that
14 something that you've seen in a market recovery
15 program?
16     A. I think when I explained to you how it
17 works, that they subsidize the benefits.
18     Q. No, no. I'm trying to focus on what the
19 contractor pays.
20         MR. I. SILLS: I guess you should ask a
21 foundational question about whether he knows these
22 details. Then --
23         MR. HOFFMAN: Okay.
24         (Pause.)

Page 22

1  Q. All right. Can you give me an example of
2  one -- maybe you can't, and then we'll move on -- of
3  one market recovery program, okay, that you have
4  been involved with and tell me if you know what
5  adjustment in benefits was made in that particular
6  market recovery program? Do you remember any one
7  that you've been involved in?
8  A. Are you asking me when the contractor
9  submits a request do I understand what the -- what's
10 supplemented?
11 Q. That's not exactly what I'm asking. When
12 you say -- all right.
13        Let's focus on your word "supplemented."
14 Something gets supplemented, right, in a market
15 recovery program?
16 A. Hm Hm.
17 Q. Give me an example of one item that you are
18 aware of which was supplemented.
19 A. Pension.
20 Q. Pension. Okay. So where does this
21 supplement come from, this money that is used to
22 supplement a pension? Where does that come from?
23        MR. I. SILLS: If you know.
24 Q. If you know.

Page 23

1  A. It comes from the cooperative trust.
2  Q. The market recovery trust?
3  A. The cooperative trust.
4  Q. Is that what it's called, the cooperative
5  trust?
6  A. Hm Hm.
7  Q. Maybe we can do it this way -- Let's see if
8  we can --
9        (Pause.)
10 Q. According to this Exhibit 1 -- Take a look
11 right after the signature page right at the end, do
12 you see where it says pension or the column that
13 says pension, P E N?
14 A. Yes.
15 Q. And it's 375, $3.75?
16 A. Yes.
17 Q. Is that per hour as you understand it?
18 A. Yes.
19 Q. Okay. All right. So under your statement
20 in order to achieve this 3.75 in a market recovery
21 program, the cooperative fund must put something
22 towards this, correct? Is that how you understand
23 it?
24 A. Yes.

Page 24

1  Q. Okay. So doesn't that mean that the
2  employer's paying less than the 3.75 if the
3  cooperative fund is paying a part of it?
4  A. Yeah.
5  Q. So, therefore, in terms of his overall cost
6  -- the employer's overall cost on a market recovery
7  job, his overall rate that he has to pay is less
8  than what appears on this page of Exhibit 1, right?
9  A. Yes.
10 Q. All right. I think that's all I was getting
11 at.
12        So did you ever learn at any time that
13 with regard to the Greater Lawrence Sanitary
14 District Waste Water Treatment facility job
15 Richardson obtained apprentices from another local?
16 A. No.
17 Q. You're not aware of that?
18 A. Well, apparently -- apparently, they did,
19 but during my course of employment and coverage of
20 that job, no.
21        MR. HOFFMAN: That's it. Thank you.
22        MR. I. SILLS: Thank you, Brian.
23        (Whereupon the proceedings
24        adjourned at 2:11 p.m.)

Page 25

1        C E R T I F I C A T E
2   I, BRIAN LALLY, do hereby certify
3  that I have read the foregoing transcript of my
4  testimony, and further certify that it is a true and
5  accurate record of my testimony (with the exception
6  of the following corrections listed below):
7  Page  Line        Correction
8  ____  ____    _____
9  ____  ____    _____
10 ____  ____    _____
11 ____  ____    _____
12 ____  ____    _____
13 ____  ____    _____
14 ____  ____    _____
15 ____  ____    _____
16 ____  ____    _____
17 ____  ____    _____
18
19   Signed under the pains and penalties of
20 perjury this /3  day of _____,
21 2005.
22
23                    BRIAN LALLY
24

Page 26

```
 1        CERTIFICATE
 2   COMMONWEALTH OF MASSACHUSETTS)
 3   SUFFOLK, SS.            )
 4
 5      I, Paulette M. Cook, Registered Merit Reporter
 6   and Notary Public in and for the Commonwealth of
 7   Massachusetts, do hereby certify that BRIAN LALLY,
 8   the witness whose deposition is hereinbefore set
 9   forth, was duly sworn by me and that such deposition
10   is a true record of the testimony given by the
11   witness.
12      I further certify that I am neither related to
13   or employed by any of the parties in or counsel to
14   this action, nor am I financially interested in the
15   outcome of this action.
16      In witness whereof, I have hereunto set my hand
17   and seal this 31st day of May, 2005.
18
19
20
21        Notary Public
22
23   My commission expires:
24   March 8, 2007
```