1  Volume: I

2  Pages: 1-57

3  Exhibits: 1-6

4  UNITED STATES DISTRICT COURT

5  DISTRICT OF MASSACHUSETTS

6  C.A. No. 03-12477 JLA

7  ----------------------------------------

8  RUSSELL F. SHEEHAN, as he is Administrator,

9  ELECTRICAL WORKERS' HEALTH AND WELFARE FUND,

10  LOCAL 103, I.B.E.W., ET AL.,

11      Plaintiff/Defendants-in-Counterclaim,

12  v.

13  RICHARDSON ELECTRIC COMPANY, INC.,

14      Defendant/Plaintiffs-in-Counterclaim,

15  and

16  BANK OF NEW HAMPSHIRE

17      Trustee.

18  ----------------------------------------

19      DEPOSITION of MICHAEL P. MONAHAN

20      Monday, May 23, 2005, 10:07 a.m.

21      LYNCH, BREWER, HOFFMAN & FINK, LLP

22          101 Federal Street

23          Boston, Massachusetts

24  Court Reporter: Paulette Cook, RPR/RMR

Page 2

1  APPEARANCES:
2
3  SEGAL, ROITMAN & COLEMAN
4  By Ira Sills, Esq.
5  Anne R. Sills, Esq.
6  11 Beacon Street, Suite 500
7  Boston, Massachusetts 02108
8  617-742-0208
9  Counsel for Local 103, I.B.E.W./
10   Counsel for Local 103 Trust Funds
11
12 LYNCH, BREWER, HOFFMAN & FINK, LLP
13 By Alan Hoffman, Esq.
14 101 Federal Street
15 Boston, Massachusetts 02110
16 617-951-0800
17 Counsel for Richardson Electric Co.
18
19 ALSO PRESENT: Barbara Wade
20
21
22
23
24

Page 3

1              INDEX
2  Examination of:                    Page
3
4  MICHAEL P. MONAHAN
5  By Mr. Hoffman                    4, 53
6  By Mr. I. Sills                    50
7
8
9
10           EXHIBITS
11 No.                                Page
12 1   9/1/00-8/31/03 Agreement and
13     Working Rules                   11
14 2   Memorandum 9/1/00               20
15 3   Memorandum 1/11/99              31
16 4   Inside Construction Agreement   35
17 5   Answers to Interrogatories      36
18 6   Richardson Letter 4/15/05       39
19
20
21
22
23
24     ** Exhibits retained by Mr. Hoffman **

Page 4

1              PROCEEDINGS
2              MICHAEL P. MONAHAN,
3
4  a witness called for examination by counsel for the
5  Defendant, being first duly sworn, was examined and
6  testified as follows:
7
8              DIRECT EXAMINATION
9  BY MR. HOFFMAN:
10    Q. Would you state your name and address, sir?
11    A. My name is Michael Monahan. My home address
12 or address -- work address?
13    Q. Home address?
14    A. Home address is 173 West Second Street,
15 South Boston.
16    Q. Your business address?
17    A. 256 Freeport Street, Dorchester.
18    Q. Are you employed at this time?
19    A. Yes.
20    Q. Who is your employer?
21    A. Local 103 I.B.E.W.
22    Q. Can you briefly state your educational
23 background?
24    A. I'm an electrician by trade. After high

Page 5

1  school, electrical apprentice training program with
2  Local 103, numerous labor courses throughout my
3  career as an officer at Local 103.
4     Q. Okay. Now before you became an officer of
5  Local 103, were you a licensed electrician?
6     A. I'm a licensed electrician and work in the
7  field prior to becoming an officer of Local 103.
8     Q. For how many years did you work as a
9  licensed electrician?
10    A. Twenty-five -- about 20 years. Twenty
11 years.
12    Q. Hm Hm. Okay. And when did you first become
13 an officer -- strike that. You were always a member
14 of the Local 103?
15    A. Yes.
16    Q. When did you first become an officer of 103?
17    A. I want to say 1987.
18    Q. What was your first position as an officer?
19    A. I was elected to the executive board in and
20 around that time.
21    Q. What's the function of the executive board?
22    A. The executive board acts on behalf of the
23 membership in between union meetings.
24    Q. And are you still on the executive board?

Michael P. Monahan

Page 6

1  A. No. No.
2  Q. What was your next position with the union?
3  A. I was appointed to the office of business
4  agent by the business manager.
5  Q. Who was the business manager at that time?
6  A. Paul Ward.
7  Q. And what -- approximately what year was
8  that?
9  A. Nineteen ninety-five.
10 Q. What were your duties as business agent?
11 A. We could go on for days. The responsibility
12 of a business agent is to obviously uphold the
13 collective bargaining agreement for those
14 geographical cities and towns which you've been
15 assigned and to seek future work through the
16 permitting process, through the political process.
17 Those are mainly your two duties as a business
18 agent.
19 Q. When you were a business agent in 1995, were
20 there other business agents as well at Local 103?
21 A. Yes.
22 Q. How many were there?
23 A. At that time I think there was eight.
24 Q. Was there only one business manager?

Page 7

1  A. Yes, there's only one business manager.
2  Q. And among the eight business agents was
3  their work divided territorial, or was there some
4  division of responsibility among them?
5  A. Geographically it's divided up amongst the
6  different business agents.
7  Q. For example, do you remember what your
8  territory was in 1995?
9  A. Merrimack Valley. Did you say 1998?
10 Q. I'm sorry, I said five.
11 A. Yeah, five was Merrimack Valley.
12 Q. Okay. How long did you stay as business
13 agent?
14 A. I was a business agent up until being
15 appointed business manager January 2003.
16 Q. I may have asked you this, but is there only
17 one business manager --
18 A. Yes.
19 Q. -- at any one time?
20 A. Yes.
21 Q. What are the duties of the business manager?
22 A. The business manager is -- Once again, it's
23 a host of things. The buck stops there so-to-speak
24 with everything within the union. You're a trustee

Page 8

1  on numerous committees, and your duties to oversee
2  the office and of course assignments of all the
3  business agents. You're a trustee of the trust
4  funds withheld pension deferred income as well as
5  the apprentice school.
6  Q. There is a separate school; it's called an
7  apprentice school?
8  A. Yes.
9  Q. Is that run by 103?
10 A. It's joint. It's jointly trusteed and
11 administered.
12 Q. With whom?
13 A. With the National Electrical Contractors
14 Association, each side whether it's the union or the
15 contractors have an equal vote and say.
16 Q. Are you currently the business manager?
17 A. Yes.
18 Q. Is the business manager the chief executive
19 officer of the union?
20 A. If you had to put it in those terms, yes.
21 Because you're chief executive, you have a say --
22 you have a vote on it. As a trustee you don't have
23 a single say with respect to the funds.
24 Q. Right. But of the union itself in terms of

