PAGES:      46

EXHIBITS:   29

VOLUME:     I

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

C.A. No. 03-12477JLA

*********************************

RUSSELL F. SHEEHAN as he is
ADMINISTRATOR, ELECTRICAL WORKERS'
HEALTH and WELFARE FUND, LOCAL 103
IBEW, et al
        Plaintiffs

vs.

RICHARDSON ELECTRIC, INC.
        Defendant/Plaintiffs-in-Countercliam
and
BANK OF NEW HAMPSHIRE
        Defendant

*********************************

DEPOSITION OF RICHARD GAMBINO, a witness called on behalf of Richardson Electric, Inc., pursuant to the Massachusetts Rules of Civil Procedure, before Gail A. Carignan, Professional Shorthand Reporter and Notary Public, within and for the Commonwealth of Massachusetts, at the Law Offices of Segal, Roitman & Coleman, 11 Beacon Street, Boston, Massachusetts, commencing at 10:27 a.m. on Wednesday, June 29, 2005.

1

APPEARANCES

LYNCH BREWER HOFFMAN & FINK
by Alan R. Hoffman, Esq.
100 Federal Street
Boston, Massachusetts 02110
617.951.0800
        On behalf of Richardson Electric, Inc.

SEGAL ROITMAN & COLEMAN
by Anne R. Sills, Esq.
   Ira Sills, Esq.
11 Beacon Street, Suite 500
Boston, Massachusetts 02109
617.742.0208
        On behalf of IBEW, Local 103

2

I N D E X

| DEPONENT | PAGE |
|---|---|
| Richard Gambino | |
| Direct Examination by Mr. Hoffman | 6 |
| Cross Examination by Mr. Sills | 32 |
| Redirect Examination by Mr. Hoffman | 39 |

E X H I B I T S

| NUMBER | | MARKED |
|---|---|---|
| 1 | Memo, dated 2/10/99 | 5 |
| 2 | Fax cover sheet, dated 2/25/99 | 5 |
| 3 | Letter, dated 2/25/99 | 5 |
| 4 | Letter, dated 5/6/99 | 5 |
| 5 | Fax cover sheet, dated 2/4/00 | 5 |
| 6 | Fax cover sheet, dated 2/10/00 | 5 |
| 7 | Letter, dated 2/15/00 | 5 |
| 8 | Letter, dated 3/29/00 | 5 |
| 9 | Letter, dated 3/30/00 | 5 |
| 10 | Fax cover sheet, dated 4/21/00 | 5 |
| 10A | Fax cover sheet, dated 4/27/00 | 15 |
| 11 | Letter, dated 4/28/00 | 5 |

3

E X H I B I T S (cont.)

| NUMBER | | MARKED |
|---|---|---|
| 12 | Letter, dated 5/3/00 | 5 |
| 13 | Fax cover sheet, dated 5/3/00 | 5 |
| 14 | Document entitled "Agreement" | 5 |
| 15 | Letter, dated 5/22/00 | 5 |
| 16 | Letter, dated 5/22/00 | 5 |
| 17 | Letter, dated 6/9/00 | 5 |
| 18 | Letter, dated 9/8/00 | 5 |
| 19 | Letter, dated 4/23/01 | 5 |
| 20 | Letter, dated 5/3/01 | 5 |
| 21 | Letter, dated 5/30/01 | 5 |
| 22 | Fax cover sheet, dated 7/18/01 | 5 |
| 23 | Document entitled "Agreement" | 5 |
| 24 | Inside Construction Agreement | 5 |
| 25 | Letter, dated 8/7/01 | 5 |
| 26 | Letter, dated 8/10/01 | 5 |
| 27 | Letter, dated 2/15/02 | 5 |
| 28 | Fax cover sheet, dated 4/5/02 | 5 |
| 29 | Document entitled "Subcontract" | 5 |

(Exhibits retained by counsel.)

4

PROCEEDINGS

(Exhibits 1 through 29 marked for
identification.)

RICHARD GAMBINO,
having been satisfactorily identified by the
production of his driver's license, and duly sworn
by the Notary Public, was examined and testified as
follows:

MR. HOFFMAN:  Shall we have the same
stipulations that we've had for all the other
depositions?

MS. SILLS:  Yes.

MR. HOFFMAN:  Shall we state them?

MS. SILLS:  Yeah.

MR. HOFFMAN:  The parties are agreed that
all objections, except as to the form of the
question, are reserved for trial, as well as motions
to strike.

The witness shall have the right to read
and sign the deposition transcript and make
corrections before it becomes an official document,

5

and he may sign it under the penalties of perjury.
Is that your understanding?

MS. SILLS:  Yes.

MR. HOFFMAN:  And just for the record,
this is a deposition of Local 103 on certain
subjects which are defined, as we were seeking the
person or persons most knowledgeable in negotiations
of and/or the existence of the contract between
Richardson Electrical Company and Local 103,
covering the period of September 1, 2000 to October
31, 2003 or any part thereof.

DIRECT EXAMINATION

BY MR. HOFFMAN:

Q.  Now, let's see.  Mr. Gambino, you have previously
testified as a witness in this case?

A.  Yes, I have.

Q.  So we don't have to go through your entire
background again.  We'll skip that.

A.  Whatever.

Q.  Okay.  But you're currently the assistant
administrator of the trust?

A.  Yes.

Q.  And just prior to that, however, you were Business
Manager of Local 103?

6

A.  Yes.

Q.  And that was from sometime in 1999 to 2003?

A.  Yes.

Q.  And your predecessor as the Business Manager was
Mr. Ward?

A.  Yes.

Q.  Okay.  Now, I'm going to show you Exhibits 1 and 2,
and I believe you've seen them, but I have to
describe them for the record because they've been
marked, but not described.