Page 9

1  its operations, is the business manager --
2  A. The day-to-day operations but still minutes
3  have to be voted on. Executive board makes motions
4  and approves things. So even if you're against them
5  they can be overruled.
6  Q. Do you know -- Well, let's go back to 1995
7  when you became a business agent.
8      Was Mr. Sheehan a union officer at that
9  time, or was he already --
10 A. When I became a business agent --
11     MR. I. SILLS: Objection. There's more
12 than one Mr. Sheehan in the local. So you may want
13 to clarify.
14 Q. Russell Sheehan?
15 A. Russell Sheehan was not an officer.
16 Q. Had he been an officer?
17 A. Yes.
18 Q. Had he been a business manager?
19 A. Yes.
20 Q. You said that as business manager you are a
21 trustee?
22 A. Yes.
23 Q. Are you a trustee of the various trust funds
24 that Russell Sheehan administers?

JONES REPORTING COMPANY
617-451-8900

Michael P. Monahan

Page 10

1   A. Yes.
2   Q. Are there both union and management trustees
3   of those funds?
4   A. Yep. All the jointly-administered funds and
5   the apprentice school are jointly administered,
6   jointly trusteed with equal amount of votes.
7   Q. With regard to the funds, are the same
8   individuals trustees for each of them with respect
9   to the union side of it? Or does it differ?
10  A. I don't know if I -- for the numerous funds?
11  Q. Right.
12  A. The numerous things that are jointly
13  trusteed, no, it's not always the same people.
14  Q. As you sit here today, are you a trustee of
15  each of the let's call them benefit funds?
16  A. Yes.
17  Q. And basically whoever the business manager
18  is a trustee of each of those funds generally?
19  A. Yes. Yep. Does not have to be but can be.
20  Q. Okay. When you were business agent, did you
21  play any role in negotiating the basic contract?
22  A. As part of the negotiating team, yes.
23  Q. Okay. I'm going to -- I'm going to have a
24  couple of documents marked. Let's see. Why don't

Page 11

1   we have this marked as Exhibit 1, and it's entitled
2   agreement and working rules governing the electrical
3   industry of Greater Boston -- and I'm going to
4   summarize -- between Local 103 and the Electrical
5   Contractors Association dated September 1, 2000 to
6   October 31, 2003.
7       (Exhibit No. 1 marked
8       for identification.)
9       MR. HOFFMAN: Before I ask you about
10  that document, Mr. Monahan, I'm going to state for
11  the record the stipulations that I believe the
12  parties are in agreement with respect to the conduct
13  of the deposition; namely, that all objections
14  except as to the form of the question are reserved
15  till the trial as well as motions to strike and that
16  the witness shall have the right to read and sign
17  the transcript before it becomes an official
18  document, and he shall have thirty days from the
19  date of receipt by his counsel. Is that okay?
20      MS. A. SILLS: Yes.
21  Q. Now I put in front of you what has been
22  marked Exhibit 1. Can you identify Exhibit 1?
23  A. This is an eight-and-a-half-by-eleven copy
24  of the agreement between September 1, 2000 and

Page 12

1   August 31, 2003.
2   Q. Is it actually bigger than
3   eight-and-a-half-by-eleven in its size, the
4   original?
5   A. We print them into a book.
6   Q. I see. Okay. So it's smaller then?
7   A. Yes.
8   Q. All right. If you turn to the signature
9   page, is that your signature?
10  A. I just saw it, yes.
11  Q. Okay. Is this the kind of governing charter
12  of the industry for the territory of Local 103 in
13  the Greater Boston area as far as you're concerned?
14  A. Yeah, this is the working agreement.
15  Q. Can you define what the territory of Local
16  103 is?
17  A. I can give you -- I can't state it -- I
18  think there's a hundred something cities and towns.
19  The east coast down to Cohasset all the way up to
20  the border of New Hampshire, across -- does not go
21  into New Hampshire --
22  Q. Right.
23  A. -- over to I believe Dunstable and down
24  highways. We use the highway I believe as a border

Page 13

1   with our sister local, Local 96 in Worcester, and
2   goes down to Bellingham and back up 95 roughly.
3   Q. Okay. Now attached to -- well, as part of
4   this document there are -- why don't you turn to the
5   page after the signature page? Were these pages
6   attached as part of the basic agreement?
7   A. Yes. These -- if what I see there -- these
8   are what we consider the wage sheets.
9   Q. The wage sheets, okay. So far as you know,
10  they're referred to in the document as exhibits or
11  an Appendix A or something like that?
12  A. Yes. Wages and fringe benefits.
13  Q. Can you identify for me what these -- after
14  the first two columns, can you identify what the --
15  each of the next column represents?
16      MR. I. SILLS: Are you on page 1 of the
17  attachment?
18  Q. Yes.
19  A. Are you referring to H&W?
20      MR. I. SILLS: September 1, 2000?
21  There's a number --
22      MR. HOFFMAN: Yes, September 1, 2000.
23  A. H&W stands for health insurance and welfare
24  which is some health insurance, some life insurance

4 (Pages 10 to 13)

Page 14

1   and some disability insurance.
2       Q. Are those one of the funds that is
3   separately administered by Mr. Sheehan?
4       A. Yes.
5       Q. What's the next one?
6       A. Pension that is a defined benefit plan.
7   That's the hourly contribution that the employer has
8   agreed to provide per hour per worker for the
9   pension, and it's a defined benefit plan.
10      Q. Is that another of the funds --
11      A. Yes.
12      Q. -- that Mr. Sheehan administers?
13      A. Yes.
14      Q. What's the next one?
15      A. Deferred income it's tax-deferred money
16  similar to a 401(k). Also, that number is what the
17  employer contributes for every hour worked for their
18  employees.
19      Q. Is that also a fund --
20      A. Yes.
21      Q. -- administered by Mr. Sheehan?
22      A. Yes.
23      Q. What is the next one?
24      A. The next one is a joint apprenticeship