Exhibit 1 is a memorandum to Paul Ward
from Vaughan Richardson, dated 2/10/99.  And Exhibit
2 is a fax cover sheet on Local 103 stationery,
enclosing a letter of assent, and this fax cover
sheet is dated 2/25/1999.

Now, you don't recall having seen these
two documents; correct?

A.  I haven't finished looking at them yet.

Q.  Okay.

A.  No.  I don't remember ever seeing them.

Q.  I just want to ask you:  On Exhibit 1, I want to ask
you about a particular phrase, "job targeting."  Is
that the predecessor to the market recovery plan?
You told us at your deposition last time that there

7

was something that preceded it which wasn't quite
the same.  Is that the word that you didn't
remember?

MR. SILLS:  If you know the answer.

A.  You know, it's a term that's thrown around a lot,
but I don't recall.

Q.  Okay.  All right.  I'm going to show you Exhibit 3,
which is a letter from Mr. Ward to Mr. Vaughan
Richardson, dated February 25, 1999, and just ask
you to read that to yourself.

A.  (Witness complies.)

Q.  You haven't seen that before?

A.  No, I haven't.

Q.  Do you see those bullet points?  I'd like you to
just -- I'd like to ask you a question about Bullet
Points 4 and 5.  Bullet Point 4 refers to a certain
paragraph.  It says, "Job targeting is the standard
market recovery program."

And then the next one says, referring to a
different paragraph, "Job targeting language is the
old reduced rate type of market recovery."

Do you know what is meant by "reduced rate
type of market recovery" in that sentence?

A.  I'm -- you're asking me to give you my opinion on

8

1    what Paul Ward meant when he wrote this?

2 Q.  Yeah.

3 A.  It looks to me like he was probably getting that, at

4    bringing to Vaughan's attention that what Paul Ward

5    is now calling "job targeting." The first point you

6    asked me about Paul Ward is, I think, saying to

7    Vaughan, job targeting is the standard market

8    recovery program.

9         The next bullet, "Job targeting language

10   is the old reduced rate." That's kind of where I

11   would go with this. I think job targeting is the

12   old reduced rate.

13        And to answer your question, prior to the

14   market recovery program we know today, as I said in

15   my prior deposition, the business manager, there was

16   a process where a contractor could apply for some

17   relief concessions, if you will, on a job, and the

18   business manager would review that with them and

19   either approve or disprove.

20 Q.  And having read these documents, is it now your

21   understanding that that was referred to as "job

22   targeting"?

23 A.  Well, again, I would say that -- yeah. But I can't

24   speak to what Paul Ward meant by it.

                                                          9

1 Q.  The next document is Exhibit 4, is a letter from

2    Barbara Wade, Controller of Richardson Electrical,

3    to Local 103, Mr. Sheehan. Can I ask you to read

4    that please?

5 A.  Sure. Mm-hmm.

6 Q.  When you became business manager sometime in 1999,

7    did you have any involvement in this issue relating

8    to the BA market recovery determination?

9 A.  I don't recall.

10 Q.  You don't recall that. Okay. All right. Moving

11   right along, Exhibit 5 is a fax cover sheet and a

12   letter from yourself to Mr. Richardson, dated

13   February 4, 2000. I'd ask you to take a look at

14   that.

15 A.  Mm-hmm.

16 Q.  First, is that your signature?

17 A.  Yes.

18 Q.  Do you recall the circumstances that led you to

19   write this particular letter?

20 A.  Exact circumstances, I don't, other than I believe

21   it was over a delinquency to the trust fund. Do I

22   remember the job? No. And my looking into the

23   records and seeing that I was in need of a new

24   collective bargaining agreement.

                                                          10

1 Q.  Well, this letter indicates that -- or in this

2    letter, you indicate that there was an absence of an

3    executed collective bargaining agreement between

4    Richardson and Local 103 at that particular time.

5    Is that your --

6 A.  That's what I felt, yeah.

7 Q.  Is that your memory --

8 A.  Excuse me?

9 Q.  Is that your memory that there was a period of time

10   where there was no collective bargaining agreement

11   in place?

12 A.  It wasn't that. I couldn't find one.

13 Q.  All right. And your letter apparently triggered a

14   response from Vaughan Richardson that we'll mark as

15   Exhibit 6 -- or has been marked as Exhibit 6, and

16   it's dated February 10, 2000. I'd ask you to read

17   that one to yourself.

18 A.  Mm-hmm.

19 Q.  Do you recall receiving that letter?

20 A.  Yes, I do.

21 Q.  And do you recall that some of the issues that

22   Mr. Richardson raised, like that he didn't want to

23   be tied in with VECA [phonetic] were continuing

24   issues for the Richardson Company?

                                                          11

1 A.  I don't understand your question.

2 Q.  He objects, according to this letter, to the subject

3    of review and control by NECA?

4 A.  Mm-hmm.

5 Q.  Is that a constant theme with the Richardson Company

6    that insofar as you've ever been involved in

7    contractual negotiations?

8 A.  That was -- that was the first that I had heard of

9    that from Vaughan, and I understood what he meant.

10 Q.  Okay. And did this letter lead to some -- well

11   strike that.

12        THE WITNESS: I'd like to just interject

13   one thing, Ira.

14        MR. SILLS: Go ahead.

15 A.  I think it's -- be somewhat helpful to, maybe, your

16   line of questioning. When I became business

17   manager, there wasn't -- there wasn't necessarily a

18   smooth transition between my predecessor and I. It

19   was, you know, you have a right to run for office

20   and be elected, and so it was. So it wasn't like

21   you just became a new chairman of the board of

22   directors, and the prior one, in other words, worked

23   with you, you know.