Page 15

1   training fund. Once again, per hour. That's the
2   contribution for the benefit -- for the purposes of
3   our apprentice school which trains not only
4   apprentices but also trains journeymen for update
5   courses.
6       Q. Is that a fund that is also administered by
7   Mr. Sheehan?
8       A. Yes.
9       Q. Okay. What's the next one?
10      A. The next one is a trust fund. It's for the
11  purposes of our employers -- make our employers more
12  competitive to regain some market share, also
13  jointly trusteed and overseen by Mr. Sheehan.
14      Q. How does that fund work, the one you just
15  referred to?
16      A. That fund, there's a application form that
17  the employer fills out, faxes into a number, and it
18  is given to that business agent like we discussed
19  earlier that handles that geographical area.
20          If the -- if the business agent who
21  handles that area thinks that the concession is
22  needed for the employer to be more competitive
23  'cause he's bidding against employers who don't
24  provide the same level of benefits. So the

Page 16

1   signatory employer is at a disadvantage, recommends
2   to the business manager that he thinks that we need
3   it.
4           The business manager signs off on the
5   concession and makes the trust funds aware that
6   we're signing off on it. NECA is involved in this
7   as well. And the employer is notified that they can
8   bid accordingly.
9       Q. And does this -- does the money in this fund
10  that you just identified, does it supplement the
11  wage payment?
12      A. No.
13      Q. So, in other words, the workers get a
14  reduced rate under these circumstances?
15      A. No.
16      Q. How does it work then?
17      A. The employer gets a reduced -- their bidding
18  is lessened.
19      Q. You have to explain that to me.
20      A. The normal benefits -- the normal hourly
21  rate contributions that the employer is obligated to
22  pay under the collective bargaining agreement are
23  more or less waived to make the employer more
24  competitive to recapture a market that has been

Page 17

1   lost.
2       Q. I just want to make sure I understand this.
3   So the worker gets the same weekly wage?
4       A. Yes.
5       Q. But the employer does not have to -- or pays
6   either lesser or no benefits?
7       A. The employer's responsibility on health,
8   pension and deferred --
9       Q. Yep.
10      A. -- those three only --
11      Q. Yes.
12      A. -- can be waived entirely or partially.
13      Q. I see. All right.
14      A. The employee still receives the same wage
15  and receives the same benefit.
16      Q. Okay. So somehow the three benefits that
17  are waived have to be made up somehow?
18      A. By this fund.
19      Q. I see. So this -- okay. Well, that makes
20  more sense to me. All right. So which one was
21  that?
22      A. That was ELIMCT.
23      Q. ELIMCT. What's the next item?
24      A. The next one is -- it stands for National

Page 18

1  Labor Management Cooperative Committee, and that is
2  a national fund not trusteed or overseen by Local
3  103. It's a penny an hour for the purposes of
4  furthering the industry, both I.B.E.W. and NECA
5  through a national level, mostly through magazine
6  publications.
7     Q. What's the next one?
8     A. Administrative maintenance fund. That's a
9  ten cents an hour for the purposes of funding the
10 NECA office so they can run their day-to-day
11 business which represents the contractors.
12    Q. So that's not a trust?
13    A. No. No.
14    Q. The last -- well, the next to last one?
15    A. That's NEBF. That's the National Electrical
16 Benefit Fund. That is 3 percent of your both, and
17 that's a pension as well, not administered or
18 trusteed locally but nationally it is. It's a
19 defined benefit plan.
20    Q. Okay. And hold on just one second.
21       (Pause.)
22    Q. Is that the fund that is administered by
23 Anthony J. Salamone?
24    A. He was at one time. He may still be. I'm

Page 19

1  not sure.
2       MR. I. SILLS: Referring to NEBF, not
3  NECA.
4       MR. HOFFMAN: NEBF.
5     Q. What's the last one?
6     A. National electrical industry fund surcharge.
7  It's a voluntary fund if you choose to become an
8  actual member of NECA.
9     Q. Okay. Is that a trust?
10    A. No.
11    Q. All right. I'm through with that document.
12 I take it you played some role in negotiating
13 Exhibit 1?
14    A. Hm Hm. Yes.
15    Q. At or about the time of those negotiations
16 did you have any negotiations with -- separate
17 negotiations with anyone connected with Richardson
18 Electrical?
19    A. On this here? Actually, nothing. No.
20    Q. Have you ever dealt with them with respect
21 to whether or not they were going to join this,
22 whether or not they wanted an amendment to it or any
23 such discussions?
24    A. No.

Page 20

1     Q. Okay.
2        MR. HOFFMAN: I'm going to ask that this
3  document be marked, and I'm not a hundred percent
4  clear myself whether all these pages go together,
5  but I will ask you about them separately. They've
6  been stapled together. It's the -- the cover page
7  is a memorandum dated September 1, 2000.
8        (Exhibit No. 2 marked
9        for identification.)
10    Q. Can you identify the -- let's take it one at
11 a time -- the cover page?
12    A. Hm Hm.
13    Q. What is the cover page of Exhibit 2?
14    A. The cover page is a notification to all
15 signatory contractors of the inside construction
16 agreement notifying them of the -- more of a summary
17 of the negotiations that were ratified by the
18 membership and by NECA.
19    Q. Hm Hm. Are these -- well, there are
20 specific clauses that are referenced under the word
21 "settlement." Are those the changes from the
22 earlier agreement?
23    A. Those would be the things that the employer
24 would look at and say what happened, you know, the

Page 21

1  summary, where there were changes.
2     Q. Can you turn to the second page? Can you
3  identify -- let's see. Second, third and fourth and
4  fifth pages.
5     A. Okay. The second page as in number 1 down
6  the bottom?
7     Q. Yes, number 1 down the bottom.
8     A. This goes to explain what's on the front of
9  the page.
10    Q. In other words, it's some of the clauses
11 that are referred to --
12    A. Yes.
13    Q. -- under settlement?
14    A. Hm Hm.
15    Q. It gives what the new language is basically?
16    A. Exactly.
17    Q. Those four pages go together so far as you
18 can tell, pages 1, 2, 3 and 4 numbered?
19    A. Yes. Yes. Those are all changes to the
20 agreement.
21    Q. Okay. Take a look at the last two pages. I
22 would just point out to you it seems -- it says
23 Richardson Electric Co., Inc., on the bottom of each
24 of those pages. Do you recognize those?