24 Q.  I see. So this contractual negotiations was kind of

                                                          12

1    new to you?

2  A.  No, no.  I'm very familiar with contractual

3    negotiations and obligations.  I just had very, very

4    limited conversation with my predecessor.

5  Q.  Got you.  Okay.  Why don't we mark as Exhibit 7 --

6    or we have marked as Exhibit 7, the February 15,

7    2000 letter from Mr. Gambino to Mr. Vaughan

8    Richardson, which appears to be a reply to Exhibit

9    6.  Why don't you read that one to yourself.

10  A.  (Witness complies.)

11  Q.  So is that your signature?

12  A.  Yes, it is.

13  Q.  Did this -- apparently, you were making certain -- I

14    don't want to call them concessions.  It was a

15    conciliatory letter to get them back on board as a

16    union contractor.  Is that a fair characterization?

17  A.  Well, I was trying to work with them, yeah.

18  Q.  And you're soliciting a meeting, a negotiating

19    session?

20  A.  Yes.

21  Q.  Okay.  Let me show you Exhibit 8, which is a letter

22    from you, dated March 29, 2000, about a month later.

23        MR. SILLS:  Objection.

24  Q.  I'm sorry.  It's not from you.  It's from Mr. Joseph

                                                          13

1    Sheehan.

2  A.  Mm-hmm.

3  Q.  Who was Mr. Joseph Sheehan at that time?

4  A.  At that time, he was a business agent for Local 103.

5  Q.  So he was under your authority?

6  A.  Yes.

7  Q.  Why don't you read that.

8  A.  Mm-hmm.

9  Q.  Do you recall this letter?

10  A.  I don't recall this exact letter, no, but I know Joe

11    was assigned to work with Vaughan and try to get a

12    meeting scheduled.

13  Q.  Do you recall if that was some snafu about getting a

14    meeting scheduled?

15  A.  I know -- I remember that it was difficult to get a

16    meeting scheduled.

17  Q.  Okay.  Let me show you Exhibit 9, which is a letter

18    from Vaughan Richardson to Joseph Sheehan, dated

19    March 30th.

20  A.  Mm-hmm.

21  Q.  Was a meeting ever held on these negotiations?

22  A.  There would have had to have been a meeting

23    because -- I never attended one, but there had to

24    have been a meeting because ultimately we had a

                                                          14

1    collective bargaining agreement.

2  Q.  So you didn't attend whatever meetings --

3  A.  No.

4  Q.  Is it your understanding that Mr. Joe Sheehan was a

5    principal negotiator for the union at these

6    meetings?

7  A.  Yes.

8  Q.  Did he report to you?

9  A.  Yes.

10  Q.  Do you remember any of the issues that came up at

11    any meeting or meetings during that time period?

12  A.  No.  I really don't believe it took a real long time

13    to do.

14  Q.  I'm going to show you two documents now.  And one of

15    them --

16        MR. HOFFMAN:  They're both marked 10.  I'm

17    going to ask the reporter to mark the second one

18    10A.

19        (Exhibit 10A marked for identification.)

20  Q.  And I'll describe them.  These are two fax cover

21    sheets from you to Vaughan Richardson, dated -- the

22    first one is dated April 21, and the second one is

23    dated April 27, and ask you to look at these.

24        (Discussion off the record)

                                                          15

1  Q.  Are these fax cover sheets that you caused to be

2    sent?

3  A.  I believe these are cover sheets that my attorneys

4    had.

5  Q.  Your attorney caused them to be sent?

6  A.  Yeah.

7  Q.  Okay.  And either you or -- well, whoever sent this

8    was looking for Richardson's attorney --

9    Richardson's attorney; correct?

10  A.  Yes.

11  Q.  Do you know whether any attorney ever surfaced on

12    behalf of Richardson?

13  A.  I don't know that.

14  Q.  All right.  I'm going to show you Exhibit 11, which

15    is a letter to you from Gerald Richardson.  Do you

16    know who Gerald Richardson is?

17  A.  I believe Gerald Richardson's the father.

18  Q.  Yeah.  And this one's dated April 28, 2000, and ask

19    you to read that to yourself.

20  A.  Mm-hmm.

21  Q.  Do you remember receiving this letter from

22    Mr. Richardson?

23  A.  No, I don't.

24  Q.  Do you remember that particular job that it makes

                                                          16

1  reference to, the old water treatment facility?
2  A.  I remember hearing about the old water treatment
3     facility, yeah.
4  Q.  Do you know whether the union was able to supply the
5     workmen being requested by this letter?
6  A.  I believe they were.
7  Q.  I'm going to show you Exhibit 12, which is a letter
8     from Vaughan Richardson to yourself, dated May 3,
9     2000, and ask you to read that one to yourself.
10 A.  (Witness complies.)
11 Q.  Do you remember receiving that letter?
12 A.  No, I don't.
13 Q.  Do you remember the circumstance that's referred to
14    in this letter?  According to the letter,
15    Mr. Sheehan had written a letter to Mr. Richardson
16    to the effect that the lack of assigned — even the
17    letter of assent was cause for the union to direct
18    the union men to return to the union hall on a
19    certain date for assignment to other contractors.
20    Do you remember that at all?
21 A.  No, I don't.
22 Q.  Having read that letter, does that refresh your
23    recollection that as of May 3rd of 2000, the
24    contract had not yet been signed?
                                              17