Page 22

1   A. I don't remember this or recognize this to
2 be honest with you.
3   Q. Hm Hm.
4   A. Because the agreement I was part of was
5 September 1, 2000-2003.
6   Q. Right.
7   A. This expired 2000.
8   Q. So this is an earlier period of time?
9   A. That's what it says, yeah, 1997 and will
10 remain in effect until August 31, 2000.
11   Q. Do you know whose typing this is by looking
12 at it? Does it look like a union typewriter or does
13 it not?
14   A. I don't know to be honest with you.
15   Q. Take a look at the -- it says page 3
16 actually but can you just read that market recovery
17 section to yourself and see if it's consistent with
18 your understanding of how the market recovery system
19 works or worked at that time.
20   A. Hm Hm.
21       (Pause.)
22       MR. I. SILLS: Just for the record, this
23 document, although attached to the first document,
24 appears to refer to a different agreement than the

Page 23

1 first agreement. The cover is '97 to 2000.
2       MR. HOFFMAN: Right.
3   A. That looks consistent with how it's run and
4 is run and continues to run.
5   Q. Are there any sections in Exhibit 1 relating
6 to the market recovery basic agreement?
7   A. I don't understand the question.
8   Q. In other words, is it covered by the union
9 agreement itself?
10   A. Market recovery is something that the
11 trustees -- the membership adopted to fund it, okay.
12   Q. Right.
13   A. The membership ratified the agreement on
14 funding it 'cause they get -- they're paying for
15 this fund.
16   Q. And --
17   A. But this fund -- this concept would be the
18 trustees of the funds. I don't know if that makes
19 sense to you.
20   Q. Let me pursue that a little bit. The first
21 part of what you said was that somewhere in Exhibit
22 1 there will be a reference to the fact that there
23 is this fund -- this market recovery fund, and
24 that's been approved, and there are certain rates as

Page 24

1 you showed us.
2   A. Hm Hm.
3   Q. Per hour, correct?
4   A. Yep.
5   Q. So the actual operation of the fund then I
6 think what you're saying is is the -- is done by the
7 fund? Let me strike that. That's a poor question.
8       You told us earlier that the business
9 agent --
10   A. Manager.
11   Q. Well, first the business agent makes a
12 recommendation to the business manager.
13   A. Right.
14   Q. Then the business manager either approves or
15 doesn't approve an application by a contractor for
16 let's call it a market recovery adjustment?
17   A. (Nods head.)
18   Q. Is that a fair statement?
19   A. Yes.
20   Q. So how -- I mean is the trustee -- are the
21 trustees, are the administrator of the fund
22 notified? Or how does that work as between the
23 business manager and the fund?
24   A. When there's been an economic decision made

Page 25

1 on a specific job, it's signed and faxed back to the
2 employer.
3   Q. Right.
4   A. -- as well as to NECA. Then the employer
5 bids accordingly. When they're successful --
6 hopefully successful, they notify the union that
7 they were successful in which the trust fund offers
8 -- upstairs -- is notified that this has been a
9 successful hit job.
10   Q. Right. And then with respect to those
11 employees on that job, the administrator of the
12 trust fundal indicates money from the market
13 recovery fund to the other funds --
14   A. Yes.
15   Q. -- to make up the difference? Is that how
16 it works?
17   A. Yes. When the employer reports on their
18 monthly reporting form.
19   Q. Okay. Does Mr. Sheehan have a say as to
20 whether the -- in a particular instance the
21 application will be granted for a market recovery?
22   A. No. He never -- he never knows anything
23 about it until -- actually, he only hears about the
24 wins.

Page 26

1    Q. The wins?
2    A. The successes.
3    Q. The successes, okay.
4    A. Yes.
5    Q. In other words, they get the bid --
6  successful bid?
7    A. Yes. Many times the employer's not
8  successful even with the concessions, and he would
9  not know anything about it.
10   Q. All right. Now you said that your office or
11 the union office is -- what is it 256 Freeport
12 Street?
13   A. Yes.
14   Q. And is that a -- what type of a building is
15 256 Freeport Street?
16   A. Brick building.
17   Q. How many stories?
18   A. Two stories.
19   Q. Is it owned by the union?
20   A. Yes.
21   Q. You indicated Mr. Sheehan's office is
22 upstairs?
23   A. He's, yeah, upstairs on the second floor.
24   Q. How many square feet is this building?

Page 27

1    A. Geez, I couldn't tell you.
2    Q. How many rooms on each floor would you say?
3    A. There's numbers of small offices.
4    Q. Are all the business agents based at that
5  address?
6    A. Yes.
7    Q. And yourself?
8    A. Yes.
9    Q. And you have some administrative staff
10 there?
11   A. Yes.
12   Q. Are they all on the first floor or some of
13 them on the second floor?
14   A. No, all on the first floor.
15   Q. Is there anything else on the second floor
16 other than what you said -- I'm sorry -- on the
17 first floor? My fault?
18   A. First floor?
19   Q. Is there anything else on the first floor
20 other than the business agents business manager and
21 some other supportive administrative --
22   A. There are some tenants on the second floor.
23   Q. You rent out some space?
24   A. Yes.

Page 28

1    Q. Are they connected with the union the
2  tenants in any way?
3    A. No.
4    Q. What's on the second floor?
5    A. Trust funds only.
6    Q. How many offices approximately -- how many
7  employees are up there?
8    A. I don't know. Total? I'd say a total of
9  35.
10   Q. They're all involved with administering the
11 funds?
12   A. Yes.
13   Q. Who pays Mr. Sheehan's salary?
14   A. The trust funds.
15   Q. So it comes out of the trust funds?
16   A. Yes.
17   Q. As well as the other employees?
18   A. Yes.
19   Q. And your salaries are paid directly out of
20 the union dues?
21   A. Out of the union, yes.
22   Q. Now do the business agents or the business
23 manager have any authority for special rates with
24 regard to any funds separate and apart from the

Page 29

1  market recovery?
2    A. Yes.
3    Q. And is that authority written anywhere?
4    A. It's in a memorandum.
5    Q. Okay. Internal memorandum?
6    A. No. It's negotiated with the contractors.
7    Q. Okay. Do you have that in your office?
8    A. Yes.
9    Q. Okay.
10       MR. HOFFMAN: I'd like to get a copy of
11 that.
12   Q. Can you summarize to the best of your
13 recollection what that memorandum says about that
14 authority?
15   A. The market recovery fund and how it's run
16 really took -- this is how we're more competitive
17 today with the employee not receiving any reduction
18 in his pay or benefits.
19   Q. Right.
20   A. Prior to this was what we called targeting.
21 You know, we would work with the employer to cut
22 wages and/or benefits to be more competitive.
23   Q. Hm Hm.
24   A. We still have that memo. I believe we've