1  A.  It doesn't recollect my memory.  It's obvious by
2     the — by what you've shown me, is that's true,
3     but —
4  Q.  All right.  I'm going to show you a document which
5     is a fax cover sheet and some other papers on
6     Richardson Electrical Company stationery sent to
7     Mr. Gambino's office.  And it concerns an award
8     letter for the market recovery job for the Hanscom
9     Air Force Base, and ask if you've seen that before.
10 A.  I must have seen it.  I signed it.
11 Q.  Do you have a recollection that there was a market
12    recovery approved for the Hanscom job referred to in
13    this correspondence?
14 A.  No, I don't.
15 Q.  Can you explain to me what the last paragraph of
16    this letter means?  In terms of notification, what
17    was the procedure supposed to be?
18 A.  The last paragraph of this first letter.
19 Q.  Yes.  The letter that's actually dated June 29,
20    1999.
21    MR. SILLS:  June 23.
22 Q.  I'm sorry.  June 23, from you to Mr. Richardson.
23 A.  Could you ask me that question again, please?
24 Q.  Yeah.  Can you explain — I think you were trying to
                                              18

1  set forth in that paragraph the procedure that the
2  contractor had to carry out, once he was awarded —
3  A.  Once a contractor requests market recovery, and he
4     finds out if — that the company's been approved, as
5     my letter states, then they have an obligation to
6     provide us with a copy of the contract within 60
7     days.  That's what that paragraph's referring to.
8  Q.  In other words, is it to you or is it the fund that
9     gets the contract?  I mean, what was the procedure?
10 A.  It would go to the — through the market recovery
11    program, which really was conducted — the approval
12    process was conducted through the business manager's
13    office.
14 Q.  So in other words, you —
15 A.  He would then — he would then — she, the business
16    manager would make copies of that and send it to the
17    fund office.
18 Q.  I see.  Okay.  I'm going to show you a document
19    which has been marked Exhibit 14, and it purports to
20    be an agreement, and it appears to be signed by
21    Vaughan Richardson and yourself, dated 5/18/00, and
22    there's a note attached to it.
23    I'm not going to ask you about the details
24    of this agreement to save time, but I'm going to ask
                                              19

1  you whether that's your signature, and do you
2  recognize this as the agreement that was in effect
3  for a period of time, starting in 2000.
4  A.  That's my signature.
5     MR. SILLS:  Objection.  You misrepresented
6  what the document says.  The document on the face
7  says that it's for an agreement to be in effect the
8  1st day of September, 1997.  You said "2000."
9     MR. HOFFMAN:  Could you show me where that
10 is, please?
11    MR. SILLS:  The third paragraph on the
12 first page.
13    MR. HOFFMAN:  Well, I don't know I
14 misrepresented.  I just asked him whether it was in
15 effect during 2000, but I accept your — let me be a
16 little clearer.
17 Q.  Is it your understanding that this agreement became
18    effective as of 1 September, 1997 and was in effect,
19    at least at the time it was signed, on May 18th of
20    2000?
21 A.  Yes.
22 Q.  Do you know why it was written that way, so that it
23    would relate back to September 1, 1997?
24 A.  No, I don't.
                                              20

1  Q.  I'm going to show you Exhibit 15, which is a letter
2      from Vaughan Richardson to yourself, dated May 22,
3      2000, which is a few days after the signature dates
4      of the prior exhibit.  And that's Exhibit 15, I
5      believe.
6  A.  This is two days after which one?
7  Q.  A few days after the --
8  A.  This one?
9  Q.  That one was signed, yes, the prior exhibit.
10 A.  Oh, okay.  Mm-hmm.
11 Q.  This is a letter to Mr. Sheehan.  Do you recall
12     seeing this letter?
13 A.  No, I don't.
14 Q.  I'm going to show you Exhibit 16, which is a letter
15     from Vaughan Richardson, or a copy of a letter from
16     Vaughan Richardson, to Mr. Gambino, dated May 22,
17     2000, and ask if you've seen that one before.
18 A.  I don't remember seeing the letter, no.
19 Q.  Do you remember any issue that arose that related to
20     a project at Hanscom Air Force Base concerning the
21     renovation of a building?
22 A.  No, I don't.
23 Q.  Okay.  I show you Exhibit 17, which is a letter from
24     Barbara Wade to Mr. Russell Sheehan, with a copy.

21

1      It shows a copy to yourself and to Vaughan
2      Richardson, and I ask you whether you've seen that
3      document before.
4  A.  I don't remember seeing the letter, no.
5  Q.  You don't remember seeing that.  Do you remember the
6      issue coming up?
7  A.  I remember there was an issue.  As a matter of fact,
8      I spoke in my last deposition about it when Ms. Wade
9      was there, that there was some kind of an
10     outstanding discrepancy on a job.  There were some
11     differences of opinion with Mr. Sheehan.  And then I
12     had offered to sit with whoever from the Richardson
13     Company and Ms. Wade and the people in Russ
14     Sheehan's office to straighten it out.
15 Q.  Do you think it related to this particular job?
16 A.  I really don't recall.
17 Q.  The letter attached to this letter from Richardson
18     is one from Mr. Sheehan to a Mr. Galloway.  Was he
19     one of the employees, one of the Local 103 member
20     employees?
21 A.  I don't know Mr. Galloway.  It appears to be a
22     standard type of letter for insufficient funds,
23     though.
24 Q.  In other words, when an employer doesn't make his