Michael P. Monahan

Page 30

1  renewed it the last couple of contracts I've been
2  involved in it. But we've not used it. This is
3  what we use.
4       MR. I. SILLS: This referring to what?
5       THE WITNESS: The market recovery -- the
6  trust ELICT.
7   Q. Did Richardson ever do any work in
8  Massachusetts within your territory when you were
9  business agent?
10  A. Oh, sure.
11  Q. Do you remember whether you ever authorized
12  a reduction under this memorandum for Richardson?
13  A. I was a business agent. I didn't have the
14  authorization. The business manager would have been
15  the person who --
16  Q. So your job would be to recommend it?
17  A. Yeah.
18  Q. Okay. Do you remember a job relating to the
19  Veterans Administration contract?
20  A. Yes. That's the only one I remember doing
21  with Richardson. There could have been others
22  but --
23       MR. HOFFMAN: Why don't you mark this as
24  the next exhibit?

Page 31

1       (Exhibit No. 3 marked
2       for identification.)
3   Q. Exhibit 3 for the record is a memo on
4  Richardson Electrical Company stationery dated
5  January 11, 1999 to Local 103.
6       Do you recall having read the -- well,
7  do you have a memory as to what the concession was
8  with regard to this particular job, the Veterans
9  Administration contract?
10      MR. I. SILLS: Objection as to form.
11  There's no foundation that he has any memory.
12  Q. Do you remember this incident at all?
13  A. I remember the job.
14  Q. Right.
15  A. I remember that we did not have a market
16  recovery fund set up at the time, and we had to
17  negotiate different terms and conditions for that
18  job so the employer could be more competitive.
19  Q. Hm Hm.
20  A. This I've never seen before.
21  Q. Okay.
22  A. I have no idea what it is.
23  Q. Okay. Who was the business manager at that
24  time?

Page 32

1  A. January 11, 1999 would have been Paul Ward.
2  Q. Do you remember recommending to him some
3  concession with regard to the bidding of that
4  Veterans Administration job?
5  A. The bidding of it, yes.
6  Q. Okay. And do you remember that Richardson
7  won the job?
8  A. Yes. Oh, yeah.
9  Q. Do you remember that whatever concession
10  that you recommended was approved by Mr. Ward?
11  A. Yes.
12  Q. And that as a result of that the employees
13  didn't get all the benefits that they would have
14  been entitled to under the union contract?
15  A. I don't remember the particulars on what the
16  concessions were. It could have been on wages and
17  benefits. It could have been just wages. I forget
18  what it was.
19  Q. Do you see here where it says a credit of
20  some sum of money has been taken for special rates
21  for an equal fund and deferred income?
22  A. Yes.
23  Q. Do you know what the equal fund is that's
24  represented?

Page 33

1  A. I really don't.
2  Q. Deferred income --
3  A. I know what deferred income is.
4  Q. That was one of the trusts the deferred
5  income?
6  A. Yeah. The deferred income is similar to a
7  401(k). It's a defined contribution fund.
8  Q. All right.
9  A. If it was sent to Local 103, it was sent to
10  the wrong place because Local 103 does not
11  administer trust funds. This should have been sent
12  -- if this is what I think it is, it should have
13  been sent to the trust funds, not Local 103.
14  Q. Hm Hm. But they were right upstairs then,
15  correct?
16  A. Different -- different departments. It's
17  Local 103 trust funds, not Local 103.
18  Q. Okay. Before the market recovery program
19  was adopted, you -- this isn't the only time that
20  you when you were business agent recommended some
21  sort of an adjustment on behalf of a contractor who
22  was seeking to bid a job?
23  A. No, it's not the only time, but I -- it
24  didn't happen often.

9 (Pages 30 to 33)

Michael P. Monahan

Page 34

1  Q. Okay. What was your territory in 2001 and
2  2002?
3  A. Two thousand -- let me see. June -- 2001,
4  2002 would have been Boston, Cambridge, those areas.
5  Q. Do you know who among the business agents
6  had the Merrimack Valley territory?
7  A. Merrimack Valley is split up -- Merrimack
8  Valley is big. You could have people two involved
9  in the same Merrimack Valley.
10  Q. Do you know which two were involved at that
11  time if there were two?
12  A. I want to say Bill Corley and Brian Lally.
13      MR. I. SILLS: Spell Corley. It's often
14  misspelled based on pronounciation in these
15  proceedings.
16  A. C O R L E Y. Lally, L A L L Y.
17  Q. Did you ever learn whether there was some
18  sort of a concession that was made in connection
19  with a Richardson electrical job in 2001 or 2002 in
20  Lawrence?
21  A. No.
22  Q. You never learned that. Okay.
23      MR. I. SILLS: Speak up when you answer.
24  A. No. Sorry.

Page 35

1      MR. HOFFMAN: I'd like to have this
2  document marked as Exhibit 4.
3      (Exhibit No. 4 marked
4       for identification.)
5  Q. Why don't you take a minute and look at all
6  three pages and tell me whether you've ever seen
7  that before?
8  A. I recognize all but the last -- the last
9  page.
10  Q. Okay. Now can I see?
11      (Pause.)
12  Q. Well, have you ever seen this -- Well, under
13  what circumstances do you recall seeing the first
14  three pages of this exhibit?
15  A. They're in the agreement (indicating).
16  Q. I see.
17      MR. I. SILLS: Identify which agreement,
18  which date.
19  A. The inside collective bargaining agreement
20  between Local 103 and NECA.
21  Q. Okay. All right. So -- May I see?
22  A. Yes.
23  Q. Just to confirm that. Do you have any
24  knowledge that Richardson was negotiating with

Page 36

1  Mr. Gambino on any amendments or separate clauses in
2  relation to the 2000 agreement?
3  A. I'm not aware of anything -- any
4  negotiations that they may have been with Richard
5  Gambino.
6  Q. Okay. All right. Thank you.
7      MR. HOFFMAN: Why don't we take a short
8  recess. He can take a look at that. I have to get
9  one document which I neglected to get.
10      (A recess was taken.)
11      MR. HOFFMAN: Why don't you mark this as
12  Exhibit 5.
13      (Exhibit No. 5 marked
14       for identification.)
15  Q. Before I show you Exhibit 5 or ask you to
16  look at Exhibit 5 -- well, why don't you look at
17  that? Are those --
18  A. Is this the one I just signed?
19  Q. Yes. Take a look at the last page. Is that
20  your signature on Exhibit 5?
21  A. On the last page? Thirteen?
22  Q. Yes.
23  A. That's what I just signed, yep.
24  Q. And those are -- the title is answers to