22

1      contribution, at some point, the administrator of
2      the funds will send a letter to the employee,
3      saying --
4  A.  Yes.
5  Q.  -- you have to make it up?
6  A.  Yes.
7  Q.  Exhibit 18 is a -- I guess it has two letters
8      stapled together, but they're both from Barbara Wade
9      to Mr. Russell Sheehan and copies to you.  I'll ask
10     if you recall seeing these letters before.
11 A.  I don't recall ever seeing these.
12 Q.  Exhibit 19 is a fax cover sheet with a letter from
13     you to -- I'm sorry -- from Vaughan Richardson to
14     you, and it's says, "Re:  Letter of assent," and
15     it's dated April 23, 2001.  Do you recall receiving
16     that letter?
17 A.  I don't recall, no.
18 Q.  Do you remember in 2001 that there were some
19     negotiations about another agreement between the
20     Richardson Company and Local 103?
21 A.  No, I don't.
22 Q.  I'm going to show you Exhibit 20, which is a letter,
23     dated May 3, 2001, from you to Vaughan Richardson
24     which states that your're enclosing two copies of

23

1      the agreement between your firm and Local 103.
2  A.  Mm-hmm.
3  Q.  Do you recall sending that?
4  A.  I don't recall it, no, but it's all normal business
5      stuff that's done every day, so I don't recall.
6  Q.  I'm going to show you Exhibit 21, which is letter
7      from Glen Richardson to yourself, Re:  Contract
8      Negotiations, and ask if you recall receiving that.
9  A.  I don't recall.
10 Q.  Okay.  I'm going to show you Exhibit 22, which is
11     a -- I'm going to show you Exhibit 22, 23, and 24.
12     Exhibit 22 is a letter from Gerald Richardson to
13     yourself in which he states, "Here is the new
14     agreement signed.  It didn't take us as long as it
15     had taken you."  He says, "Let's keep things going
16     because these are looking better."  I show you that.
17          And Exhibit 23 appears to be a signed
18     agreement, one signed by both parties.
19          MR. SILLS:  Can you get the numbers for me
20     straight again?  The Gerald letter is --
21          MR. HOFFMAN:  Exhibit 22.  Exhibit 23 is
22     the two-page --
23          MS. SILLS:  22 is the fax --
24          MR. HOFFMAN:  Yeah, the fax sheet.

24

MR. SILLS: Yeah.

1  Q.  Do you recall receiving the letter?

3  A.  I don't recall receiving this letter from Gerald.

4  Q.  Why don't you take a look at Exhibit 23. Is that
5     your signature?

6  A.  That's my signature.

7  Q.  Do you recall that this was the agreement that was
8     executed by the parties in 2001?

9  A.  I really don't recall that either.

10 Q.  All right.

11 A.  I really don't recall that either.

12 Q.  Exhibit 24, I don't know -- it says "Inside
13    Construction Agreement." I believe Exhibit 24 was
14    the document that I showed you at your last
15    deposition which you didn't recognize, but I will
16    show it to you again.

17       The last page appears to be signed by
18    Richardsons, and it seems to be identical to the
19    prior exhibit, but the other pages are different.
20    What are the other pages?

21 A.  As compared to this?

22 Q.  Yeah. Do you know where the other pages come from,
23    the first three pages of that exhibit?

24 A.  No, I don't.

25

1  Q.  All right. Do you remember an issue that came up
2     regarding the Lawrence Water Treatment job?

3  A.  I remember one of the jobs up in that area. There
4     was a discrepancy of ours. Was it that job? No.

5  Q.  I'm going to show you Exhibit 25, which is a letter
6     to you from Vaughan Richardson, and ask you to read
7     the letter to yourself. There are other documents
8     attached to it.

9  A.  (Witness complies.)

10 Q.  I'm not going to ask you to look at the rest of the
11    exhibit.

12 A.  Mm-hmm.

13 Q.  Do you recall the issue?

14 A.  I recall vaguely some of the issue, that Vaughan
15    Richardson had asked for me to look into a job. The
16    job, I don't remember particularly. And there was a
17    discrepancy, a misunderstanding, of whether it was
18    approved on time, whether he had the right
19    notification, whether he did what was right on his
20    part or -- there was -- as you can see, there's a
21    pattern here that, in my opinion, he didn't get
22    along well with others, but I did --

23 Q.  Who's the "he" in that --

24 A.  Vaughan.

26

1  Q.  Oh, okay. He's probably here.

2  A.  But once again, my job is to try to make things
3     work. And I think -- I think. I'm not a hundred
4     percent sure. This is the project that I got
5     involved with and tried to help with the trust fund
6     office to reconcile this discrepancy.

7  Q.  Okay. And do you think you were successful?

8  A.  I believe I was.

9  Q.  Okay. Exhibit 26 is a letter from Mr. Sheehan to
10    Mr. Richardson in connection with that issue, dated
11    August 10th.

12       Why don't you leaf through it, and just --
13    you know, if you haven't seen it before, I'm not
14    going to question you about it. We are winding
15    down.

16 A.  I have not seen that letter before.

17 Q.  Exhibit 27 is a letter from Gerald Richardson to
18    you, dated February 15, 2002. I'll ask you to just
19    read that to yourself.

20 A.  Mm-hmm.

21 Q.  Do you recall this letter at all?

22 A.  I recall the letter because I sent it to all
23    signatory contractors.

24 Q.  And what was the -- I mean, do you recall this

27

1     letter, or the letter --

2  A.  I sent this letter to all signatory contractors in
3     Local 103.

4  Q.  So that they would -- what was your purpose?

5  A.  My purpose was that a company by the name of
6     Thompson Lightning Rod/J&G Lightning Rod was
7     representing themselves. It's a specialty type of
8     work. They were representing themselves as a union
9     contractor on the depression of the Central Artery,
10    otherwise known as the "Big Dig."

11       And a lot of contractors -- there was many
12    different signatory electrical contractors on that
13    project, and they were subbing their lightning rod
14    protection portion to them.