Page 37

1  interrogatories of Local 103 international
2  brotherhood of electrical workers, correct?
3  A. Hm Hm.
4  Q. And as business manager you're authorized to
5  sign this on behalf of the union?
6  A. Yes, the union.
7  Q. Okay. Let me just take those back. We'll
8  just leave it here.
9      Are you aware of the fact that there was
10  a request for production of documents in this case
11  that the Richardsons submitted to your counsel a
12  request for documents to be produced?
13  A. Yeah. Yeah, I am familiar with that. I
14  don't know which ones you're referring to.
15  Q. No, but just generally --
16  A. Yes.
17  Q. You're aware of that. And did you --
18      MR. I. SILLS: Are you asking with
19  regard to your request to the union or to the funds?
20  He's the chief executive of the union.
21  Q. Relating to the union because the request
22  was to all plaintiffs. With regard to the union's
23  response, did you play any role in looking for
24  documents?

Michael P. Monahan

Page 38

1   A. Looking for documents?
2   Q. Yes.
3   A. Well, Ira is the counsel for the union and
4   represents us. I'm sure I was part of helping him
5   defend us in whatever way possible, sure.
6   Q. Well, the question -- I guess what I'm
7   focusing on is Exhibit 4 which you've said you
8   recognize the first three pages and not the fourth
9   page, -- well, the first three pages, of course,
10  were produced at least as part of the basic
11  collective bargaining agreement, but did anyone
12  actually to your knowledge look in files relating to
13  contracts or contractual negotiations to see whether
14  or not there were any separate agreements, even in
15  draft form, between Local 103 and the Richardsons?
16  A. Sure.
17  Q. And you didn't find anything?
18  A. I wasn't the one personally looking for
19  them. My assistant was probably the one looking for
20  them at Ira's request, yeah.
21  Q. Okay. Now did you receive a letter I guess
22  in April of 2005 from Linda Richardson requesting a
23  joint conference meeting to resolve a dispute
24  between Richardson and Local 103, the benefit funds?

Page 39

1   A. Yes.
2   Q. Did you receive a second letter notifying
3   the union that Richardson would submit the required
4   forms to request arbitration to the American
5   Arbitration Association? Do you remember receiving
6   that?
7   A. I believe so.
8   Q. Okay.
9       MR. HOFFMAN: Let me mark as Exhibit 6
10  the second letter which is April 15, 2005.
11          (Exhibit No. 6 marked
12           for identification.)
13  Q. Okay. Can you just identify -- tell us
14  whether you recall receiving that letter.
15  A. Personally the letter does not look
16  familiar. But the issue would -- the issue I'm
17  familiar with, but the letter does not look
18  familiar.
19  Q. Okay. And the issue is what as you
20  understand it?
21  A. Requesting a joint conference hearing.
22  Q. Did you ever respond to that request?
23  A. I believe through counsel.
24  Q. Okay. But you didn't personally?

Page 40

1   A. No.
2   Q. So you turned the matter over to counsel?
3   A. Yes.
4   Q. That was the end of it as far as you were
5   concerned?
6   A. Yes.
7   Q. Do you have any present role with regard to
8   apprentices as business manager or as trustee?
9   A. As trustee, I'm one of six trustees in the
10  Joint Apprenticeship Training Fund.
11  Q. Before you became business manager, were you
12  a trustee?
13  A. Yes.
14  Q. For how long have you been a trustee?
15  A. I'd say from around summer of '99.
16  Q. Was Mr. Lally ever a trustee?
17  A. No.
18  Q. And what is your role as trustee? What do
19  you do?
20  A. Well, the trustees, which there's six of
21  them --
22  Q. Right.
23  A. -- there's an administrator, an assistant
24  administrator, and they work for the trustees. And

Page 41

1   they administer the day-to-day business of the
2   apprentice school and the assignment of work, things
3   like this.
4   Q. So it's like running a school as well as
5   facilitating employment?
6   A. Yes.
7   Q. Do the apprentices get jobs while they're in
8   school?
9   A. Yes.
10  Q. Okay.
11  A. They go to school nights.
12  Q. I see. Who are the -- who are the
13  administrators -- who's the administrator and the
14  assistant administrator?
15  A. The administrator of the Joint
16  Apprenticeship Training School Fund is a Phil Mason,
17  M A S O N.
18  Q. And is that -- that's a separate fund?
19  A. Yep. It's in that wage sheet.
20  Q. Mr. Sheehan, he's not the administrator of
21  that or is he?
22  A. He's the administrator of the funds.
23  Mr. Mason is the administrator of the school. Not
24  to be confused with the funds.

11 (Pages 38 to 41)

Page 42

1    Q. Was he also the administrator in 2001 and
2  2002?
3    A. Yes.
4    Q. Did he have an assistant administrator at
5  that time?
6    A. Yes.
7    Q. Who was that?
8    A. Frank Nigro, N I G R O.
9    Q. Now do they work on the second floor or on
10 the first floor?
11   A. They're in a separate building.
12   Q. Separate building?
13   A. (Nods head.)
14   Q. The school is a -- in a separate building?
15   A. Yes.
16   Q. I see. While you were either business agent
17 or business manager or trustee of the funds --
18 strike that -- of the school, did you ever
19 experience a time when a contractor who had signed
20 onto the collective bargaining agreement requested
21 apprentices and there was no one available?
22   A. Yes.
23   Q. How often did that occur?
24   A. In a three-year period? Maybe half a dozen

Page 43

1  times.
2    Q. Okay. And of those half dozen times were a
3  number of them when you were a business agent?
4    A. Yes.
5    Q. Any when you were business manager?
6    A. Maybe one.
7    Q. What did you do? What did you tell the
8  contractor when he needed one or two or needed
9  apprentices and they were all hired?
10   A. We would call other unions in the area, ask
11 them if they had any apprentices unemployed. If so,
12 we told them we could put them to work.
13   Q. That's what you recall doing --
14   A. Yes.
15   Q. -- under those circumstances?
16   A. Yeah.
17   Q. Which unions would you call?
18   A. Brockton, Worcester, Springfield, New
19 Hampshire, Maine.
20   Q. Do you remember your calling -- is 490
21 Maine?
22   A. New Hampshire.
23   Q. New Hampshire. Do you remember calling 490?
24   A. Yes.