15       So rather than try to call 200 of them, I
16    sent a letter to all of them, stating that -- hoping
17    to state that to take the confusion out of it,
18    they're not signatory.

19 Q.  So this Thompson was not a signatory?

20 A.  Mm-hmm.

21 Q.  Okay. I see.

22 A.  And it looks like Gerry was letting me know that he
23    could provide that, why wouldn't I go get him some
24    business or something. I don't know. I'm just

28

1    assuming that.
2 Q.  Okay.  I'm going to show you Exhibit 28, which is
3    a -- it's to Glen Richardson from Mr. Gambino,
4    4/5/02.  Why don't I show you that, and ask you to
5    take a look at the second page.  This is a letter
6    that you wrote, apparently wrote.
7        And if you take a look towards the third
8    page from the end of this exhibit is a fax to you
9    from Glen Richardson, expressing an interest in
10   market recovery consideration, market recovery
11   consideration.
12 A.  (Witness complies.)
13 Q.  Is that your signature?
14 A.  I remember the April 4th letter.  I do not remember
15   the April 2nd letter.
16 Q.  That being the one from Glen Richardson, the April
17   2nd letter?
18 A.  Yes.
19 Q.  So do you remember the circumstances that led you to
20   send the April 4th letter?
21 A.  Yes.  I believe that the Richardson Electric Company
22   had applied for market recovery on a job -- I don't
23   remember the job -- and it was brought to my
24   attention.  Weekly, I'm given a list of delinquent

29

1    contractors, and if you're delinquent, we can't --
2    one of the rules of getting market recovery is to be
3    current.
4 Q.  Do you know whether they corrected the delinquency
5    after they received your letter at about that time?
6 A.  I believe they did correct the delinquency.  The
7    time frame, I don't remember.
8 Q.  In the file that was produced by the union recently,
9    there is this particular contract, which is a
10   contract, waste water pump station upgrade, but I'll
11   show it to you.  We've marked this as Exhibit 29,
12   and I'll ask you whether -- what, if anything, you
13   know about this particular contract or job?  There
14   are other documents attached to the exhibit.  It
15   looks like an application for a permit.
16 A.  I don't remember seeing this.
17 Q.  Okay.  I just have two other questions that don't
18   relate to the documents.  I think you told us at
19   your last deposition, you were trustees for a number
20   of years of the various trusts; is that correct?
21 A.  That's correct.
22 Q.  And is it true that there are an equal number of
23   trustees representing 103 and the contractors?
24 A.  Yes.  Three and three.

30

1 Q.  What happens if there's a tie on a vote on
2    something?
3 A.  Good question.  I've never seen that happen.
4 Q.  You don't know that there's any way to break a tie
5    in the bylaws or trust documents?
6 A.  No, I don't know.  I don't know.
7 Q.  And the last question is:  You served as both
8    business manager and many years previously as
9    business agent?
10 A.  Yes.
11 Q.  So you're familiar with those two positions and what
12   they do?
13 A.  Yes.
14 Q.  How much authority does a business agent have in his
15   daily work?
16 A.  Depends on the business manager he works for.  Every
17   business manager runs the business different.  Some
18   give more flexibility and authority than others.
19 Q.  Now, when you were a business manager, where would
20   you fit on that continually, in terms of giving the
21   business agent a little authority, versus giving the
22   business agent a lot of authority?
23 A.  That's kind of a hard way to put it.
24 Q.  Well, you can put it in a different way if you're

31

1    more comfortable, but --
2 A.  I'd say they had -- on scale of one to ten, they
3    probably -- one being a little authority, ten being
4    a lot of the authority, they probably had a four.
5 Q.  Okay.
6 A.  Most major decisions, I made.
7        MR. HOFFMAN:  Okay.  I have no further
8    questions.
9        MR. SILLS:  I have a few.
10   EXAMINATION BY MR. SILLS:
11 Q.  Just to follow up, Mr. Gambino, on that last
12   question with regard to the amount of authority
13   given to business agents by business managers, and
14   in particular, yourself as business manager.
15       Would the amount of authority delegated to
16   a business agent vary with the amount of experience
17   that business agent had?
18 A.  Yup.
19 Q.  And if the experience was less, or the business
20   agent was less experienced, how would that affect
21   the amount of authority given to them?
22 A.  He'd be given less authority.
23 Q.  To your knowledge, when you were a business manager,
24   did a business agent have the authority to change

32

1    terms of the collective bargaining agreement between
2    you and the contractors?
3 A.  No, they didn't.
4 Q.  Did that kind of authority require consultation and
5    approval by you if it were to be exercised by a
6    business agent?
7 A.  Yes, it would.
8 Q.  When did you stop being business manager, if you
9    recall?
10 A.  December 31, '02.
11 Q.  And prior to your leaving the position of business
12    manager, did you hire Brian Lally as a business
13    agent?
14 A.  Yes, I did.
15 Q.  And at the time you left office at the end of
16    December of '02, was Brian the most junior business
17    agent, if you recall, or the most recently hired
18    business agent?
19 A.  I have to think for a second, probably more than a
20    second, Ira.
21 Q.  If you're not sure --
22 A.  No, he was not.
23 Q.  Who was hired after him?
24 A.  Mike Calder.