Page 44

1    Q. And do you remember the specific contract or
2  contractor with regard to any of those six instances
3  -- five or six instances?
4    A. The contractors?
5    Q. Yes.
6    A. Yeah. There was mostly -- mostly newer
7  contractors within Local 103. Maiuri -- M A I U R
8  I -- Electric.
9    Q. Where are they located?
10   A. Danvers. Aldon Electric. A L D O N. And
11 no one others that really come to mind.
12   Q. Do you remember with regard to any of those
13 five or six -- where's Aldon Electric, by the way?
14   A. Weymouth.
15   Q. Do you remember with regard to any of the
16 five or six instances any discussion about benefits
17 and how benefits should be paid?
18   A. Sure.
19   Q. What do you recall about those instances?
20   A. Well, with the employer you're talking
21 about? Or the worker?
22   Q. Well, let's take it one at a time. The
23 employer.
24   A. The employer would say we bid this job and

Page 45

1  we need apprentices. Our price reflects more
2  apprentices than what we have. What do you want to
3  do. So many times we would -- if we were going
4  through an organizing drive, we would strip
5  employees -- apprentices and journeymen from open
6  shop contractors and get them to them.
7       Or if those local unions that we called
8  had apprentices available, we'd say send them to us.
9  We would do the necessary paperwork. We would fill
10 out our reciprocal paperwork which is the paperwork
11 necessary for the trust funds to reciprocate
12 benefits back to those local unions that those
13 people we borrowed so-to-speak benefits were
14 located. And it should be noted 490 I don't believe
15 had any apprentices unemployed at this time.
16   Q. At the time that you were talking about?
17   A. Yeah. When I called 490, I don't believe
18 they had any apprentices.
19   Q. Okay.
20   A. They had a power plant going, and they had a
21 lot of work themselves.
22   Q. With regard to each time this happens, do
23 you have to fill out paperwork with regard to the
24 reciprocation of benefits, or is it a matter of a

12 (Pages 42 to 45)

Michael P. Monahan

Page 46

1  general agreement?
2     A. There's what's called the National
3  Reciprocity Agreement --
4     Q. Right.
5     A. -- which all trust funds participating sign
6  on.
7     Q. Right.
8     A. Any time you're working in an area that is
9  not the geographical area controlled by your local
10 union, you have to fill out paperwork because the
11 employer working in that geographical area of that
12 local union has to contribute benefits through that
13 office, whether they're members of that union or
14 not. And that's standard. That's the National
15 Reciprocity Agreement.
16    Q. Okay.
17    A. When the money is received by the trust
18 funds --
19    Q. Right.
20    A. -- and they see whether, you know, it's you
21 or me, that's foreign to them 'cause they don't know
22 who those people are.
23    Q. Right.
24    A. The reciprocal paperwork allows the trust

Page 47

1  funds to reciprocate the monies that were received
2  back to the local union that that person is a member
3  of so they'll maintain their health coverage, their
4  pension credits and their 401(k) credits.
5     Q. So in each instance in order that the funds
6  -- the Local 103 funds are going on, the local union
7  has some paperwork that say these are the
8  employees --
9     A. It's not the local union. It's the
10 individual who signs the paperwork.
11    Q. I see. So the individual employee -- the
12 apprentice --
13    A. -- or journeyman.
14    Q. -- or journeyman depending on the
15 situation?
16    A. Yes.
17    Q. So he will fill out a form, if all goes
18 according to plan, to say, look, I'm a member of
19 Local 680 in Timbuktu; so here's my information,
20 please give me my benefits basically?
21    A. Yeah.
22    Q. What is your understanding of what happens
23 if Local 103's rate for a particular benefit is
24 higher than the external local to which the employee

Page 48

1  is a member?
2     A. I don't know if I understand the question.
3  Boston -- Local 103's total package, wage and
4  benefit, is the highest in New England.
5     Q. Right. So let's take it fund by fund.
6  Let's suppose a pension fund contribution as per the
7  collective bargaining agreement is $5 an hour and
8  for Local 490, for example, it's $3 --
9       MR. I. SILLS: For Local 103.
10      MR. HOFFMAN: For Local 103.
11    Q. -- is lower, $3, is it your understanding
12 firstly that the contractor utilizing foreign
13 workers so-to-speak has to pay the $5 to 103?
14    A. They reciprocate like funds. Whatever the
15 contribution rate is in that union, that's what they
16 reciprocate back.
17      MR. I. SILLS: The question is what do
18 they pay.
19    Q. First of all, the contractor pays 103's
20 rates? Is that what you're saying?
21    A. Yes, they have to. Because the other
22 employers who work on a day-to-day basis full time
23 in the area would be at a disadvantage competing
24 against a fellow union contractor whose office is

Page 49

1  not -- who's not from this area and we have a
2  favored nations clause. If one is given a break,
3  the others have to get a break. So you -- the
4  standard for an area is all -- it's all. Everyone
5  pays the same rate. Everyone provides the same
6  benefit.
7     Q. Is something called a prevailing wage?
8     A. That's a law in Massachusetts.
9     Q. Does that include both wages and benefits?
10 In other words, is it the total package the
11 prevailing wage?
12    A. The prevailing wage law is a total package
13 number associated with certain trades.
14    Q. Is there one for electrical?
15    A. Sure. Yes.
16    Q. Okay. So if we added up all those columns
17 that we went through, that would be equal to the
18 prevailing wage at the time?
19    A. No. The prevailing wage is still less.
20    Q. Is less than that?
21    A. Yes.
22    Q. Okay. All right. So your understanding is
23 that the Massachusetts employer within Local 103's
24 territory pays to a foreign worker -- a worker

13 (Pages 46 to 49)

Page 50

1 member of an outlying union would pay the Local 103
2 rates including all the benefits --
3    A. Yes.
4    Q. -- as per the collective bargaining
5 agreement?
6    A. Hm Hm.
7    Q. And then the union -- I'm sorry -- the funds
8 would reciprocate only to the extent of the foreign
9 union's rates we talked about?
10   A. Yes.
11   Q. That's your understanding?
12   A. Yes.
13   Q. And do you remember where you got that
14 understanding from?
15   A. Being a trustee and just from experience
16 being in the office.
17   Q. Being a trustee of the funds?
18   A. Of the funds.
19   Q. Okay. Let me just -- Hold on one second.
20      (Pause.)
21      MR. HOFFMAN: Thank you, sir.
22      MR. I. SILLS: I have a few questions
23 just to clarify the record.
24 CROSS-EXAMINATION BY MR. I. SILLS:

Page 51

1    Q. Mr. Monahan, a few quick questions so the
2 record is clear. On Exhibit 1 which is your working
3 agreement for 2000-2003, I just want to draw your
4 attention to -- you were asked some questions about
5 the obligations to pay contributions to the various
6 funds, and counsel for Richardson made reference to
7 other places in the agreement where that obligation
8 is indicated.
9       I want to draw your attention to
10 Articles 4 -- Article 4 starting on page 11 which
11 references the National Electrical Benefit Fund. Is
12 that the NEBF?
13   A. Yes.
14   Q. Does that specify the employer's obligation
15 under that agreement -- under that fund?
16   A. Yes.
17   Q. Similarly, 4.2 has health and welfare. 4.3,
18 pension. 4.4, deferred income. 4.5, electrical
19 industry labor management cooperation trust.
20   A. Hm Hm.
21   Q. And I want you to note just for a moment a
22 definition under that in this agreement. Does it
23 say it's the equality fund? Is that what it was
24 formally called?

Page 52

1    A. It may have been when it started as the
2 equality fund. We know it as -- it's market
3 recovery in layman's terms with the ELICMT.
4    Q. Okay, and 4.6 is a working assessment; 4.7
5 is the National Electrical Industry Fund; and 4.8 is
6 the Administrative Maintenance Fund?
7    A. Hm Hm.
8    Q. Are these provisions of the agreement that
9 also deal with the employer's obligation that deal
10 with these various funds or entities?
11   A. Yes.
12   Q. Okay. Thank you. And with regard to
13 employer Exhibit 4 -- strike that.
14      With regard to employer Exhibit 2, the
15 cover memo on this is a summary of a new agreement,
16 and it's dated September 1, 2000, was that the
17 2000-2003 agreement?
18   A. Yes.
19   Q. Then there's -- on the back of it, the last
20 two pages they're entitled memorandum of
21 understanding. Does that appear to refer to the
22 '97-2000 agreement? Just looking at the very top.
23   A. Yes.
24   Q. Which is the predecessor agreement?

Page 53

1    A. Hm Hm.
2    Q. Is that correct?
3    A. Yes.
4    Q. Okay. And with regard to employer Exhibit
5 4, whatever this document is, I want to draw your
6 attention to the last page.
7       Does this page appear to be signed by
8 anybody from the union?
9    A. No, it's not signed.
10   Q. And one or two other quick questions.
11      (Pause.)
12   Q. You were asked some questions about the
13 benefit funds being in the same building as you, and
14 I think you testified they were on the second floor
15 of the same building the union is in; is that
16 correct?
17   A. Yes.
18   Q. Are the benefit funds a separate legal
19 entity or entities?
20   A. Separate legal entities and the building's
21 owned by the union. They pay rent to the union.
22   Q. You anticipated my question. No further
23 questions.
24 REDIRECT EXAMINATION BY MR. HOFFMAN:

Page 54

1  Q. To follow up on one point, you saw 4.5 which
2  is the Electrical Industry Labor Management
3  Cooperation Trust -- 4.5 of Exhibit 1 in the
4  collective bargaining agreement. That is the market
5  recovery trust?
6  A. Is it in parentheses underneath it equality
7  fund?
8  Q. Yes.
9  A. Yes, it is.
10  Q. Showing you again Exhibit 3, from reading
11  Exhibit 3, is it your understanding that the equal
12  fund then refers to the market recovery fund?
13         MR. I. SILLS: Objection. You're asking
14  the witness to testify what Mr. Richardson intended
15  from a document or somebody from Richardson Electric
16  wrote which he's not really competent to explain.
17  Q. Let me ask it another way. Now that you've
18  seen the clause in the collective bargaining
19  agreement and again looking at Exhibit 3, does that
20  refresh your memory that the concessions involved
21  deferred income and market recovery funds?
22  A. No. I've never seen this before.
23  Q. Okay. But I'm asking --
24  A. I'm not familiar with any credit of any sort

Page 55

1  from the market recovery fund for any job at the VA.
2  Q. Okay. This was before the market recovery
3  fund, 1999?
4  A. I think the market recovery fund started --
5  language agreed upon I believe around '97 and
6  started being funded in and around that time as
7  well.
8  Q. Okay. All right. So you don't really
9  understand what is meant by equal fund here?
10  A. No.
11  Q. All right.
12         MR. HOFFMAN: I have no further
13  questions of this witness.
14         (Pause.)
15         MR. I. SILLS: Nothing further.
16         (Whereupon the proceedings
17         adjourned at 11:21 a.m.)
18
19
20
21
22
23
24

Page 56

1  CERTIFICATE
2  I, MICHAEL P. MONAHAN, do hereby certify
3  that I have read the foregoing transcript of my
4  testimony, and further certify that it is a true and
5  accurate record of my testimony (with the exception
6  of the following corrections listed below):
7  Page  Line       Correction
8  ____  ____   _____
9  ____  ____   _____
10 ____  ____   _____
11 ____  ____   _____
12 ____  ____   _____
13 ____  ____   _____
14 ____  ____   _____
15 ____  ____   _____
16 ____  ____   _____
17 ____  ____   _____
18
19   Signed under the pains and penalties of
20  perjury this ____ day of _____,
21  2005.
22           _____
23           MICHAEL P. MONAHAN
24

Page 57

1        CERTIFICATE
2  COMMONWEALTH OF MASSACHUSETTS)
3  SUFFOLK, SS.              )
4
5  I, Paulette M. Cook, Registered Merit Reporter
6  and Notary Public in and for the Commonwealth of
7  Massachusetts, do hereby certify that MICHAEL P.
8  MONAHAN, the witness whose deposition is
9  hereinbefore set forth, was duly sworn by me and
10 that such deposition is a true record of the
11 testimony given by the witness.
12  I further certify that I am neither related to
13 or employed by any of the parties in or counsel to
14 this action, nor am I financially interested in the
15 outcome of this action.
16  In witness whereof, I have hereunto set my hand
17 and seal this 31st day of May, 2005.
18
19
20
21         Notary Public
22
23 My commission expires:
24 March 8, 2007