33

1 Q.  And was Brian hired before Mike by you?
2 A.  Before Mike Calder?
3 Q.  Yeah.
4 A.  Yes.
5 Q.  Okay.  So he was one of the most junior of the
6    business agents?
7 A.  Mm-hmm.  Ten business agents, he'd be one of the
8    bottom three.
9 Q.  And did Brian Lally ever ask you if he could allow
10    Richardson Electric to pay apprentices on the
11    Lawrence Water Treatment facility rates equal to the
12    rates under their Local 490 contractor fringe
13    benefit contributions?
14 A.  No.
15 Q.  Did he ever ask you if Richardson Electric, with
16    regard to work on the Lawrence Water Treatment
17    facility, if Richardson could pay their apprentices
18    fringe benefit contributions directly to the home
19    local of Local 490 members? -- to their home local
20    fringe benefits funds, I mean.
21 A.  Those aren't the conversations that Brian would have
22    with me.
23 Q.  Why is that?
24 A.  Because he would never enter into those discussions.

34

1    He was -- wouldn't go there.
2 Q.  Why not?
3 A.  I said in my last deposition, there was two people
4    that you could have that discussion with, myself or
5    Mike Monahan.
6 Q.  So what you're saying is that Mr. Lally would not
7    have had authority to make those decisions and
8    communicate them to a contractor?
9            MR. HOFFMAN:  Objection.  You can answer.
10 A.  No, he wouldn't.
11 Q.  You were asked some questions about a couple of
12    exhibits.  I just want to ask you to just grab them
13    again for a second just to clarify a few points for
14    the record.
15        With regard to Exhibit 23, Rich, can you
16    grab that exhibit if you can find it.
17 A.  I don't think mine is marked as clearly as yours,
18    Ira.
19 Q.  Those little blue things.
20 A.  Oh, I'm sorry.  23?
21 Q.  Yup.  It should be the agreement that was --
22 A.  Mm-hmm.
23 Q.  -- signed by you on May 1, '01 and signed by Vaughan
24    Richardson, apparently, on May 7, '01.  Do you see

35

1    that document?
2 A.  Yes, I do.
3 Q.  You were asked -- I don't remember the exact words
4    of the question -- but whether you had any
5    involvement in the negotiation of this.  And I
6    believe your answer was "no"?
7 A.  That's correct.
8 Q.  Can you explain the circumstances of how that could
9    be, that you have a contract with a contractor like
10    this, that you would have no involvement in the
11    negotiation, an agreement that you signed?
12 A.  Yes, I could.  As you can see by all the earlier
13    correspondence that's been shared in the last couple
14    of depositions, that most everything that was done
15    with the Richardson Electric Company was quite
16    lengthy.  And I assigned Business Agent Joe Sheehan
17    and requested the assistance of my attorney at the
18    time, Don Segal, to negotiate the contract for the
19    local.
20 Q.  Well, the Segal -- the documents involved the
21    2000 -- '97/2000 agreement which was signed in 2000.
22    This one was the subsequent agreement that was
23    signed in 2001 for the 2000/2003 period.  And there
24    are some correspondence preceding it that indicate

36

1  that there was just a mailing of documents back and
2  forth and no apparent renegotiation of any terms.
3  The arbitration clause was carried over from the
4  prior agreement for '97/2000.
5       So I guess my question is whether or not
6  there was any need for an actual negotiation process
7  to get to this agreement, if you know?
8  A.  I don't recall.
9  Q.  Okay.  You routinely signed these kinds of
10  agreements with numerous other contractors as they
11  come in as a matter of your regular course of
12  business?
13  A.  Could you explain?
14  Q.  Do these kinds of agreements regularly come across
15  your desk from all contractors who are becoming
16  signatory to the union that require your signature?
17  A.  All contracts require my signature.
18  Q.  Okay.  And how many contractors, approximately, did
19  Local 103 have under agreement, without holding you
20  to an exact number, in 2001?
21  A.  Well, this was a hectic time.  We had approximately
22  a hundred and twenty longtime signatory contractors
23  that we negotiated and re-signed whatever the length
24  of the collective bargaining agreement was.  And in

37

1  this period of four years, I signed over a hundred
2  new open-shop contractors to collective bargaining,
3  so that's really where my time and energy was being
4  spent.
5  Q.  Okay.  And when you say "this period," what period
6  are you talking about?
7  A.  '99 through '02.
8  Q.  And with regard to Exhibit 24, can you turn to that?
9  A.  Mm-hmm.  Yup.
10  Q.  Drawing your attention to that first and second page
11  of this agreement --
12  A.  Correct.
13  Q.  -- does this appear from its face to be the first
14  two pages of the basic inside construction agreement
15  between Local 103 and NECA?  And if you look again
16  to the second page of the document, it says
17  "effective dates September 1, 2000 to August 31,
18  2003."
19       Do these two pages appear to be the first
20  two pages of the NECA 103 contract for that period
21  of time?
22  A.  It appears to be.  I couldn't say, unless I read
23  every bit of it.
24  Q.  Right.  And on the third page, does the Grievance

38

1  Dispute section reflect the Standard NECA Joint
2  Conference structure, or does it appear to from
3  your --
4  A.  It appears to, yes.
5  Q.  And was this the structure that with regard to the
6  Richardson Electric contracts of both 2000 and 2001
7  that the union agreed to substitute the American
8  Arbitration Association for the Joint Conference
9  process?
10  A.  Yes.
11       MR. SILLS:  I have no other questions.
12  RE-EXAMINATION BY MR. HOFFMAN:
13  Q.  I have two areas, one being:  You said that you
14  spent a lot of time signing agreements with
15  contractors from 2000 through the end of 2002?
16       MR. SILLS:  Objection.
17  A.  Organizing open-shop contractors, yes.
18  Q.  Okay.  But does every member of NECA have to sign
19  like an assent form to the contract?
20  A.  Yes.
21  Q.  Okay.  So in a number of the instances when a member
22  of NECA -- you know, when you sign a contract with a
23  member of NECA, it's merely signing one of the
24  consent forms; is that correct?

39

1  A.  Yes.
2  Q.  And the Richardson Company was a bit more
3  complicated than the typical re-upping of a NECA --
4  A.  Yes.
5  Q.  And how many any other contractors did you actually
6  have to sit down and negotiate terms with, as
7  opposed to just signing, you know, the form?
8  A.  How many other long-standing NECA contractors, or
9  how       many -- because your question can be
10  taken a couple of ways.  I just explained to you
11  when those hundred-plus open-shop contractors --
12  Q.  Well, let's just separate it first.
13  A.  Take them out of the picture.  The others that had
14  long-standing relationships with the union?
15  Q.  They just signed the form and you signed the form?
16  A.  I would say so, yes.
17  Q.  And what is that -- several hundred or --
18  A.  No.  At this time now, separating them out, I'd say
19  there was approximately a hundred, a hundred and
20  ten.
21  Q.  What did you mean when you said you were signing up
22  open -- is this what you said, "open-shop
23  contractors"?
24  A.  Yes.

40

1  Q.  What is an open-shop contractor?

2  A.  A contract that's never been signatory to the IBEW.

3  Q.  Okay.  So when you -- so you signed a lot of them up

4      during this period of time?

5  A.  Yes, I did.

6  Q.  And would that involve routinely a negotiation, or

7      would it also be just signing a form?

8  A.  It would involve a negotiation.

9  Q.  And in some of those instances, were there

10     additional terms that were separate from the

11     standard agreement or the --

12 A.  I never negotiated different terms with any of them.

13     A lot of the time was spent letting the owner know

14     who you were and try to build a trust that you were

15     going to work with them and not --

16 Q.  Okay.  And the end result of that negotiation or

17     discussion would be that they'd sign the form and

18     you'd sign the form?

19 A.  Well, they were free to do whatever.  They signed.

20     They looked at the collective bargaining agreement

21     and agreed to sign it.

22 Q.  But there wouldn't be additional terms, like you had

23     or, what, like the union had with Richardson?

24 A.  Not to my recollection, did I have any others like

41

1      that.

2  Q.  Okay.  And finally, just to get back to Mr. Lally,

3      do you remember the date that you hired Mr. Lally?

4  A.  I believe I hired Mr. Lally late fall, early winter

5      of '99.

6  Q.  Okay.  And to your knowledge, what was his -- what

7      position, if any, did he have with the union, just

8      prior to your hiring him?

9  A.  He was an electrician in the field.

10 Q.  And when you hired him, was there any regular

11     training program for new business agents?

12 A.  No.

13 Q.  What did the training consist of?  Was there a

14     training?

15 A.  The training would consist of trying to pair him up

16     with somebody with a lot more experience and maybe

17     make his tasks, you know, start him off -- I don't

18     know what it's like to be an attorney, but I'm sure

19     you just don't walk in and become the person who

20     handles the large corporation.

21 Q.  Do you know who he was paired off with?

22 A.  I would say between two people, Joe Sheehan and Mike

23     Monahan.

24         MR. HOFFMAN:  Okay.  I have no further

42

1  questions.

2         MS. SILLS:  Nothing further.

3         (Deposition concluded at 11:37 a.m.)

43

1         C E R T I F I C A T E

2  COMMONWEALTH OF MASSACHUSETTS

3  BRISTOL, SS.

4

5         I, Gail A. Carignan, a Professional Shorthand

6  Reporter and Notary Public in and for the Commonwealth of

7  Massachusetts, do hereby certify that Richard Gambino,

8  the witness whose deposition is hereinbefore set forth,

9  was duly sworn by me and that such deposition is a true

10 and accurate record, to the best of my knowledge, skills

11 and ability, of the testimony given by such witness.

12         IN WITNESS WHEREOF, I have hereunto set my hand

13 and seal this 8th day of July, 2005.

14

15

16

17

18                        Gail A. Carignan
                          Notary Public

19

20                        My commission expires:
                          March 16, 2012

21

22

23

24

44

1    ERRATA SHEET DISTRIBUTION INFORMATION
2    DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS
3
4    ERRATA SHEET DISTRIBUTION INFORMATION
5        The original of the Errata Sheet has been
6    delivered to Ira Sills, Esq.
7        When the Errata Sheet has been completed
8    by the deponent and signed, a copy thereof should
9    be delivered to each party of record and the
10   ORIGINAL forwarded to Alan Hoffman, Esq., to whom
11   the original transcript was delivered.
12
13       INSTRUCTIONS TO DEPONENT
14       After reading this volume of your
15   deposition, please indicate any corrections or
16   changes to your testimony and the reasons
17   therefor on the Errata Sheet supplied to you and
18   sign it.
19   DO NOT make marks or notations on the transcript
20   volume itself.  Add additional sheets if
21   necessary.  Please refer to the above instructions
22   for errata sheet distribution information.
23
24
                            45

1    PLEASE ATTACH TO THE DEPOSITION OF RICHARD GAMBINO
2    CASE:  RUSSELL F. SHEEHAN ET AL V. RICHARDSON ELECTRIC
3    DATE TAKEN: June 29, 2005
4              ERRATA SHEET
5    Please refer to page 46 for errata sheet instructions and
6    distribution information.
7    PAGE     LINE     CHANGE               REASON
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16       I have read the foregoing transcript of my
17   deposition and except for any corrections or changes
18   noted above, I hereby subscribe to the transcript as an
19   accurate record of the statements made by me.
20       Executed this _____ day of ____, 2005.
21
22       _____
23            Richard Gambino
24
                            46